**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement,<br><br>     Defendants. | Civ. No.<br><br><br>**COMPLAINT** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     The State of New Jersey and the Township of Roxbury come to this Court to seek relief from the unlawful decision of the U.S. Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) to establish a large-scale immigration detention facility in an industrial warehouse in Roxbury (the "Roxbury Warehouse"). In their rush to expand detention capacity across the country, DHS and ICE have flouted bedrock federal statutory mandates with which Congress requires it to comply: the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*; the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*; the Intergovernmental Cooperation Act (ICA), 31 U.S.C. § 6506(c); and the Immigration and Nationality Act (INA), 8 U.S.C. § 1231(g). Any one of these violations requires vacating the

decision to establish an immigration detention facility at this site and restraining further steps to construct one; together, the need for judicial intervention is overwhelming.

2.      Seeking to put into practice the Executive's plan to treat deportation as a "business" that operates "like (Amazon) Prime, but with human beings," DHS has made the final decision to establish a mass detention facility at the Roxbury Warehouse. There is no doubt of the finality of that plan: DHS has purchased the site, has confirmed the site will be converted to an immigration detention center, and is evidently soliciting construction bids to start work. Nor is there any doubt that the Roxbury Warehouse is not fit for detention. The Roxbury Warehouse is a logistics center fit for Amazon Prime packages, not people—among other things, it currently has a total of four toilets, despite the planned influx of up to 1,500 detainees and hundreds more ICE employees. Indeed, the influx of up to 1,500 detainees requiring potable water and sewage conveyance would strain beyond capacity the local water and sewage systems, threatening water availability and risking sewage overflows into land and water. The construction required to further establish the site as a detention center would have major environmental impacts to boot. And the health care needs at DHS detention facilities, which have been vectors for disease outbreaks, would risk quickly overwhelming Roxbury's two-ambulance volunteer Emergency Medical Service.

3.      It is thus unsurprising that DHS's decision to establish a mass detention facility at the Roxbury Warehouse has drawn such powerful opposition across the political and ideological spectrum. Although state and local officials were not consulted by DHS in advance of its decision to develop a 1,500-person detention facility at the warehouse site, they reacted swiftly once DHS's final decision became known: Governor Mikie Sherrill expressed her "strong opposition" to DHS

by letter,[1] and the Roxbury Township Council "unanimously[] provided its opposition to a detention center."[2] DHS, however, has proceeded apace with its plans, undaunted by their significant concerns.

4.      Whatever the merits of DHS's policy goals, the agency's rush to ramp up immigration detention capacity by using the Roxbury Warehouse has violated countless federal statutes. Indeed, although Congress appropriated funds to DHS to expand immigration detention capacity, Congress did not lift the statutory restrictions that govern the agencies' selection and construction of sites at which to engage in such detention. Those laws include NEPA, which requires federal agencies to assess and mitigate local environmental harms, "in cooperation with State and local governments," 42 U.S.C. § 4331(a), and to consider environmental consequences of its actions before making a final decision. Depending on the facts, there are multiple ways that an agency can comply—from preparing a more detailed environmental impact statement (EIS) to, at a minimum, a less comprehensive environmental assessment (EA). 42 U.S.C. §§ 4332(c)(i), 4336(b)(2). But absent some express statutory exclusion from NEPA—and none apply here—DHS cannot do what it has done in this case: nothing. DHS's failure to prepare any public report on the profound impacts that its decision to establish a detention center at this site will have, including on an area that provides more than 70% of New Jerseyans' drinking water and important sewage systems, is legally fatal.

5.      Nor was NEPA the only law DHS violated in its rush to convert this logistics site into a major, 1,500-person detention center. The Intergovernmental Cooperation Act (ICA) directs

---

[1] Letter from N.J. Gov. Mikie Sherrill to DHS Sec. Kristi Noem (Feb. 27, 2026), https://perma.cc/CBU7-VATX.

[2] Township of Roxbury, *Press Release from Roxbury Township* (Feb. 20, 2026), https://perma.cc/RPB8-F24Q.

the federal government to account for "all national, regional, State, and local viewpoints … in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c). DHS accounted for *none* of these views here, declining to discuss its plans with state and local officials before making its final decision, and failing to affirmatively solicit their views even now—even as it gave credit to the objections of officials in other politically allied States about other proposed DHS detention sites. State and local officials might not have a veto over DHS's decisions, but this utter lack of communication and consultation flies in the face of federal law.

6.      DHS's failure to consult state and local officials also resulted in DHS's selection of a site that is inappropriate for a mass detention facility—violating the Immigration and Nationality Act (INA) in the process. The INA specifically requires ICE to first consider suitable alternatives for detention before constructing a new site, and when it does so, still requires that ICE "arrange for appropriate places of detention for aliens." 8 U.S.C. 1231(g)(1). ICE defines "appropriate," in part, through reference to state and local standards, ICE, *National Detention Standards*, at 7 (rev. 2025) ("ICE National Detention Standards"), https://perma.cc/U2KX-4V5D; and the standards preclude establishing a mass detention facility in a warehouse that lacks adequate water and sewer systems to detain up to 1,500 people. Nor is it remotely appropriate to establish a detention facility where its operation would overburden local resources and create hazardous traffic conditions.

7.      And of course, in violating these federal statutes through a rushed, haphazard, and ill-explained decision to establish a mass immigration detention facility at the unjustified location of the Roxbury Warehouse, the agencies violated the APA too. The most basic requirement of the APA avoids arbitrary and capricious decision-making by ensuring that agencies consider all of the

4

important aspects of the problem before them. Here, DHS failed to consider the most obvious ones: whether the Roxbury Warehouse is in fact an appropriate site for a detention facility considering the overburdening of local infrastructure, strain on local resources, substantial environmental harms, threats to public health and safety, and unsuitability for human habitation. ICE's decision to establish a mass detention facility at the Roxbury Warehouse—without taking a sufficient look at the environmental consequences, and without any meaningful consultation with state and local officials—thus violates federal law four times over.

8.    A logistics center fit for Amazon Prime packages is an unjustifiable location at which to establish a mass immigration detention center covering the 1,000 to 1,500 detainees DHS plans to house in the Roxbury Warehouse. Yet Defendants are rushing ahead to do just that. They have already purchased the warehouse, and plan to execute a contract for its renovation by the end of March, with work to be completed within 90 days and commencing operation as a detention facility as soon as June. Because establishing a detention facility at the site will plainly overburden local infrastructure, strain local resources, and risk substantial environmental harms—and because these harms are the result of a final agency decision that violates four laws—the State and Township come to this court for relief. Judicial intervention is critically necessary.

## JURISDICTION AND VENUE

9.    Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

10.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiff the State of New Jersey and Plaintiff the Township of Roxbury reside in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

## PARTIES

### I.    Plaintiffs

11.    Plaintiff State of New Jersey is a sovereign state of the United States of America. The State of New Jersey is represented by and through its chief legal officer, Attorney General Jennifer Davenport.

12.    Plaintiff Township of Roxbury is an incorporated township in western Morris County, New Jersey.

### II.    Defendants

13.    ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is under the supervision of DHS.

14.    DHS is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

15.    Kristi Noem is the Secretary of Homeland Security and the head of DHS. She is sued in her official capacity.

16.    Todd Lyons is the Senior Official Performing the Duties of the Director of ICE. He is sued in his official capacity.

## ALLEGATIONS

### I.    NEPA Requires Federal Agencies to Consider the Environmental Impacts of Major Federal Actions Before Acting.

17.    Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," Congress established "the continuing policy of the Federal Government, *in cooperation with State and local*

6

*governments*, and other concerned public and private organizations, to use all practicable means and measures" to accomplish the Act's goals. 42 U.S.C. § 4331(a) (emphasis added).

18.     NEPA's goals are two-fold: First, NEPA ensures "federal agencies consider the environmental consequences of projects before committing resources." *State Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 268 (3d Cir. 2012) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–52 (1989)). Second, it "facilitate[s] agencies' communication with the public about their environmental analyses." *Id.* "The point … is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'" *Seven Cnty. Infrastructure Coal. v. Eagle County, Colo.*, 605 U.S. 168, 197–98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

19.     NEPA accomplishes these goals by requiring "a set of 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences, … and that provide for broad dissemination of relevant environmental information.'" *Robertson*, 490 U.S. at 350 (internal citation omitted).

20.     NEPA requires federal agencies to "include in every recommendation or report on proposals for … major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on … reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i).

21.     This report, known as an Environmental Impact Statement (EIS), must also include discussions of: "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives" including a "no action alternative"; a discussion of "the relationship between short-term uses of man's environment and the maintenance and enhancement

of long-term productivity"; and an accounting of the "irreversible and irretrievable commitments of Federal resources" from the proposed action. 42 U.S.C. § 4332(C)(ii)-(v).

22.     The requirement to prepare an EIS is triggered whenever there is a proposed "major federal action" that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(C).

23.     NEPA defines a "major federal action" to mean "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). DHS, in turn, has identified its "major federal actions" for NEPA purposes to include "mission and operations planning," "[a]cquisitions and procurements," and "[a]sset management." *Environmental Planning Program*, 71 Fed. Reg. 16,790, 16,801 (Apr. 4, 2006).

24.     Agencies must consider a broad range of effects to the quality of the human environment when evaluating an action under NEPA. DHS has specified that a NEPA analysis includes consideration of "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects. *See* Dep't of Homeland Sec., Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA), at II-2 (Nov. 6, 2014), https://perma.cc/U2E2-8GH4 (hereinafter "DHS Instruction Manual"); *see also Environmental Planning and Historic Preservation Program*, 79 Fed. Reg. 70,538 (Nov. 26, 2014).

25.     If an agency does not expect a proposed major federal action to have significant environmental impacts, or if the significance of such impacts is unknown, then the agency "*shall* prepare an environmental assessment" instead of an EIS. 42 U.S.C. § 4336(b)(2) (emphasis added). An environmental assessment (EA) is less comprehensive than an EIS.  Nonetheless it still

must "be a concise *public* document" that either sets forth the basis for the agency's finding of no significant impact or determines that an EIS is in fact required. *Id.* (emphasis added).  Like an EIS, it must be completed, and published, prior to taking final action. *Id.*

26.     An agency can dispense with preparing an EIS and an EA only if it finds that the proposed agency action fits within a duly adopted categorical exclusion or if it is excluded from environmental review by another provision of law. *See* 42 U.S.C. § 4336(a)(2), (b)(2).

27.     A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 4332(2)(C)." 42 U.S.C. § 4336e(1). DHS itself instructs that a categorical exclusion is only appropriate where the action "[c]learly fits the category described in" a table of enumerated categorical exclusions;  it "[i]s not a piece of a larger action"; and "[n]o extraordinary circumstances exist." DHS Instruction Manual at V-5. The proposed action must "clearly meet all three conditions" to be categorically excluded. *Id.,* at V-4 to V-5.

28.     An agency must complete the NEPA process by preparing an EIS or EA or properly invoking a categorical exclusion *before* acting; the "detailed statement" must be included "in every recommendation or report on *proposals*" for action.  42 U.S.C. § 4332(C) (emphasis added). NEPA defines "proposal" to mean "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." 42 U.S.C. § 4336e(12).

29.     By forcing pre-action consideration, "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. For example, the public disclosures NEPA requires allow state and local officials and members of the public to scrutinize a proposal's

environmental consequences and assess whether any would constitute violations of substantive environmental laws.

30.    In preparing an EIS or EA in advance of an agency decision, an agency gathers the "comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards," and those comments and views "shall be made available to the ... public." 42 U.S.C. § 4332(C).

31.    DHS itself "require[s] public involvement in the NEPA process for proposed DHS actions." DHS Instruction Manual at V-11. Its own manual affirms that "[c]ollaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making." *Id.* at IV-6.

## II.    The ICA Requires Defendants to Consider State and Local Concerns in Developing a Detention Facility.

32.    The aptly-named Intergovernmental Cooperation Act requires that, "[t]o the extent possible, all national, regional, State, and local viewpoints shall be considered in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c).

33.    Originally enacted in 1968, *see* Pub. L. 90-577, 82 Stat. 1098, the ICA was designed "[t]o achieve the fullest cooperation and coordination of activities among the levels of government in order to improve the operation of our federal system in an increasingly complex society." 82 Stat. 1098. In line with these objectives, the ICA directs the President to "prescribe regulations governing the formulation, evaluation, and review of United States Government programs and projects having a significant impact on area and community development." 31 U.S.C. § 6506(b). Those rules were to enable federal agencies to make "reasoned choices" among specified competing objectives, including selecting "[a]ppropriate land uses for housing, commercial,

industrial, governmental, institutional, and other purposes," ensuring "wise development and conservation of natural resources," and providing for "properly planned community facilities, including utilities," and for the "safe[] dispos[al] of wastes." *Id.*

34.     In line with this Congressional directive, Executive Order 12372 requires "federal agencies" to "provide opportunities for consultation by elected officials of those State and local governments … that would be directly affected by … direct Federal development." 47 Fed. Reg. 30,959 (July 14, 1982).

35.     The ICA and Executive Order 12372 implementing it apply to federal construction and renovation projects like the Roxbury Warehouse project. *See, e.g.*, *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 238 (1st Cir. 1993) (applying the ICA to the United States Postal Service's purchase of land and conversion of properties on it into a 400,000 square foot mail distribution facility).

36.     Similarly to NEPA, the ICA imposes "an affirmative obligation" on federal agencies to consider local interests and "to develop a reviewable record" to explain any "decision to act in disharmony with local planning objectives." *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 976 (2d Cir. 1976).

37.     Courts have recognized that Executive Order 12372 and the ICA together require "consideration of local viewpoints during the planning stages of a project." *City of Waltham*, 11 F.3d at 244 (cleaned up); *see City of Rochester*, 541 F.2d at 976.

11

**III.    The INA Requires Defendants to Arrange for Appropriate Places of Detention.**

38.    The INA requires DHS to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[3]

39.    While the INA does not explicitly define what an "appropriate place[] of detention" is, the plain meaning of "appropriate" is "suitable or right for a particular situation."[4]

40.    ICE's own detention standards direct that a place for detention is inappropriate if the site fails to comply with regulations delineating when a space is fit for human habitation, requiring that facilities "ensure appropriate temperatures, air and water quality, … and detainee living space, in accordance with any applicable state and local jail/prison standards." *See* ICE National Detention Standards, at 7. New Jersey regulations, in turn, provide certain minimum requirements for showers and drinking fountains in a correctional facility, *see* N.J. Admin. Code § 10A:31-3.7, and for minimum ratios of toilets and wash basins to inmates, *see id.* § 10A:31-3.6(i). They also require jails to conform to local building and fire codes, *id.* § 10A:31-3.19(a), and here, the Roxbury Building Code provides that buildings are "unfit for human habitation or occupancy or use" if they lack "potable running water within each dwelling" or a "connection between plumbing fixtures and adequate sewage disposal system." Roxbury Mun. Code § 9-3.3(a). Moreover, the location of the Roxbury Warehouse is zoned "Light Industrial/Office Research,"

---

[3] Responsibility for the statutory obligations related to "[c]arrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization" were transferred to DHS in the Homeland Security Act of 2002. Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(3), 116 Stat. 2135, 2178 (2002); see also *Lin-Zheng v. Atty. Gen.*, 557 F.3d 147, 152 n.4 (3d Cir. 2009).

[4] *See Appropriate*, Cambridge Dictionary, https://tinyurl.com/55v99dxm (last visited Mar. 19, 2026).

which does not include carceral facilities or any other uses involving overnight occupancy. Roxbury Mun. Code § 13-7.3402.

## IV.     ICE Adopts an Unprecedented Policy for Expanding Mass Detention.

41.     In a marked change from its prior detention practices, DHS recently has embarked on a plan to purchase and convert industrial warehouses into processing and detention centers in support of its broad mass deportation campaign.[5]

42.     ICE traditionally avoided expanding detention space through ICE-owned facilities "because of the substantial amount of time needed to design and construct such a facility."[6]

43.     On the rare occasions in which DHS has attempted to construct or modify a detention facility,[7] it has engaged with the NEPA process, as required by law.[8] For example, in 2021, DHS completed an EA for the El Paso Service Processing Center. The Final EA discussed several opportunities for public involvement including letters sent to stakeholders and a draft EA

---

[5] Douglas MacMillan & Jonathan O'Connell, *ICE Documents Reveal Plan to Hold 80,000 Immigrants in Warehouses*, Wash. Post (Dec. 24, 2025), https://perma.cc/LSH6-FJKQ.

[6] U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://perma.cc/CCW8-KW82 (stating "officials said that new contracts for ICE-owned service processing centers are not a viable option" because of the time required "coupled with the fact that ICE does not have construction authority").

[7] Plaintiffs use the term "detention facility" to refer to any facility intended to "house" noncitizens "to secure their presence for immigration proceedings or removal from the U.S." Dep't of Homeland Sec., Immigr. & Customs Enf't, *Detention Facilities*, https://perma.cc/JA5U-93Z3. These facilities include "processing centers," which are intended to hold noncitizens for shorter periods of time, and other detention centers that are intended to hold noncitizens for longer periods of time. Because ICE uses "processing centers" to hold individuals in civil detention, Plaintiff refers to "processing centers" and "detention centers" interchangeably.

[8] *See* Dep't of Homeland Sec., *DHS Environmental Planning Document Library* (last updated Nov. 14, 2025), https://perma.cc/VR29-NN7L

published on the DHS website. The EA also included a description of the proposed action and three alternatives, including an analysis of the impact that each option would likely have on, among other things: water quality, biological resources, utilities and infrastructure, air quality and climate change, transportation and traffic, and waste management and hazardous materials.[9]

44.    Pursuant to a "new model" designed to meet ICE's goal to "increase bed capacity to 92,600 beds,"[10] however, DHS has begun purchasing and converting warehouses without regard to NEPA, ICA, or INA processes and restrictions.

45.    The new model, which attempts to run the agency's deportation activities "like (Amazon) Prime, but with human beings,"[11] relies on $45 billion appropriated by Congress in July 2025 for ICE detention centers as part of the One Big Beautiful Bill Act (OBBBA). Pub. L. 119-21, § 90003, 139 Stat. 72, 358 (July 4, 2025). But nothing in this appropriation excused ICE from complying with NEPA, the ICA, the INA, or any other legal requirement at issue here.

46.     A recent ICE document, labeled "ICE Detention Reengineering Initiative," spells out the details of this new model.[12]

47.    In the document, ICE lays out its plans to use OBBBA funding to "fully implement a new detention model by the end of Fiscal Year 2026."  The effort will "focus[] on non-traditional

---

[9] Dep't of Homeland Sec., Immigr. & Customs Enf't, *Final Environmental Assessment for El Paso, Texas Service Processing Center* (Sept. 15, 2021), https://perma.cc/VED3-J4BP. *See also* U.S. Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97.

[10]  Dep't Homeland Sec., *ICE Detention Reengineering Initiative* (Feb. 12, 2026), https://perma.cc/VZM6-G7B7.

[11]  Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025), https://tinyurl.com/3chhajbv.

[12] ICE Detention Reengineering Initiative, *supra* note 10.

facilities built specifically to support ICE's needs," including "the acquisition and renovation of eight large-scale detention centers and 16 regional processing sites, as well as the acquisition of 10 existing 'turnkey' facilities where ICE ERO already operates."  The goal of the "new model" is to "increase bed capacity to 92,600 beds … by November 30, 2026."[13]

48.    The same document states that each of these new regional processing centers will "hous[e] an average daily population of 1,000 to 1,500 detainees for average stays of 3–7 days. These will serve as staging locations for transfers or removals."[14]

49.    The plan also involves closing existing facilities:  the "new model will allow ICE to create an efficient detention network by reducing the total number of contracted detention facilities in use while increasing total bed capacity, enhancing custody management, and streamlining removal operations."[15]  DHS representatives recently said the same, advising community members that, as part of the plan, ICE will close dozens of privately owned detention centers and end ICE's partnerships with county-run jails to hold detainees.[16]

50.    The ICE Detention Reengineering Initiative acknowledges that, in establishing the new model, ICE must still "comply[] with [NEPA] to evaluate the impacts of proposed actions and their reasonable alternatives" and suggests that "[a]ll detention infrastructure will comply with

---

[13] ICE Detention Reengineering Initiative, *supra* note 10.

[14] *Id.* at 1.

[15] *Id.*

[16] *See* City of Social Circle, *Updated Statement Regarding ICE Detention Facility* (Feb. 18, 2026), https://perma.cc/J3WA-YQ2J; Douglas MacMilan & Aaron Schaffer, *ICE selects untested firms to oversee new warehouse detention centers*, Wash. Post (Mar. 9, 2026).

the latest ICE National Detention Standards … , relevant federal regulations, environmental regulations, and industry best practices."[17]

51.    There is no evidence, however, of ICE's compliance with NEPA with respect to its decision to establish a mass detention facility in the Roxbury Warehouse.

**V.    ICE Purchases the Roxbury Warehouse to Use as an Immigration Detention Facility.**

52.    Last year, DHS identified Roxbury as one of the locations where it intended to implement its plan to use industrial warehouses to process and hold ICE detainees.[18]

53.    State and local officials in New Jersey learned of ICE's plans to purchase and convert the Roxbury Warehouse for the first time from a Washington Post article published on December 24, 2025.

54.    In response, on January 13, 2026, the Township Council of the Township of Roxbury unanimously passed a municipal resolution, Resolution 2026-029, declaring that Roxbury "unequivocally opposes the conversion of existing industrial warehouses within the Township for the creation of a U.S. Immigration and Customs Enforcement processing facility, or any other facility that disregards the Township's land use and regulatory ordinances and creates unanticipated burdens upon the Township's infrastructure, resources, and services."[19]

55.    On January 14, 2026, a DHS Environmental Protection Specialist wrote a letter to the New Jersey Historic Preservation Office initiating a process under Section 106 of the National Historic Preservation Act for the Roxbury Warehouse property. Ex. 1. This was the first and only

---

[17] ICE Detention Reengineering Initiative, *supra* note 10, at 2.

[18] *See* MacMillan & O'Connell, *supra* note 5.

[19] Township of Roxbury, Resolution No. 2026-029, https://tinyurl.com/37acfevc.

outreach by any defendant to any state or local official in New Jersey regarding defendants' plans to purchase and convert the Roxbury Warehouse into a detention facility prior to the purchase.

56.     In the letter, DHS wrote that it is "proposing to purchase, occupy, and rehabilitate [the Roxbury Warehouse] … in support of ICE operations," and described that suite of actions as an "undertaking" requiring the agency to give notice and participate in the National Historic Preservation Act process.

57.     DHS also described the substantial modifications it intends to make to the property, explaining that "[p]roposed site improvements may include, but are not limited to, installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and cameras;" installing "[t]entage and a guard shack;" "painting or sealing the exterior of the structure; installing, removing, or modifying bays (truck bays, window bays, or doors); repairing or replacing the existing roof or cladding materials; adding security equipment; or adding exterior personnel/guest access controls;" "constructi[ng] … holding and processing spaces, office space, public-facing visitor spaces;" installing "amenities, such as cafeterias, bathrooms, and health care spaces;" and constructing "piers and fence posts" on the currently undeveloped portions of the property beyond the existing warehouse structure. The letter included photographic and topographical exhibits reflecting DHS's limited understanding of the environmental and structural components of the property prior to purchase.

58.     Following public reporting that Defendants had purchased the Roxbury Warehouse, on February 18, 2026, ICE announced via email that "ICE has not purchased a facility in Roxbury,

New Jersey," and any prior statement to the contrary "was sent without proper approval, and this mistake has since been rectified."[20]

59.     In an abrupt reversal, DHS publicly announced on February 20, 2026 that it had, in fact, purchased the Roxbury Warehouse.[21] On information and belief, the warehouse was purchased on February 19, 2026. DHS has made clear in press communications that its purchase of the Roxbury Warehouse is expressly for the purpose of converting the site into a large-scale detention facility. In responding to press questions about its late 2025 and early 2026 blitz of warehouses purchases across the United States, DHS confirmed that these warehouses, including the Roxbury Warehouse, will be used as detention facilities.[22]

## VI.     Defendants Failed to Consider State and Local Concerns Regarding the Suitability of the Roxbury Warehouse as a Detention Facility.

60.     In its rush to acquire the Roxbury Warehouse and convert it to a detention facility, Defendants undertook no meaningful effort to consider or address local concerns regarding the warehouse's suitability as a large-scale detention facility.

61.     Prior to DHS's February 20 announcement that it had purchased the warehouse, the sole communication from any federal agency to any New Jersey or Roxbury official regarding the purchase was the January 14, 2026 letter to the New Jersey Historic Preservation Office, sent for

---

[20] Bryan Fumagalli, *After days of confusion, Roxbury officials say ICE bought warehouse*, The Chronicle (Feb. 24, 2026), https://perma.cc/Q8AJ-HXE9.

[21] Joey Fox, *DHS confirms Roxbury detention center plans, to local officials' dismay* (Feb. 20, 2026), https://perma.cc/T99B-7QS9.

[22] *Id. See also* Sophie Nieto-Munoz, *ICE Buys Warehouse for Migrant Detention, Roxbury Officials Say*, New Jersey Monitor (Feb. 20, 2026), https://tinyurl.com/mr457nem; Mike Hayes, *Feds Say ICE Buys Roxbury, NJ Property for Detention … Confusing the Locals*, Gothamist (Feb. 19, 2026), https://perma.cc/MF8M-YMZ9.

the narrow purpose of addressing potential historic preservation concerns. Neither in that letter nor in any other communication did Defendants seek to consult with state and local officials regarding environmental or other local impacts.

62.    On February 24, 2026—four days *after* announcing the warehouse purchase—DHS sent the New Jersey Department of Environmental Protection (NJDEP) a perfunctory notification that it had purchased the Roxbury Warehouse. For the first time, DHS acknowledged that the warehouse property was "encumbered by a conservation easement to the benefit of the [New Jersey] Department of Environmental Protection." Ex. 2. And DHS acknowledged that the "easement required that the former owner of the property notify the Department of Environmental Protection *one month in advance* of a transfer of property ownership both in writing and telephonically." *Id*. (emphasis added). Yet no notification had been provided in advance of DHS purchasing the property.

63.    Even in its February 24 letter, DHS did not request or inquire as to the State's views or concerns regarding the property, its suitability for development into an immigration detention facility, or any environmental impacts that would result from repurposing the warehouse into a detention facility.

64.    Roxbury officials repeatedly reached out to DHS, seeking to discuss the agency's plans for the warehouse property. DHS did not respond until February 25, 2026, when it confirmed by phone its purchase and intended use of the Roxbury Warehouse, but did not solicit Roxbury officials' views on that purchase or intended use.

65. On Friday, February 27, 2026, New Jersey Governor Mikie Sherrill posted a letter to DHS Secretary Noem to express the State's strong opposition to the Roxbury Warehouse conversion.[23]

66. Governor Sherrill identified various ways in which converting the warehouse into a detention processing facility to hold up to 1,500 people at a time would harm and interfere with local conditions: by imposing "significant resource demands on Roxbury" and "surrounding towns," including "increased wastewater and trash, increased strain on municipal services, and increased traffic" as well as "potential conflicts with state and local building codes and zoning laws."[24]

67. On March 11, 2026, at the request of New Jersey officials, Roxbury officials spoke with DHS officials. Rather than indicating any openness to the views of local officials, DHS officials confirmed that they are proceeding with their plan to convert the Roxbury Warehouse into a mass detention facility. They stated that they expected to execute a contract for the renovation of the warehouse by the end of March, and that they expected the renovation to be completed within 90 days, with the detention facility commencing operation shortly thereafter. At no point during the meeting did DHS ask Roxbury officials for their views concerning these plans.

68. Defendants have not provided Plaintiffs with any opportunity to submit "comments and views [as] appropriate State … and local agencies, which are authorized to develop and enforce environmental standards." 42 U.S.C. § 4332(C)(v).

69. Defendants have likewise failed to consider "State[] and local viewpoints … in planning" to develop the Roxbury Warehouse into a mass detention facility, 31 U.S.C. § 6506(c)—

---

[23] Letter from Gov. Mikie Sherrill to DHS Sec. Kristi Noem, *supra* note 1.

[24] *Id.* at 1–2.

let alone "diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions before decisions are made." DHS Instruction Manual at IV-6. Defendants provided no opportunity for Plaintiffs to share their "objectives" and "needs" for the area, 31 U.S.C. § 6506(c), rendering Defendants unable to make "reasoned choices" between Plaintiffs' and Defendants' desires for the area, or to balance competing interests in "appropriate land uses for housing, commercial, industrial, governmental, institutional, and other purposes;" "wise development and conservation of all natural resources;" and "properly planned community facilities (including utilities for supplying power, water, and communications) for safely disposing of wastes, and for other purposes," *id.* § 6506(b). Specifically, Defendants' failure to consult with state and local officials left DHS without pre-decisional input from those most knowledgeable about relevant conditions on the ground in Roxbury—such as whether there is available water or sewage capacity for the planned detention facility.

70.     Consulting with state and local officials, as required by the ICA, and producing an EA or EIS, as required by NEPA, would further allow state and local officials, as well as the public, to assess whether DHS's decision to establish a mass detention facility in the Roxbury Warehouse implicates other federal or state legal restrictions, including applicable permitting requirements and the conservation easement held by New Jersey over a large swatch of the property where the warehouse is located.

71.     In sharp contrast to Defendants' failure to consider state and local viewpoints with respect to DHS's decision to establish a mass detention facility in the Roxbury Warehouse, DHS was responsive to state and local concerns with respect to DHS's similar plans to establish a mass detention facility at a warehouse in Merrimack, New Hampshire.

21

72.     After learning of DHS's detention facility plans, the town of Merrimack sent a letter to DHS stating its opposition to the proposed warehouse conversion—just as Roxbury did on February 20.[25]

73.     And just as Governor Sherrill reached out to Secretary Noem by letter to communicate state and local concerns with DHS's decision to establish a mass detention facility in the Roxbury Warehouse, New Hampshire Governor Kelly Ayotte reached out to Secretary Noem to communicate state and local concerns with DHS's decision to establish a similar facility in the Merrimack warehouse.[26]

74.     Despite similar expressions of state and local opposition to DHS's plans to establish mass detention facilities in Roxbury, New Jersey and Merrimack, New Hampshire, respectively, DHS's response to those concerns was markedly different.

75.     Indeed, within a week of Governor Ayotte meeting with Secretary Noem in Washington to discuss New Hampshire residents' opposition to DHS's plans to establish a mass detention facility at the warehouse in Merrimack, DHS abandoned those plans.[27]

76.     Meanwhile, DHS has refused to heed the concerns of New Jersey and its residents.

**VII.    Conversion of the Roxbury Warehouse Into a Large-Scale Immigration Detention Facility Will Harm the Local Environment and Public Resources, and Will Fail to Meet Defendants' Obligation to Provide for an Appropriate Place of Detention.**

77.     Defendants' planned conversion of the Roxbury Warehouse into a large-scale detention facility that houses up to 1,500 detainees is highly likely to have significant

---

[25] Kate Dario, *Merrimack leaders say they oppose ICE facility in letter to state, federal offices*, N.H. Public Radio (Jan. 23, 2026), https://perma.cc/RJY3-8EXY.

[26] Press Release, Off. of Gov. Kelly Ayotte, DHS Will Not Move Forward with Proposed ICE Facility in Merrimack (Feb. 24, 2026), https://perma.cc/K9WQ-5U8F.

[27] *Id.*

environmental impacts, burden public infrastructure and resources, and fail to meet Defendants' obligations to provide an appropriate place of detention—none of which was adequately considered by Defendants before they decided to put their rushed plans into action.

78.   The Roxbury Warehouse is a large vacant warehouse located at 1879 Route 46 within the Township of Roxbury. Preliminary major site plans submitted to Roxbury in 2019 by the site's prior owner, Adler Roxbury, LLC, describe the building as a 470,444 square-foot warehouse located on Block 9501, Lot 1, in Roxbury Township. The location was further described as having 119 trailer truck parking spots and 299 regular parking spaces.

79.   The location of the Roxbury Warehouse is not zoned for large-scale human occupancy. Rather, the site is zoned for "Light Industrial/Office Research."  Under Township of Roxbury Municipal Code § 13-7.3402, a number of "[p]rincipal permitted uses" are listed for sites zoned as "Light Industrial/Office Research" including "professional offices" and "manufacturing limited to assembly of finished components," but none of the listed permitted uses includes detention facilities or any other remotely similar use. And under Township of Roxbury Municipal Code §§ 13-7.802 and 13-7.815, "[n]o land or premises shall be … used for any purpose other than a purpose permitted herein for the zone district in which it is located;" in other words, "[a]ll uses not specifically permitted in each zone district are prohibited."

80.   The warehouse is largely comprised of a single large room with concrete floors, a minimal amount of office space, and only one men's, one women's, and one single bathroom.

81.   To serve as a detention facility for up to 1,500 detainees, the Roxbury Warehouse would need to undergo significant alterations that would require major construction and substantially change the character, purpose, function, and environs of the warehouse.

23

82.    As described above, DHS intends to "install[], upgrad[e], or rehabilitat[e] existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, [and] recreation areas" as well as install "[t]entage and a guard shack" and "piers and fence posts" on the currently undeveloped portions of the property. Ex. 1.

83.    Indeed, ICE's National Detention Standards would further require substantial redevelopment of the warehouse.[28] Among other things, the Standards specifically require Defendants to construct a "secure perimeter" equipped with a "sally port," "reasonably private bathing and toileting environment[s]," and an "emergency electrical power generator." *See* ICE National Detention Standards at 5, 25, 128. The Standards also require Defendants to ensure that "[p]otable water [is] available throughout the facility," and that "[e]nvironmental health conditions will be maintained at a level that meets recognized standards of hygiene," including those set by "the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association (including the Life Safety Code (NFPA 101)), and the Centers for Disease Control and Prevention (CDC)." *Id.* at 5–6.

84.    DHS's detention standards also provide that detention facilities "shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards." *Id.* at 7.

85.    New Jersey's applicable standards—the regulations governing adult correctional facilities—require at least one operable shower with controlled hot and cold water for every 16

---

[28] ICE's Service Processing Centers must also comply with the Performance-Based National Detention Standards (PBNDS), last revised in 2016. *See* ICE, Performance-Based National Detention Standards, at 1 (rev. Dec. 2016), https://perma.cc/Q58M-UPS6. The PBNDS recognize that ICE must exercise its authority to detain individuals "in the most humane manner possible with a focus on providing sound conditions and care." *Id.* at i.

inmates, N.J. Admin. Code § 10A:31-3.7(a)-(d), one toilet for every eight female inmates and twelve male inmates, *id.* § 10A:31-3.6(i)(1), (2), and one wash basin for every twelve inmates, *id.* § 10A:31-3.6(i)(3). Assuming the facility will hold 1,500 detainees, as projected by ICE, and assuming, conservatively and for the sake of simplicity, that all those detainees are male, the facility would be required to have at least 94 showers, 125 toilets, and 125 wash basins—yet the warehouse currently has just 4 toilets, one urinal, and 5 wash basins.

86.     Under these same regulations, all subject facilities must "conform to all applicable Federal, State, and local building and fire codes." *Id.* § 10A:31-3.19(a). The Township of Roxbury's Building and Housing Code provides, in turn, that a building is "unfit for human habitation or occupancy or use" if it lacks "potable running water within each dwelling," "flush toilet[s], fit for use, in each building," or a "connection between plumbing fixtures and adequate sewage disposal system." Roxbury Mun. Code § 9-3.3(a).

87.     Any attempt to convert the Roxbury Warehouse into an immigration detention facility that comports with these requirements, along with the operation of such a facility once constructed, would pose substantial risks to the surrounding environment, burden local infrastructure and resources that are not equipped to support a dramatic shift, and would otherwise fall short of being an appropriate place of detention across a broad range of areas as detailed below:

88.     ***Water Systems.*** Converting the Roxbury Warehouse into a detention facility housing up to 1,500 detainees at a time would impose an additional estimated 187,500 gallons per day of water demand on a system with insufficient capacity for that additional demand. By further straining an already stressed water system, Defendants threaten the viability of the entire system.

89.     The Roxbury Water Department owns and operates a municipal retail water supply distribution system for the delivery of potable water to service connections within the township.

25

The Roxbury Warehouse is connected to the Roxbury Township Water Department's Skyview system (PWSID # NJ1436004).

90. Prior to DHS acquiring the warehouse for conversion into a detention facility, the water demand for the Roxbury Warehouse was estimated to be 12,000 gallons per day, based on 245 employees and 47,000 square feet of office space.

91. Were the Roxbury Warehouse to house up to 1,500 detainees, the facility's water demand would increase more than fifteen-fold, to an estimated 187,500 gallons per day—just for the detainee population, not accounting for use by ICE employees or other uses.

92. Potable water to the Roxbury Warehouse is currently supplied by the Roxbury Skyview System's three active wells (a fourth well is currently offline) and bulk water purchased from the Morris County Municipal Utilities Authority.

93. The Skyview system does not have sufficient capacity to meet the additional water demand of a detention facility with up to 1,500 detainees. And even if the fourth well were brought back online, the system would still lack sufficient capacity to accommodate Defendants' plans.

94. Nor could the Roxbury Water Department simply increase the Skyview system's capacity to accommodate a detention facility of this size, as both the Roxbury Water Department and the Morris County Municipal Utilities Authority are subject to water allocation permits which limit the withdrawal of quantities of water from the waters of the State (groundwater or surface water) under the authority of the New Jersey Water Supply Management Act, N.J. Stat. Ann. § 58:1A-1 to -17.

95. Such water allocation permits are based on extensive technical documentation tailored to the water source at issue. For groundwater extraction, which is applicable here, prior to receiving a permit, applicants must provide "a discussion of the geology, hydrogeology, and the

26

expected impacts of the diversion both on the resource and on other users of that resource." N.J. Admin. Code § 7:19-2.2(c). New wells or increased capacity require hydrogeologic testing and detailed reports on the results thereof to determine whether the water can sustainably be delivered to a given public water system. *See* N.J. Admin. Code § 7:19-2.2.

96. If Defendants nonetheless convert the Roxbury Warehouse into a detention facility housing up to 1,500 people and draw on the existing Skyview System to provide water for that facility, this would strain an already stressed water system beyond its capabilities.

97. A large ongoing water withdrawal that was not previously anticipated poses a substantial risk of exceeding the available allocation or system capacity, which could in turn reduce water pressure and reliability for other users, impair flows needed for suppressing fires, accelerate the depletion of underground water aquifers, diminish nearby wells, and alter groundwater flow in ways that degrade water quality and quantity.

98. ***Sewer Systems.*** Defendants' plans for the Roxbury Warehouse also create a serious risk of overwhelming the local wastewater conveyance system. Conversion of the warehouse into a mass detention facility would likely increase the sewage output more than fifteen-fold. Such a greatly expanded unplanned ongoing wastewater discharge poses a serious risk of exceeding contractual flow limits and the hydraulic capacity of the conveyance system, thereby causing sewer main backups, overflows at manholes or pump stations, backups through service pipes into upstream properties, and contamination of groundwater and local waterways.

99. The wastewater flowing from the Roxbury Warehouse is ultimately conveyed through Netcong Heights (an apartment complex), then through the Borough of Netcong, and then flows to the Musconetcong Sewerage Authority Sewage Treatment Plant, which discharges treated

wastewater into the Musconetcong River, a waterway that is held in trust for the benefit of the public.

100.   The most recent water quality management plan for the Roxbury Warehouse site, a Sewage Transmission Agreement between the prior warehouse owners and the Borough of Netcong, and a sanitary sewer agreement between the Borough of Netcong and Township of Roxbury, provide for a wastewater discharge from the Roxbury Warehouse of no more than 11,700 gallons per day. Consistent with these documents, NJDEP issued a Treatment Works Approval in 2022 that authorized the construction and operation of a sewer extension to the warehouse that allows for a maximum flow of 11,700 gallons of wastewater per day based on the identified needs for a 470,444 square foot warehouse with 280 employees and 47,000 square feet of office space.

101.   If the Roxbury Warehouse were converted into a detention facility housing up to 1,500 detainees at a time, its projected wastewater output would balloon to an estimated 187,500 gallons per day—more than 15 times greater than the current 11,700 gallon per day limit.

102.   The Borough of Netcong's existing conveyance system has insufficient capacity to convey the additional anticipated flow from the proposed detention facility.

103.   Wastewater flow from the Roxbury Warehouse that exceeds the capacity of the existing infrastructure poses serious risks of damage to the sewer system and sewage overflows into nearby land, groundwater, and waterways. Indeed, the anticipated fifteen-fold increase in wastewater flow would render the system liable to overflows in at least four discrete locations in the township, resulting in sewage flowing to the stormwater system and ultimately discharging into Lake Musconetcong.

104.   And DHS cannot simply avoid modifying sewage use by trucking wastewater out, as that shortcut would render the warehouse "unfit for human … occupancy" under the local

28

building code. *See* Roxbury Mun. Code § 9-3.3(a) (requiring "connection between plumbing fixtures and adequate sewage disposal system").

105.   ***Waterways.*** The State has a strong interest in protecting its waterways and groundwater for recreational, environmental, and public consumption purposes. Construction necessary to convert the Roxbury Warehouse into a detention facility—including those changes DHS itself described in its National Historic Preservation Act letter—would require significant new infrastructure and renovation. This construction would likely cause significant ground disturbance and change the property's impervious surface, which could alter planned stormwater flow patterns and existing mitigation measures.

106.   Further, as detailed above: the capacity of the current wastewater conveyance system is likely inadequate to service a detention facility of this scale, such insufficient capacity significantly risks sewage backups and overflows, and any such overflows would result in untreated sewage discharging into Lake Musconetcong—and from there, cascading into nearby watersheds as well.

107.   Lake Musconetcong is a freshwater lake, owned by the State and held in trust on behalf of all New Jersey residents pursuant to N.J. Stat. Ann. § 13:12-4. Lake Musconetcong is approximately 1,000 feet away and downhill from the existing warehouse, so any stormwater and pollutants contained therein not captured by the warehouse's existing systems—due to either the construction process or an increased development of the currently undeveloped land without expanding the stormwater system to accommodate it—would flow downhill from the property and into Lake Musconetcong.

108.   Lake Musconetcong is connected to Lake Hopatcong, so Lake Hopatcong would also be impacted by sewage overflows and excess stormwater flowing to Lake Musconetcong.

Lake Hopatcong is the largest freshwater lake in New Jersey and is also owned by the State and held in trust on behalf of all New Jersey residents pursuant to N.J. Stat. Ann. § 13:12-4. It serves as an emergency source of drinking water and provides recreational opportunities, including swimming and fishing, that contribute significantly to the region's economy.

109.    Lake Hopatcong and Lake Musconetcong both flow into the Musconetcong River, so this river, too, would be impacted by the sewage overflows and excess stormwater likely to result from the detention facility's construction and operation. The Musconetcong River, a 45.7-mile-long tributary of the Delaware River that is a federally protected Wild and Scenic River, *see* 16 U.S.C. §§ 1271–1287, is the water body to which the Musconetcong Sewerage Authority discharges treated wastewater from the warehouse property. It connects Lake Hopatcong to Lake Musconetcong and flows on from Lake Musconetcong.

110.    As the Musconetcong River is a tributary of the Delaware River, harms to the Musconetcong River, in turn, harm the Delaware River into which the Musconetcong River flows. The Delaware River is the longest undammed river east of the Mississippi River, provides habitat for numerous fish species, and, combined with its tributaries, is a drinking, agricultural, and industrial water source for 14.2 million people.

111.    In addition to the considerable risk that sewage overflows and excess stormwater pose to these important waterways, withdrawing water from the conveyance system significantly beyond what was previously anticipated, as would likely be needed to accommodate this mass detention center, poses a substantial risk of accelerating the depletion of underground water aquifers and diminishing nearby wells, thus impacting groundwater as well—another critical, local natural resource.

112.    Nearly all of the Highlands region population relies on groundwater as its primary drinking water supply. In 2008, it was estimated that every day, over 170 million gallons of water are withdrawn from Highlands aquifers.

113.    Beyond depleting nearby groundwater, the planned detention facility would result in the substantial transfer of water from one watershed into another. As currently configured, the planned detention facility would withdraw water from wells in the Raritan River watershed while expelling wastewater into the Delaware River Basin watershed.

114.    Such interbasin transfers raise concerns for both surface water and groundwater systems. They are likely to diminish aquifer reserves in the donor system, here the Raritan River watershed, limiting water supply for local ecosystems and users. And they are likely to alter hydrologic and wastewater discharge patterns in the receiving system, here the Delaware River Basin watershed.

115.    Because of these likely effects on shared interstate water resources, the water supply and wastewater impacts relating to the conversion of the Roxbury Warehouse to a detention facility may require review by the Delaware River Basin Commission. Section 3.8 of the Delaware River Basin Compact, to which both New Jersey and the federal government are signatories, prohibits any "project having a substantial effect on the water resources of the basin … unless it shall have been first submitted to and approved by the commission." Failure to review such projects under the Compact would be a violation of federal law.

116.    Without any public NEPA disclosures analyzing the environmental effects of Defendants' plan to establish a mass detention facility in the Roxbury Warehouse, Plaintiffs cannot conclude with certainty that the plan would substantially affect the Basin's water resources. But as detailed above, there is a likelihood that it would.

117.    ***Wildlife and Aquatic Species.*** New Jersey's Legislature directs the State to manage all wildlife, which is accomplished through the Endangered and Non-game Species Conservation Act, N.J. Stat. Ann. § 23:2A-1 to -16.

118.    According to the latest 2025 update to NJDEP's Landscape Project mapping tool, the property on which the Roxbury Warehouse is located currently has suitable habitat for several species of concern, including the bald eagle, which is protected under the federal Bald and Golden Eagle Protection Act, *see* 16 U.S.C. § 668, as well as the red-shouldered hawk, the northern long-eared bat, the little brown bat, the big brown bat, the eastern red bat, and the bobcat, each of which is protected under New Jersey's Endangered and Nongame Species Conservation Act, *see* N.J. Stat. Ann. § 23:2A-1; N.J. Admin. Code § 7:25-4.13. The northern long-eared bat additionally is protected under the federal Endangered Species Act. *See* 16 U.S.C. §§ 1531–1544; Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, U.S. Fish & Wildlife Serv., 87 Fed. Reg. 73488 (Nov. 30, 2022).

119.    In recognition of the valuable wildlife habitat at the property and pursuant to N.J. Admin. Code § 7:15-4.4(k)(3), NJDEP required Adler Roxbury, LLC to execute and record a conservation easement, governed by N.J. Stat. Ann. § 13:8B-3, barring any development of the conservation easement area—which covers the majority of property not occupied by the warehouse—as a condition of their Site Specific Water Quality Management Plan amendment. Adler Roxbury, LLC complied and the conservation easement, by its terms, now runs with the land in perpetuity and prohibits, among other things, the "removal, excavation, or disturbance of the soil" as well as "installation of structures."

120.    The conservation easement is governed by the New Jersey Conservation Restriction and Historic Preservation Restriction Act, N.J. Stat. Ann. §§ 13:8B-1 to -9, which authorizes

32

enforcement of the restriction's terms and may not be released until the release request has undergone public notice and a hearing and has received the NJDEP Commissioner's approval. *See* N.J. Stat. Ann. § 13:8B-5, -6.

121. Increasing the development footprint to convert the existing warehouse into a detention center, including any extension of the physical infrastructure, such as by installing "piers and fence posts" on currently undeveloped land (as DHS already indicated in its Historic Preservation Act letter to the State it plans to do), or increasing the size of the parking lot, is almost certain to violate the conservation easement, risking harm to the endangered and threatened species that the State is statutorily obliged to manage and which the easement is designed to protect.

122. ***Ecologically Significant Areas.*** As the most densely developed State in the nation, New Jersey has a special interest in maintaining ecologically sensitive areas, two of which would be impacted by redevelopment of the warehouse site into a detention facility.

123. First, the Roxbury Warehouse property is located in the Highlands, an area New Jersey's Legislature has found is "a landscape of special significance" and an essential drinking water source that provides drinking water for much of the State's population. N.J. Stat. Ann. § 13:20-2. The property is located in the Highlands Planning Area, *see id.* § 13:20-7, and mapped as being in the Protection Zone under the Highlands Land Use Capability Zone Map, meaning that any expanded development must meet the Highlands Council's standards for water sources and water quality.

124. The property also contains nine confirmed vernal pools (temporary wetlands appearing from rain in the spring which are essential breeding habitats for many species of amphibians and invertebrates, as defined by N.J. Admin. Code § 7:7A-1.3), which are protected under New Jersey's Freshwater Wetlands Protection Act and in the Highlands. *See* N.J. Admin.

Code § 7:7A-5.7; N.J. Admin. Code § 7:38-3.12. Development of the property outside of the existing warehouse footprint—such as by constructing a guard house or erecting perimeter fencing—is likely to harm these vernal pools and the species that rely on them.

125.    Harm to these ecologically significant areas, and the species that inhabit them, inhibits the State's ability to meet its statutory obligation to manage such species under Endangered and Non-game Species Conservation Act, N.J. Stat. Ann. § 23:2A-1 to -16.

126.    *Traffic.* Operating the Roxbury Warehouse as a detention facility is also likely to have an impact on traffic, including on nearby state highways.

127.    The Roxbury Warehouse is situated on a stretch of roadway already plagued by significant traffic issues. The Roxbury Warehouse is located approximately .3 miles from the Route 46 interchange with Interstate 80, both of which are busy roadways with high volumes of motor vehicle accidents and speeding complaints.

128.    The area is a dangerous section of highway due to the grade of the roadway, limited visibility, speeding motorists, and pedestrian traffic. At certain times of day, there are also documented sun glare issues.

129.    Near or around the area of the Roxbury Warehouse there have been 46 motor vehicle crashes since 2019. Three of those crashes were fatal.

130.    Given these conditions, a traffic engineering evaluation conducted at the time the Roxbury Warehouse originally was constructed concluded that additional tractor trailer traffic to the facility would potentially have a negative impact on the operation of the roadway and surrounding intersections. The report noted that the development of the facility as a warehouse would also generally increase vehicle traffic in the area.

131.    Operating the Roxbury Warehouse as a detention facility housing up to 1,500 detainees at a time and staffed by hundreds of ICE employees will likely add to these already significant traffic problems.

132.    While Defendants have not provided any details regarding expected traffic impacts, it is very likely that there will be substantially increased traffic in the area from (1) movement of detainees to and from the facility, (2) increased staff commuting to work at the facility, and (3) visits to the facility from friends, family, and legal counsel exercising their right to visit detainees.

133.    Indeed, ICE's own documents suggest there will be steady movement of detainees to and from the facility, as the average stay for detainees at the detention facility ICE intends to establish in the Roxbury Warehouse will be 3-7 days. *See* ICE Detention Reengineering Initiative.

134.    Traffic impacts from staff commuting to and from the facility will also be significant. Upon information and belief, DHS expects to employ approximately 1,000 staff at the Roxbury Warehouse following its conversion, including approximately 400 staff working at a time during daytime shifts.

135.    Further, to the extent that Defendants intend to attempt to work around the Roxbury Warehouse's sewer and water systems capacity limitations by transporting water to the warehouse and sewage from the warehouse by truck, that would likely further exacerbate the already significant traffic impacts of operating the site as a mass detention facility.

136.    Since Defendants' purchase of the property, the Township has conducted a traffic study to assess the impact to the surrounding areas of operating the warehouse as a detention processing facility. The traffic study estimates that use of the Roxbury Warehouse as a detention

processing facility would add approximately 479 new trips to and from the facility during the peak morning hour, and approximately 422 new trips during the peak afternoon hour.

137.    By comparison, at the time the Roxbury Warehouse was constructed, a contemporaneous traffic impact study estimated that use of the property as a warehouse would add approximately 71 trips during the peak morning hour, and 80 trips during the peak afternoon hour.

138.    Based on that analysis, it is estimated that conversion of the Roxbury Warehouse to a detention processing facility would increase traffic volume during the peak morning period by nearly *seven* times, and nearly *five* times for the peak afternoon period.

139.    This is a significant change to the anticipated use of the property and will add a new level of complexity to an already dangerous stretch of roadway.

140.    Upon information and belief, there likely will be increases in traffic caused by the influx of protestors to the facility. While Route 46 is equipped with sidewalks for pedestrian use, protest activity will likely be forced into the highway's narrow shoulder, creating additional traffic safety concerns.

141.    ***Air quality.*** The State has a well-established interest in maintaining air quality. *See* N.J. Stat. Ann. § 26:2C-1 to -68 (New Jersey Air Pollution Control Act, first enacted in 1954). New Jersey uses its stringent air permitting requirements to meet its Clean Air Act duties and obligations, including meeting National Ambient Air Quality Standards across the State. Each significant source that emits air pollutants therefore requires a permit and significant source modifications frequently require updated or modified air permits. The permitting process, which incorporates public review and comment, involves an in-depth analysis to ensure the facility is meeting air pollution control regulations, including emission limits. Relevant here, converting the Roxbury Warehouse to a detention facility is likely to increase air emissions if additional boilers,

emergency generating units, or similar emitting equipment are required. As DHS's own detention standards require an "emergency electrical power generator," some increase in air emissions is effectively certain. ICE National Detention Standards at 5.

142.    The increased traffic in the area from the establishment of a mass detention facility, detailed above, would increase local air emissions as well. For instance, EPA has recognized that mobile sources—i.e., cars and trucks—emit nitrogen oxides (NOx), a precursor to ground-level ozone. Ozone is a pollutant for which the EPA sets National Ambient Air Quality Standards due to ozone's negative health impacts which include causing difficulty breathing, increasing asthma attacks, and aggravating lung diseases.

143.    ***Public health and safety.*** Operating the Roxbury Warehouse as a detention facility housing up to 1,500 detainees at a time is likely to create public health and safety concerns that will at best massively strain Roxbury's resources, and at worst exceed the Township's capacity to manage and contain serious crises, requiring the New Jersey Department of Health (NJDOH) to expend its own limited resources.

144.    DHS's detention facilities have a long and documented track-record of poor public health conditions, ranging from inadequate medical care to unsanitary conditions to physical abuse of detainees.[29]

---

[29] *See, e.g.,* Office of the Inspector Gen. (OIG), U.S. Dep't of Homeland Sec. (DHS), OIG-24-59, *Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020-2023* at 10 (Sept. 24, 2024), https://perma.cc/377Q-B39X; OIG-22-47, *Violations of ICE Detention Standards at Folkston ICE Processing Ctr. & Folkston Annex* at 6, 11-12 (June 30, 2022), https://perma.cc/54FK-DLJ4; OIG-22-31, *Mgmt. Alert—Immediate Removal of All Detainees from the Torrance County Detention Facility* at 1, 3–5 (Mar. 16, 2022), https://perma.cc/75K8-KAZW; OIG-21-46, *Violations of ICE Detention Standards at Adams County Corr. Ctr.* at 4 (July 14, 2021), https://perma.cc/ZTB6-8VT9; OIG-21-30, V*iolations of Detention Stds. amid COVID-19 Outbreak at La Palma Correctional Ctr. in Eloy, AZ* at 4–6, 9 (Mar. 30, 2021),

145.    Indeed, DHS's own Office for Civil Rights and Civil Liberties has investigated DHS facilities' failure to provide adequate medical care, citing allegations about an existing facility as part of the impetus for the broader investigation.[30] And an independent research report of DHS detainee deaths found that DHS facilities "provided incomplete, inappropriate, or delayed treatment and medication," engaged "flawed or delayed emergency response," failed to "take basic precautions during the COVID-19 pandemic," and did not provide adequate "staff who are trained and licensed to ensure patient health and safety."[31] As a result of these public health infirmities, DHS detention facilities are vectors for spreading disease.[32]

146.    Just this month, the country's largest detention center experienced a major measles outbreak, reflecting how ill-equipped DHS facilities are to contain deadly and highly contagious pathogen spread.[33]

147.    Given this potential for major disease outbreak, in combination with other public health risk factors, the planned facility is likely to generate a high volume of emergency incidents.[34]

---

https://perma.cc/3QT2-FTSX; OIG-19-47, *Concerns about ICE Detainee Treatment & Care at Four Detention Facilities* at 4, 6 (June 3, 2019), https://perma.cc/L3CP-7E6P.

[30] *See* Memorandum from Cameron P. Quinn, I*CE Health Service Corps Medical/Mental Health Care & Oversight* at 1–2 (Mar. 20, 2019), https://perma.cc/SJ2J-LPSJ.

[31] ACLU, Am. Oversight & Physicians for Hum. Rts, *Deadly Failures: Preventable Deaths in U.S. Immigration Detention* 8–10*,* 37, 41–44, 48(2024), https://perma.cc/YMZ7-BZPA.

[32] Nathan C. Lo et al., *Influenza, Varicella, and Mumps Outbreaks in US Migrant Detention Centers*, 325 JAMA 180, 180–82 (2021), https://perma.cc/9TN5-UQMB.

[33] Nicole Acevedo, *ICE confirms a measles outbreak in the nation's largest detention facility in Texas*, NBC News (Mar. 4, 2026), https://perma.cc/3TYG-SGZV.

[34] *See, e.g.* Dhruv Mehrotra and Dell Cameron, '*They're Not Breathing': Inside the Chaos of ICE Detention Center 911 Calls,* WIRED (June 25, 2025), https://www.wired.com/story/ice-detention-center-911-emergencies/; Laura Romero, *911 calls from ICE detention center underscore concerns about conditions, advocates say,* ABC News (Mar. 4, 2026), https://perma.cc/66L7-73WK.

148.    Roxbury's Health Department—with only five full-time employees—is not sufficiently resourced to assist in containing any disease outbreaks that spread beyond the confines of the facility. To fill the gap, NJDOH would likely have to expend its own already-strained resources to help contain any such outbreaks—just as other state departments of health have had to assist in containing outbreaks at existing DHS facilities.[35]

149.    Roxbury's Emergency Medical Service—an entirely-volunteer group comprised of just 35 individuals and two ambulances—is likewise not prepared to respond to emergencies arising within the intended facility without jeopardizing its ability to meet Roxbury's existing needs.

150.    On top of straining local and state-wide public health resources, moving forward with the warehouse conversion likely will generate public protests at a volume and frequency that the 42 full-time sworn officers of the Roxbury Police Department, only two of whom are trained in protest management, are not equipped to handle.

151.    ***Economic impacts.*** Finally, the Roxbury Warehouse will financially harm the State and town. By placing burdens on public water and sewage conveyance capacity, clogging roads and highways, and diverting emergency response resources, the Roxbury Warehouse will deprive the local community of other economic opportunities, including an estimated $1.8 million in annual tax revenue.

---

[35] *See, e.g.* Lomi Kriel and Alex Nguyen, *Two cases of measles detected at Dilley immigrant family detention center,* The Texas Tribune (Feb. 2, 2026), https://perma.cc/RQ44-U2Z2.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Administrative Procedure Act**
**Action that is Contrary to Law (NEPA, 42 U.S.C. § 4321, *et seq.*)**

152. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this complaint.

153. Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

154. Defendants' decision to establish a mass detention facility in the Roxbury Warehouse constitutes final agency action reviewable under the APA.

155. The finality of this decision is evidenced by Defendants' purchase of the Roxbury Warehouse expressly for the purpose of converting it to and using it as a detention facility for up to 1,500 detainees.

156. Establishing a mass detention facility in the Roxbury Warehouse is a "major Federal action[]" under Defendant ICE's substantial direction and control and with impacts on the human environment that must be evaluated under NEPA. 42 U.S.C. §§ 4336e(10)(A), 4332(C).

157. Defendants' final decision to establish a mass detention facility in the Roxbury Warehouse violates Sections 706(2)(A), (C), and (D) of the APA because it was in violation of NEPA's requirement that federal agencies prepare and publish either an EIS or EA prior to committing to undertake a major federal action.

158. Defendants have not published either an EIS or an EA with respect to the project.

40

159. There is no applicable categorical exclusion that could properly excuse ICE from reviewing the project under NEPA here.

160. Defendants did not seek comments or views from the State or Roxbury prior to finalizing its decision to establish a mass detention facility in the Roxbury Warehouse. Indeed, Defendants acted upon that decision by purchasing the property without seeking out any state or local viewpoints. Nor have Defendants sought such perspectives at any point as they have developed their renovation and operation plans for the facility.

161. Failure to conduct and publish the results of the required environmental review under NEPA deprives the State, Roxbury, other local governments, and the public of the procedure to which they are entitled by law.

162. The Court should vacate, set aside, and enjoin Defendants' decision to establish a mass detention facility in the Roxbury Warehouse and enjoin any further implementation of the decision, including any future physical modifications and construction at the site for purposes of conversion to a detention facility.

**COUNT II**
**Violation of the Administrative Procedure Act**
**Action that is Contrary to Law (ICA, 31 U.S.C. § 6506(c))**

163. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this complaint.

164. Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

165.     The ICA requires that "State[] and local viewpoints … be considered in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c). The ICA imposes "an affirmative obligation" on federal agencies to consider local interests and "to develop a reviewable record" to explain any "decision to act in disharmony with local planning objectives." *City of Rochester*, 541 F.2d at 976.

166.     The "consideration of local viewpoints" required by the ICA must occur "during the planning stages of a project." *City of Waltham*, 11 F.3d at 244 (cleaned up).

167.     In violation of these statutory obligations, DHS decided to establish a mass detention facility at the site of the Roxbury Warehouse without considering State and local viewpoints during its deliberative process.

168.     This decision constitutes final agency action reviewable under the APA.

169.     Indeed, DHS "finally determined" that the Roxbury Warehouse was "the best available site for the new [mass detention] facility," as evidenced by its purchase of the warehouse expressly for that purpose, all "without [even] informing" the State or township of its plan, let alone soliciting and considering their views, as the ICA requires. *City of Rochester*, 541 F.2d at 972.

170.     DHS's failure to engage in the ICA's required consultation resulted in its deciding to establish a mass detention facility in the Roxbury Warehouse without critical information from the government officials most knowledgeable about conditions on the ground in Roxbury—such as the fact that the township's water and sewage systems lack the capacity to meet the needs of a new mass detention facility. Without this information, DHS was unable to make a fully informed and "reasoned choice[]" among competing national, state, and local objectives for development in Roxbury, frustrating the ICA's central purpose. 31 U.S.C. § 6506(b).

171. Because Defendants' decision to establish a mass detention facility in the Roxbury Warehouse without considering state and local views violates the ICA, the Court should vacate and set aside that decision and enjoin any further implementation thereof, including any future physical modifications and construction at the site for purposes of conversion to a detention facility.

## COUNT III
### Violation of the Administrative Procedure Act
### Action that is Contrary to Law (INA, 8 U.S.C. § 1231, *et seq.*)

172. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this complaint.

173. Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

174. Defendants' decision to establish a mass detention facility in the Roxbury Warehouse was a final agency action that is reviewable under the APA.

175. The finality of this decision is evidenced by Defendants' purchase of the Roxbury Warehouse expressly for the purpose of converting it to and using it as a detention facility for up to 1,500 detainees.

176. By deciding to establish a mass detention facility in the Roxbury Warehouse, ICE has "arrange[d] for … [a] place[] of detention for aliens detained pending removal or a decision on removal"—but has failed to arrange for one that is "appropriate." 8 U.S.C. § 1231(g)(1).

177.    While the INA does not define what an "appropriate place[] of detention" is, the plain meaning of "appropriate" requires that the selected site be "suitable or right" for the intended use.[36] Yet the Roxbury Warehouse is anything but a suitable place for mass detention.

178.    The Roxbury Warehouse is not an appropriate place for the mass detention that ICE is arranging to use it for because the warehouse is not suitable for occupancy by up to 1,900 individuals. ICE intends to detain up to 1,500 people at the warehouse at a time and have 400 employees working the facility during day shifts—not to mention others who will be present at the facility to visit detainees or provide legal services.

179.    The Roxbury Warehouse lacks the water or sewer infrastructure to accommodate these nearly two thousand human occupants. As to sewer, the connected wastewater conveyance system cannot adequately serve the wastewater needs of all these people due to insufficient sewer conveyance capacity.

180.    As to water, the connected water system cannot serve the water needs of all these people because such an increased volume of use would likely reduce pressure and reliability for other users, impair fire flows, accelerate aquifer drawdown, diminish nearby wells, and alter groundwater flow in ways that degrade water quality and stream baseflow.

181.    A facility without adequate sewer or water infrastructure to accommodate the intended number of occupants is plainly an "inappropriate" location for such intended occupancy. ICE's own National Detention Standards confirm as much. They require that facilities "ensure appropriate temperatures, air and water quality, … and detainee living space, in accordance with any applicable state and local jail/prison standards." *See* ICE National Detention Standards, at 7. New Jersey regulations, in turn, require jails to "conform to all applicable Federal, State, and local

---

[36] *See Appropriate*, Cambridge Dictionary, *supra* note 4.

building and fire codes." N.J. Admin. Code § 10A:31-3.19(a). And the Roxbury Building Code provides that buildings are "unfit for human habitation or occupancy or use" if they lack "potable running water within each dwelling" or a "connection between plumbing fixtures and adequate sewage disposal system." Roxbury Mun. Code § 9-3.3(a)(2) and (3).

182.    Further, the Roxbury Warehouse is not an appropriate place for DHS to arrange for detention because construction necessary to convert the warehouse to a detention facility will work unlawful harms on the environment, and operation of the warehouse as a detention facility will overburden local resources and dramatically increase traffic on roads already plagued by high accident rates.

183.    The Court should vacate and set aside Defendants' decision to establish a mass detention facility in the Roxbury Warehouse, an inappropriate place for such detention, and enjoin any further implementation of the decision, including any future physical modifications and construction at the site for purposes of conversion to a detention facility.

**COUNT IV**
**Violation of the Administrative Procedure Act**
**Agency Action that is Arbitrary and Capricious (5 U.S.C. § 706)**

184.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this complaint.

185.    The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

186.    Defendants' decision to establish a mass detention facility in the Roxbury Warehouse constitutes final agency action reviewable under the APA.

187.    The finality of this decision is evidenced by Defendants' purchase of the Roxbury Warehouse expressly for the purpose of converting it to and using it as a detention facility for up to 1,500 detainees.

188.    Agency actions must be both "'reasonable and reasonably explained,'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)), and arbitrary-and-capricious actions include when an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

189.    In addition to being contrary to law, Defendants' decision to establish a mass detention facility in the Roxbury Warehouse is arbitrary and capricious because Defendants have "entirely failed to consider" a glaringly "important aspect of the problem" before them: whether the Roxbury Warehouse is an appropriate site for a detention facility considering the overburdening of local infrastructure, strain on local resources, substantial environmental harms, and threats to public health and safety, as well as its unsuitability for human habitation. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43).

190.    Establishing a mass detention facility in the Roxbury Warehouse poses very real and concrete harms to the municipality and State that jeopardize the utility of the site as a detention facility and pose a continuing danger to anyone located there as well as to others in the community:

46

water demand could increase more than fifteen-fold, placing significant strain on a water system with insufficient capacity to cover the additional demand, which could cause adverse impacts on groundwater resources, other water users, and fire suppression capabilities; sewage system output will similarly increase posing serious risks of exceeding contractual flow limits and the hydraulic capacity of the conveyance system, thereby potentially causing sewer main backup, overflows at manholes or pump stations, and contamination of groundwater and local waterways; it will impinge on any number of natural resources because the property is environmentally constrained and located in New Jersey's Highlands Area (providing drinking water to more than 70% of all New Jerseyans) that contains numerous wetlands, vernal ponds, and constitutes suitable foraging habitat for the endangered red-shouldered hawk; it will cause a spike in emergency medical incidents and health outbreaks in a locality that will likely be overwhelmed and will force the State to expend its own already-strained resources; and it will place persons detained there in a site that was never intended—and is inappropriate—for human habitation.

191.    Not only does Defendants' decision ignore these important aspects of the problem but it also ignores factors that Congress intended them to consider and clearly "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Congress has imposed on federal agencies an affirmative obligation to ensure that "State[] and local viewpoints … be considered in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c); *see also* 40 U.S.C. § 3312(e) (requiring that "due consideration" be given to the "recommendations" of State and municipal officials concerning how the federal government should "account [for] local conditions" as well as concerning local zoning and land-use laws). However, Defendants did not engage State and municipal officials prior to deciding to establish a mass detention facility in the Roxbury Warehouse nor take into account their viewpoints and

47

recommendations (even after State and municipal officials voiced their concerns and objections)—or existing land-use and environmental constraints—when planning to establish a mass detention facility in the Roxbury Warehouse. The failure to consider these factors that Congress has expressly specified should be considered and Defendants' consideration of other factors that Congress has not intended them to consider is unreasonable and renders the decision arbitrary and capricious.

192.    The Court should vacate and set aside Defendants' decision to establish a mass detention facility in the Roxbury Warehouse as arbitrary and capricious and enjoin any further implementation of the decision, including any future physical modifications and construction at the site for purposes of conversion to a detention facility.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Declare that Defendants' decision to establish a mass detention facility in the Roxbury Warehouse without first preparing an environmental assessment or environmental impact statement is not in accordance with the law, in excess of statutory authority and right, and without observance of procedure required by law, and therefore in violation of the APA;

ii.    Declare that Defendants' decision to establish a mass detention facility in the Roxbury Warehouse without first taking due consideration of State and local viewpoints is not in accordance with the law, in excess of statutory authority and right, and without observance of procedure required by law, and therefore in violation of the APA;

iii.    Declare that Defendants' decision to establish a mass detention facility in the Roxbury Warehouse, an inappropriate place for such detention, is not in accordance with the law,

in excess of statutory authority and right, and arbitrary and capricious, and therefore in violation of the APA;

iv.   Vacate and set aside Defendants' decision to establish a mass detention facility in the Roxbury Warehouse;

v.   Preliminarily and permanently restrain, enjoin, and stay Defendants from further implementing their decision to establish a mass detention facility in the Roxbury Warehouse, including through any physical modifications of or construction at the site for purposes of conversion to a detention facility;

vi.   Grant such other relief as this Court may deem proper.

Dated: March 20, 2026                                         Respectfully submitted,

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Shankar Duraiswamy*
Jeremy M. Feigenbaum
  *Solicitor General*
Shankar Duraiswamy
  *Deputy Solicitor General*
Naima Drecker-Waxman
Yael N. Fisher
Viviana M. Hanley
Kristen D. Heinzerling
Kristina L. Miles
Daniel Resler
Lauren E. Van Driesen
  *Deputy Attorneys General*

Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Shankar.Duraiswamy@njoag.gov
(862) 350-5800

*Counsel for the State of New Jersey*

**TOWNSHIP OF ROXBURY**
MURPHY MCKEON, PC

By: */s/ James T. Bryce*

901 Route 23 2nd Floor
Pompton Plains, New Jersey 07444
(973) 835-0100
jbryce@murphymckeonlaw.com

*Attorney for the Township of Roxbury*