# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>    Defendants. | Hon. Jamel K. Semper, U.S.D.J.<br><br>Hon. James B. Clark, U.S.M.J.<br><br><br>Civil Action No.: 26-02884 |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

Jeremy M. Feigenbaum
  *Solicitor General*
Shankar Duraiswamy
  *Deputy Solicitor General*
Naima Drecker-Waxman
Yael N. Fisher
Viviana M. Hanley
Kristen D. Heinzerling
Kristina L. Miles
Lauren E. Van Driesen
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
Lauren.VanDriesen@law.njoag.gov
(609) 696-5366

*Attorneys for the State of New Jersey*

**MURPHY MCKEON, PC**

901 Route 23 2nd Floor
Pompton Plains, New Jersey 07444
jbryce@murphymckeonlaw.com
(973) 835-0100

*Attorneys for the Township of Roxbury*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

    A.   Legal Background ......................................................................... 3

    B.   Factual Background ..................................................................... 10

ARGUMENT .................................................................................................... 18

   I.    PLAINTIFFS HAVE STANDING. ............................................... 18

  II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............ 22

    A.   DHS's Decision Violates NEPA. ................................................ 22

    B.   DHS's Decision Violates The ICA. ........................................... 33

  III.  THE EQUITIES FAVOR PRELIMINARY RELIEF. ............................ 36

CONCLUSION ................................................................................................. 40

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).................................................................................... 36, 38

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979)..........................................................................................4

*Arkansas Nature All., Inc. v. U.S. Army Corps of Eng'rs*,
  266 F. Supp. 2d 876 (E.D. Ark. 2003)................................................................31

*Azzolina v. USPS*,
  602 F. Supp. 859 (D.N.J. 1985) .................................................................. 34, 35

*Bergen Cnty. v. Dole*,
  620 F. Supp. 1009 (D.N.J. 1985) .......................................................................35

*Biden v. Nebraska*,
  600 U.S. 477 (2023)..........................................................................................18

*BRRAM, Inc. v. FAA*,
  721 F. App'x 173 (3d Cir. 2018) .......................................................................30

*Citizens Advisory Comm. on Priv. Prisons v. USDOJ*,
  197 F. Supp. 2d 226 (W.D. Pa. 2001).................................................................25

*City of Davis v. Coleman*,
  521 F.2d 661 (9th Cir. 1975) .............................................................................25

*City of Fernley v. Conant*,
  763 F. Supp. 3d 1184 (D. Nev. 2025).................................................................20

*City of Rochester v. USPS*,
  541 F.2d 967 (2d Cir. 1976)......................................................... 10, 20, 34, 35

*City of Waltham v. USPS,*
   11 F.3d 235 (1st Cir. 1993)......................................................................9, 33

*Clean Wis. v. EPA,*
   964 F.3d 1145 (D.C. Cir. 2020)....................................................................20

*Clinton Twp. v. USPS,*
   638 F. Supp. 763 (D.N.J. 1986) ....................................................................35

*Colorado v. EPA,*
   989 F.3d 874 (10th Cir. 2021) ......................................................................36

*Comm. to Save the Rio Hondo v. Lucero,*
   102 F.3d 445 (10th Cir. 1996) ......................................................................20

*Const. Party of Pa. v. Aichele,*
   757 F.3d 347 (3d Cir. 2014)..........................................................................19

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs,*
   685 F.3d 259 (3d Cir. 2012)............................................................ 3, 5, 23, 25

*Dep't of Educ. v. Brown,*
   600 U.S. 551 (2023).......................................................................................19

*Env't Def. Fund v. Corps of Eng'rs of U.S. Army,*
   324 F. Supp. 878 (D.D.C. 1971)...................................................................39

*Friends of the Everglades v. Noem,*
   796 F. Supp. 3d 1234 (S.D. Fla. 2025)..........................................................39

*Friends of Tims Ford v. TVA,*
   585 F.3d 955 (6th Cir. 2009) ........................................................................19

*J.P. Rail, Inc. v. N.J. Pinelands Comm'n,*
   404 F. Supp. 2d 636 (D.N.J. 2005)................................................................36

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
   140 F. Supp. 3d 1123 (D.N.M. 2015)............................................................20

*Limerick Ecology Action, Inc. v. U.S. Nuclear Regul. Comm'n*,
   869 F.2d 719 (3d Cir. 1989)..................................................................32

*Lowman v. FAA*,
   83 F.4th 1345 (11th Cir. 2023) ................................................. 19, 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................. 19, 21

*Maryland v. Noem*,
   No. 26-733, 2026 WL 691507 (D. Md. Mar. 11, 2026) ............................. *passim*

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..................................................................20

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011)..............................................................38

*Nat'l Post Off. Collaborative v. Donahoe*,
   No. 13-1406, 2013 WL 5818889 (D. Conn. Oct. 28, 2013)..............................28

*Navajo Nation v. Dep't of Interior*,
   876 F.3d 1144 (9th Cir. 2017) ................................................. 19, 20

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................38

*NRDC v. Texaco Ref. & Mktg., Inc.*,
   2 F.3d 493 (3d Cir. 1993)..............................................................36

*Olmsted Citizens for a Better Cmty. v. United States*,
   606 F. Supp. 964 (D. Minn. 1985).......................................................34

*Ondrusek v. U.S. Army Corps of Eng'rs*,
   123 F.4th 720 (5th Cir. 2024) ................................................. 19, 21

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*,
   605 F. Supp. 3d 28 (D.D.C. 2022)......................................................27

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017).................................................................................18

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
  826 F.3d 1030 (8th Cir. 2016) .............................................................................37

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................... 3, 5, 25

*Rodriguez v. Hermosillo*,
  802 F. Supp. 3d 1297 (W.D. Wash. 2025)...........................................................40

*S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*,
  588 F.3d 718 (9th Cir. 2009) ....................................................................... 37, 39

*Save Long Beach Island v. U.S. Dep't of Com.*,
  794 F. Supp. 3d 273 (D.N.J. 2025)......................................................................31

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
  605 U.S. 168 (2025)...............................................................................................4

*Sierra Club v. United States*,
  255 F. Supp. 2d 1177 (D. Colo. 2002).................................................................28

*Trenton Threatened Skies, Inc v. FAA*,
  90 F.4th 122 (3d Cir. 2024) ......................................................................... 20, 23

*Twp. of Bordentown v. FERC*,
  903 F.3d 234 (3d Cir. 2018).................................................................................25

*United States v. Verdeza*,
  69 F.4th 780 (11th Cir. 2023) ..............................................................................29

*Utah Env't Cong. v. Bosworth*,
  443 F.3d 732 (10th Cir. 2006) .............................................................................31

**Statutes**

31 U.S.C. § 6506 ............................................................................ 9, 33, 34

31 U.S.C. §§ 6501–6508 ............................................................... *passim*

42 U.S.C § 4336 ...................................................................................4, 6

42 U.S.C. § 4331 ..................................................................................3, 25

42 U.S.C. § 4332 ................................................................................ 4, 5, 6

42 U.S.C. § 4336 ........................................................................... *passim*

42 U.S.C. §§ 4321–4347 ................................................................ *passim*

Pub. L. 90-577, 82 Stat. 1098 (1968) .......................................................8

 **Other Authorities**

DHS, *EA for El Paso, Tex. Serv. Processing Center* (Sept. 2021),
   https://perma.cc/VED3-J4BP ...........................................................8

DHS, *EA for the Proposed Contract Detention Facility in
   the Houston, Texas Area* (Dec. 2016), https://perma.cc/Q87V-54HQ ..................8

DHS, *Final EA: Addressing the Proposed Land Purchase & Construction,
   Operation, and Maintenance of a Joint Processing Ctr.
   in Yuma* (Sep. 2023), https://perma.cc/5LQY-ZP9M ...........................................8

DHS, *Final EA: Addressing the Proposed Land Purchase,
   and Construction, Operation, and Maintenance of a
   Joint Processing Ctr. in Eagle Pass* (Aug. 2023),
   https://perma.cc/Z85P-U2LH...............................................................8

DHS, *Final Supp. EA: Addressing the Proposed Construction,
   Operation, & Maintenance of a New Joint Processing Ctr.
   in Laredo* (April 2024), https://perma.cc/ZHH8-XH97 ......................................8

DHS, ICE, *Detention Facilities*, https://perma.cc/JA5U-93Z3 ..............................8

DHS, ICE, *Port Isabel Ser. Processing Center Final EA* (Feb. 2019),
   https://perma.cc/LC8L-KCR7.................................................................8

DHS, Instruction Manual 023-01-001-01,
 Revision 01, Implementation of NEPA (Nov. 6, 2014) .............................. *passim*

*Envt'l Plan. & Historic Pres. Prog.*, 79 Fed. Reg. 70,538 (Nov. 26, 2014) .............6

*Envt'l Plan. Prog.*, 71 Fed. Reg. 16,790, 16,801 (Apr. 4, 2006).................... 6, 7, 24

*Exec. Order 12372*, 47 Fed. Reg. 30,959 (July 14, 1982)...................................9, 33

*Function*, Oxford English Dictionary,
 https://www.oed.com/dictionary/function_n  .....................................................28

*Functional*, Black's Law Dictionary (12th ed. 2024)..............................................28

*Brief in Opposition to Motion for Preliminary Injunction,*
 *Maryland v. Mullin*, No. 26-733, ECF 34 (Apr. 2, 2026)...................................27

OMB Circular A-95*, 44 (Feb. 11, 1975) ...................................................................9

U.S. GAO, *Immigration Detention: Actions Needed to Improve Planning,*
 *Documentation, and Oversight of Detention Facility*
 *Contracts* 13 (Jan. 13, 2021), https://perma.cc/CCW8-KW82...........................10

## Regulations

28 C.F.R. Pt. 61, App. A.........................................................................................24

### <u>INTRODUCTION</u>

Last year, the Federal Government announced its intent to run its immigration detention operations "like (Amazon) Prime, but with human beings." In pursuit of this goal, the Department of Homeland Security (DHS) recently purchased a vacant industrial warehouse in Roxbury for conversion into a mass immigration detention facility housing up to 1,500 detainees and staffed by 1,000 employees. Despite the profound burdens this would impose on local infrastructure and on public resources, and contrary to longstanding practice, DHS did not consult with state or local officials or conduct a public environmental review before acting. To the contrary, Roxbury officials reached out to DHS officials at least five times in an effort to discuss their concerns about the warehouse, but DHS ignored them for two months, waiting until after the warehouse purchase was consummated before finally responding. And when DHS did respond, it did not ask for input on environmental or other local impacts, but simply confirmed its plans to plow ahead with the detention facility.

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Intergovernmental Cooperation Act (ICA), 31 U.S.C. §§ 6501–6508, exist precisely to prevent this kind of hasty, unilateral federal action. NEPA requires that before a federal agency commits to a construction project, it publicly assesses environmental impacts—whether a full Environmental Impact Statement (EIS) or a less

1

detailed Environmental Assessment (EA) if it believes that the project will not significantly impact the environment. The ICA, for its part, ensures that state and local governments have a meaningful voice in federal development projects that impact their communities. Together, they ensure that federal agencies not undertake major new projects that will harm public health and the environment and overburden local infrastructure. Yet DHS complied with neither law.

The harms to the State and Township are significant and urgent. Converting the Roxbury warehouse into a mass detention facility would overwhelm local infrastructure. It would multiply water demand and wastewater output at the site by more than fifteen—impairing Roxbury's ability to meet local residents' water needs, and greatly increasing the risk of water contamination, "boil water" advisories, and sewage overflows into public waterways and household drains. Moreover, the warehouse lies in the Highlands region, an environmentally sensitive area from which more than 70 percent of New Jersey residents draw their drinking water; and the property is subject to a state agency easement that specifically protects the site from further development and concomitant harms. DHS failed to address any of this before procuring the site for a detention facility, flouting statutory commands.

Federal law gives DHS discretion to manage immigration enforcement operations. But federal law constrains how DHS may do so. And those constraints do not permit DHS to transform local neighborhoods into mass detention outposts without

2

fully assessing impacts on state and local infrastructure and resources. Just as another federal court found an identical DHS decision to convert a warehouse into an ICE detention facility likely unlawful, *Maryland v. Noem*, No. 26-733, 2026 WL 691507 (D. Md. Mar. 11, 2026), this Court should preliminarily enjoin DHS's conversion of the warehouse into a detention facility.

## BACKGROUND

**A. Legal Background**

**1. The National Environmental Policy Act**

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). The statute acknowledges the need to cooperate with state and local governments to protect those statutory interests. *See* 42 U.S.C. § 4331 (declaring "it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals).

NEPA requires agencies to comply with certain "action-forcing" procedures, *Robertson*, 490 U.S. at 438, that (1) ensure "agencies consider the environmental consequences of projects before committing resources" and (2) facilitate "agencies' communication with the public about their environmental analyses," *Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 269 (3d Cir. 2012) ("*Del. DNR*"). NEPA does not dictate a substantive outcome, but ensures that

3

officials take enumerated steps to "help[] agencies … make better decisions and to ensure good project management." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 177 (2025). "The point … is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'" *Id.* at 197–98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

Under NEPA, agencies must engage in a public environmental review process before initiating any "major Federal action," 42 U.S.C. § 4332(2)(G), which is defined as an action "subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). More specifically, federal agencies must prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C); *see id.* § 4336(b)(1). Because this requirement applies to "proposals," the EIS must be prepared "at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12).

The EIS is a "detailed statement by the responsible official," which addresses all "reasonably foreseeable environmental effects of the proposed agency action;" "reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;" feasible "alternatives to the proposed agency

4

action;" "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity;" and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action." *Id.* § 4332(2)(C). An agency must solicit "the comments and views of the appropriate Federal, State, and local agencies" and make them, along with the EIS, "available to the President, [to] the Council on Environmental Quality[,] and to the public." *Id.* "Publication of an EIS, both in draft and final form" both shows that the agency considered environmental consequences and ensures "a springboard for public comment." *Robertson*, 490 U.S. at 349.

If an agency believes that a proposed major federal action does not have a "reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," it need not publish an EIS, but must issue an EA. 42 U.S.C. § 4336(b)(2). An EA is a "concise public document" which sets forth the basis for either the "agency's finding of no significant impact" or "that an environmental impact statement is necessary." *Id.* A determination that an EIS is not necessary is subject to judicial review. *See Del. DNR*, 685 F.3d at 271.

An agency can only opt out of providing an EIS or EA for a proposed major federal action in four circumstances: (1) "the proposed agency action is not a final agency action" under the APA; (2) the proposed action is subject to a categorical exclusion, *i.e.*, a category of actions that a federal agency has determined in advance

normally do not significantly affect the quality of the environment; (3) preparation of an EIS or EA would "clearly and fundamentally conflict with the requirements of another provision of law," or (4) the action is nondiscretionary such that the agency cannot consider NEPA factors when reaching a decision. 42 U.S.C. § 4336(a)(1)–(4); *see also id.* § 4336e(1) (providing clarifying definitions of subsection (a)(2)).

NEPA directs agencies to "identify and develop methods and procedures" to ensure that these environmental factors "may be given appropriate consideration in decisionmaking along with economic and technical considerations." *Id.* § 4332(2)(B). DHS thus first promulgated its NEPA protocols in a 2006 directive. *See Envt'l Plan. Prog.*, 71 Fed. Reg. 16,790, 16,801 (Apr. 4, 2006). DHS revised its protocols in 2014 and supplemented them with a manual. *See Envt'l Plan. & Historic Pres. Prog.*, 79 Fed. Reg. 70,538 (Nov. 26, 2014); DHS, Directive 023-01, Revision 01, (Nov. 6, 2014), https://perma.cc/U945-23CP; DHS, Instruction Manual 023-01-001-01, Revision 01, Implementation of NEPA (Nov. 6, 2014) (Ex. L).[1]

DHS recognizes "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS." Ex. L at III-1. And DHS identifies "[a]cquisitions" as one of the agency's major federal actions. *Envt'l Planning Prog.*,

---

[1] Exhibits are attached to the Van Driesen Declaration unless otherwise indicated.

71 Fed. Reg. at 16,801. Environmental impacts DHS considers include "ecological (such as the effects on natural resources …), aesthetic, historic, cultural, economic, social, or health" effects, "whether direct, indirect, or cumulative." Ex. L at II-2.

Because "[t]he NEPA process encourages public involvement in decisions that would affect the quality of the human environment," *id.* at III-1, DHS directs its components to "make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions before decisions are made," *id.* at IV-6. DHS identifies "three key elements" for that pre-decision public involvement: "(1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id.* at IV-6–IV-7.

Consistent with its guidance, DHS has routinely prepared EAs under NEPA when constructing or renovating a detention facility, including on at least six occasions since 2016.[2] *See* DHS, *Final EA for El Paso, Tex. Serv. Processing Center*

---

[2] Plaintiffs use the term "detention facility" to refer to a facility intended to "house" noncitizens "to secure their presence for immigration proceedings or removal from

(Sept. 2021), https://perma.cc/VED3-J4BP; DHS, *Final Supp. EA: Addressing the Proposed Construction, Operation, & Maintenance of a New Joint Processing Ctr. in Laredo* (April 2024), https://perma.cc/ZHH8-XH97; DHS, ICE, *Port Isabel Ser. Processing Center Final EA* (Feb. 2019), https://perma.cc/LC8L-KCR7; DHS, *EA for the Proposed Contract Detention Facility in the Houston, Texas Area* (Dec. 2016), https://perma.cc/Q87V-54HQ; DHS, *Final EA: Addressing the Proposed Land Purchase & Construction, Operation, and Maintenance of a Joint Processing Ctr. in Yuma* (Sep. 2023), https://perma.cc/5LQY-ZP9M; DHS, *Final EA: Addressing the Proposed Land Purchase, and Construction, Operation, and Maintenance of a Joint Processing Ctr. in Eagle Pass* (Aug. 2023), https://perma.cc/Z85P-U2LH.

### 2. The Intergovernmental Cooperation Act

Congress enacted the ICA in 1968 "[t]o achieve the fullest cooperation and coordination of activities among the levels of government in order to improve the operation of our federal system in an increasingly complex society." Intergovernmental Cooperation Act, Pub. L. 90-577, 82 Stat. 1098 (1968). The ICA mandates that "all national, regional, State, and local viewpoints shall be considered in planning development programs and projects of the United States Government" and that

---

the U.S." DHS, ICE, *Detention Facilities*, https://perma.cc/JA5U-93Z3. This includes both "processing centers" intended to hold noncitizens for shorter periods of time and other facilities intended to hold noncitizens for longer periods. *Id.*

the "needs of regions, States, and localities shall be considered in plan formulation, evaluation, and review." 31 U.S.C. § 6506(c).

To implement this statutory requirement, the U.S. Office of Management and Budget (OMB) promulgated Circular A-95, which recognized that the ICA required intergovernmental coordination for "[d]irect Federal development projects." Off. of Mgmt. & Budget, GGD-75-52, Improved Cooperation and Coordination Needed Among All Levels of Government—OMB Circular A-95, 44 (Feb. 11, 1975). Acknowledging failures to consult with state or local governments that resulted in "delays, cost overruns, and adverse reactions from citizens and from officials of affected governmental units," OMB directed federal agencies "to insure maximum feasible consistency of their proposed projects with [the] plans and programs" of state, regional, and local entities. *Id.* at 44, 49.

President Reagan replaced OMB Circular A-95 with Executive Order 12372, which gave States and localities flexibility regarding how to share their viewpoints, but continued to direct agencies to "provide opportunities for consultation by elected officials of those State and local governments … that would be directly affected by … direct Federal development." *Exec. Order 12372*, 47 Fed. Reg. 30,959 (July 14, 1982). Courts have recognized that EO 12372 and the ICA require "consideration of local viewpoints during the planning stages of a project." *City of Waltham v. USPS.*, 11 F.3d 235, 244 (1st Cir. 1993) (cleaned up); *see also City of Rochester v. USPS*,

9

541 F.2d 967, 976 (2d Cir. 1976). This amounts to "an affirmative obligation" for federal agencies to consider local interests, and "to develop a reviewable record" explaining any "decision to act in disharmony with local planning objectives." *Rochester*, 541 F.2d at 976.

## B.    Factual Background

### 1.    ICE Purchases Warehouse To Establish Detention Facility.

Last summer, ICE announced its intention to run the agency's deportation operations "like (Amazon) Prime, but with human beings." Ex. A. To that end, ICE has embarked on an unprecedented plan to buy and convert industrial warehouses into detention facilities, as detailed in a recent memo. Ex. B. ICE had traditionally avoided expanding detention space through ICE-owned facilities given "the substantial amount of time needed to design and construct such a facility."[3] But, seeking to "increase bed capacity to 92,600 beds … by November 30, 2026," ICE decided to pursue "the acquisition and renovation of eight large-scale detention centers and 16 regional processing sites, as well as the acquisition of 10 existing 'turnkey' facilities where ICE ERO already operates." Ex. B at 1. Each new processing center will "hous[e] an average daily population of 1,000 to 1,500 detainees for average stays

---

[3] U.S. GAO, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://perma.cc/CCW8-KW82 ("officials said that new contracts for ICE-owned service processing centers are not a viable option" because of the time required "coupled with the fact that ICE does not have construction authority").

of 3–7 days" and "will serve as staging locations for transfers or removals." *Id*. ICE intends to close dozens of private detention centers and end its partnerships with local jails to hold detainees. *See* Ex. D; Ex. E at 2–3.

In December 2025, public reports indicated that ICE intended to purchase the property at 1879 Route 46, Roxbury, New Jersey (the "Warehouse") to serve as one of these detention facilities. Ex. G. Constructed in 2019, the Warehouse is a vacant, 470,444 square-foot facility that consists of a single large room with concrete floors, a minimal amount of office space, and only four toilets. Michetti Decl. ¶ 15; Murphy Decl. ¶ 24. The location of the Warehouse is not zoned for large-scale human occupancy. Rather, it is zoned for "Light Industrial/Office Research," for which the "[p]rincipal permitted uses" include "professional offices" and "manufacturing limited to assembly of finished components." Murphy Decl. ¶ 22.

Following the public reports and concerned about the local impacts of turning the Warehouse into a mass detention center, Roxbury officials expressed their strong objections to the facility. Memorializing their opposition in a unanimous resolution, the Roxbury Township Council emphasized the facility would run afoul of "the Township's land use and regulatory ordinances" and would "create[] unanticipated burdens upon the Township's infrastructure, resources, and services." Murphy Decl., Ex. C. Roxbury officials also "repeatedly attempted to contact Defendants to discuss

11

their plans for the Warehouse," emailing or calling them over a dozen times between December 29, 2025 and February 19, 2026. Murphy Decl. ¶ 5.

Although ICE announced on February 18 that it "has not purchased a facility in Roxbury, New Jersey," Ex. C, in an abrupt reversal, DHS (ICE's parent agency) announced on February 20 that it had, in fact, purchased the Warehouse, Ex. G. Public records subsequently confirmed that DHS paid $129 million to acquire it. Ex. H. Then, on February 24, DHS sent the New Jersey Department of Environmental Protection (NJDEP) a one-paragraph letter confirming it had purchased the Warehouse. Kane Decl., Ex. C. The letter acknowledged the Warehouse property was "encumbered by a conservation easement to the benefit of" NJDEP, that the easement's terms required advance notice to NJDEP of changes in property ownership, and that such notice may not have been provided. *Id*. The letter did not seek NJDEP's views on the impacts of converting the Warehouse into a detention facility. *Id*.

On February 25, 2026, DHS replied to one of Roxbury's emails—two months after Roxbury's initial outreach—to confirm the purchase and intended use of the Warehouse, but did not solicit or engage with Roxbury's views on the local impacts of a detention facility. Murphy Decl. ¶¶ 13-14. Two days later, Governor Mikie Sherill sent DHS a letter expressing New Jersey's opposition to the detention center, given the impact on state and local resources. Ex. K. On March 11, the office of Senator Andy Kim invited Roxbury officials to a meeting with DHS to discuss the

12

facility. Murphy Decl. ¶ 15. At the meeting, DHS officials confirmed their plan to convert the Warehouse into a facility for up to 1,500 detainees, staffed by 1,000 employees. *Id*. ¶ 16. DHS indicated the facility would be operational within a few months, but did not ask Roxbury officials for their views concerning these plans. *Id*.

At no point prior to purchasing the property did DHS seek the State's or Roxbury's views or concerns regarding the property, its suitability for development into a detention facility, or environmental impacts that would result from repurposing the Warehouse. Pepe Decl. ¶ 8; Murphy Decl. ¶¶ 4–5. DHS's only outreach to a state or local official prior to the Warehouse purchase was a January 14, 2026 letter to the state Historic Preservation Office, which confirmed DHS intended "to purchase, occupy, and rehabilitate [the Warehouse] … in support of ICE operations" and announced DHS's determination that no historic properties covered by the National Historic Preservation Act would be affected by its plans. Pepe Decl., Ex. A, at 1. The letter did not address any other issues. *See id* at 1–2; Pepe Decl. ¶¶ 11-12.

The January 14 letter made clear that DHS planned extensive construction and renovation activities at the Warehouse site. *Id.* DHS explained that "[p]roposed site improvements may include, but are not limited to, installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and cameras"; installing "[t]entage and a guard shack"; "painting or sealing the exterior of the structure; installing, removing, or modifying

13

bays (truck bays, window bays, or doors); repairing or replacing the existing roof or cladding materials; adding security equipment; or adding exterior personnel/guest access controls"; "constructi[ng] … holding and processing spaces, office space, public-facing visitor spaces"; installing "amenities, such as cafeterias, bathrooms, and health care spaces"; and constructing "piers and fence posts" on the undeveloped portions of the property beyond the existing warehouse structure. *Id*. at 1.

### 2.    Impacts On Environment And Public Resources

As the following summary of the PI record confirms, converting the Warehouse into a mass detention facility, and operating it as such, would burden local infrastructure and resources and pose substantial risks to the environment.

***Threats to Water Systems.*** Roxbury owns and operates a municipal water supply system for delivery of potable water to service connections within the Township. Michetti Decl. ¶ 16. The Warehouse is connected to Roxbury's Skyview water system for receipt of potable water. *Id.* Prior to ICE's purchase, the daily water demand for the Warehouse was estimated at 12,000 gallons per day, based on 245 employees and 47,000 square feet of office space. Ingelido Decl. ¶ 18. Conversion of the Warehouse into a detention facility housing 1,500 detainees and staffed by 1,000 employees, as described by DHS, would increase the facility's projected average daily water demand to 212,500 gallons per day—a 17-fold increase. *Id.* ¶¶ 19–23.

14

Skyview is not equipped for this increase. The system currently has a limited surplus capacity of 121,000 gallons per day, but operation of a detention facility at the site is projected to increase peak daily water demand on Skyview to more than 600,000 gallons per day. *Id.* ¶ 25. The increased demand on the system would thus surpass its design capacity, risking reduced water pressure for households that rely on the Skyview system. *Id.* ¶ 31. Still more, water pumping equipment would be overburdened and risks malfunctioning, further compounding the strain on the system and imposing substantial repair costs. Michetti Decl. ¶¶ 25–26. Eventually, the water reserves could be so depleted that water would not flow at all. *Id.* ¶ 13.

Reduced pressure and unreliable water availability not only impair daily water use, but also pose serious health and safety risks. Because lower water pressure increases the risk of contamination, state regulations require "boil water" advisories when pressure falls below a certain threshold. Ingelido Decl. ¶ 9. Limited water availability also undermines fire suppression efforts. *Id.* ¶ 32; Michetti Decl. ¶ 23. Nor could the Skyview system readily satisfy the increased water demand by developing new sources of water, such as by drilling new wells, *see* Ingelido Decl. ¶ 34, for this is extremely costly, Michetti Decl. ¶ 26, takes years, *id.*, and may be precluded by the need to preserve water availability for the State's other water systems. Ingelido Decl. ¶ 10. And contractual, regulatory, and infrastructure limitations constrain Roxbury's ability to buy water from other systems. Michetti Decl. ¶¶ 24–25.

***Threats to Sewer System.*** Operating a detention facility at this site would also compromise the integrity of the sewer system, risking sewage overflows that pollute waterways and are hazardous to public health. The State approved the Warehouse's initial connection to the sewer system based on an estimate that its use as an industrial warehouse would generate 11,700 gallons of wastewater daily. *Id.* ¶ 8; *see also* Rosenwinkel Decl. ¶ 10. Conversion of the Warehouse would dramatically increase projected wastewater output of the facility to an estimated 187,500 gallons per day. Ferriero Decl. ¶ 9. This increase would strain already overburdened infrastructure, subjecting the sewer system to increased risks of raw sewage overflowing in various locations and discharging into Lake Musconetcong. *Id.* ¶ 19–20. It also heightens the risk that sewage backs up into the system, seeping out of shower drains and sinks. *Id.* ¶ 21. And the presence of untreated sewage in the streets and in people's showers and sinks poses significant public health concerns. Jenkins Decl. ¶ 7.

***Impacts on Areas Covered by Easement.*** The Highlands Region in which the Warehouse is located is an environmentally sensitive area—from which more than 70% of state residents get their drinking water and which both the state and federal government have enacted laws to protect and conserve. Kane Decl. ¶¶ 10–12; Ingelido Decl. ¶ 42. NJDEP thus conditioned enabling sewer service to the Warehouse in 2022 on the prior owner's execution of an easement that barred any development of, or construction on, 74.7 acres of the property. Kane Decl. ¶ 24. The easement runs

16

with the land in perpetuity and prohibits the "removal, excavation, or disturbance of the soil" as well as "installation of structures." *Id.*, Ex. A. Any development that goes beyond the Warehouse's existing footprint would implicate the State's property interests in the area covered by that easement. *Id.* ¶ 28. It would also threaten the habitat, including freshwater wetlands, of several species that are protected by a range of federal and state laws. *Id.* ¶ 37. Indeed, DHS's plans to extend the physical infrastructure of the Warehouse, including installing "piers and fence posts" on un-developed land and increasing the parking lot, Pepe Decl., Ex. A at 1, will encroach on lands covered by the easement. Kane Decl. ¶ 38; *id.*, Ex. A. Further, conversion to a detention facility will likely require the installation of equipment that generates air pollutants. Steitz Decl. ¶¶ 17–20.

**Traffic Impacts**. The Warehouse is situated on a stretch of roadway plagued by traffic. It is located about 0.3 miles from the Route 46 interchange with Interstate 80, busy roadways with high volumes of accidents and speeding complaints. Ferriero Decl. ¶ 23. The area is a dangerous section of highway due to the grade of the road-way, limited visibility, speeding motorists, periodic sun glare, and pedestrian traffic. *Id.* The area near or around the Warehouse has seen 46 motor vehicle crashes, three fatal, since 2019. *Id.* ¶ 46. A recent traffic study estimated that DHS's planned con-version of the Warehouse would increase traffic volume nearly seven times during the peak morning period, and nearly five times for the peak afternoon. *Id.* ¶ 29. The

17

surge in traffic would be further exacerbated if DHS used trucks to transport water and wastewater to and from the site. *See id.* ¶ 28; Rosenwinkel Decl. ¶ 24.

***Public Health Impacts.*** Finally, conversion of the Warehouse to a detention facility will likely create public health and safety risks that strain Roxbury's emergency and public health resources. Murphy Decl. ¶¶ 31–34. For example, Roxbury's Health Department has only five full-time employees and does not have sufficient resources to assist in containing disease outbreaks that spread beyond the facility. *Id.* ¶ 32. And Roxbury's EMS, a volunteer service with only 35 individuals and 2 ambulances, is not equipped to respond to emergencies arising in the facility without jeopardizing its ability to meet Roxbury residents' existing needs. *Id.* ¶ 33.

## ARGUMENT

This Court should issue preliminary relief to preserve the status quo while this litigation unfolds. The State and Roxbury have standing to sue; are likely to succeed on the merits of their NEPA and ICA claims; and will likely suffer irreparable harm absent a preliminary injunction. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Further, both the balance of the equities and the public interest favor preliminary relief, before irrevocable harms from construction occur. *See id.*

## I.    PLAINTIFFS HAVE STANDING.

To satisfy Article III, the State or the Township must have a "personal stake" in the lawsuit. *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). That requires showing

"three elements: injury-in-fact, causation, and redressability." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014). Because the State and Township each face a substantial risk of harm to their proprietary and sovereign interests if DHS proceeds with a detention facility at the Warehouse, they both easily meet that test.

Begin with injury in fact. That requirement ensures the plaintiffs are suffering concrete, particular, and imminent harm. *See id.* at 361; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs asserting violations of procedural requirements face a lighter burden , *see Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023); *Lujan*, 504 U.S. at 572 n.7: they need only show "it is 'reasonably probable' that the challenged action threatens [their] concrete interest[s]." *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017); *see Lowman v. FAA*, 83 F.4th 1345, 1355–56 (11th Cir. 2023); *Friends of Tims Ford v. TVA*, 585 F.3d 955, 968 (6th Cir. 2009). That makes sense, since such statutory requirements exist to reveal information necessary to assess fully the harms the action would impose. For example, NEPA plaintiffs "need only show a risk that serious environmental impacts will be overlooked"; they "need not present the court with the results of the same environmental investigation that [they] seek[] in [their] suit to compel the agency to undertake." *Ondrusek v. U.S. Army Corps of Eng'rs*, 123 F.4th 720, 731 (5th Cir. 2024) (quotation omitted); *Sierra Club v. U.S. Army Corps of Eng'rs,* 446 F.3d 808,

19

816 (8th Cir. 2006) (seeking only "risk of environmental harm"); *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449–50 (10th Cir. 1996).

New Jersey and Roxbury easily meet their burden. States and localities suffer sufficient "concrete and particularized interests" under Article III, *Lucero*, 102 F.3d at 449; *Navajo Nation*, 876 F.3d at 1160–61, where the action threatens harms to their public properties, like "state parks, beaches, reservations, [or] wildlife sanctuaries," or to public infrastructure, including "stormwater pump stations." *Massachusetts v. EPA*, 549 U.S. 497, 522 n.19 (2007); *see also, e.g., Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 130 (3d Cir. 2024) (town suffered injury from increased flight traffic, aircraft noise, and air pollution that would decrease property values); *Clean Wis. v. EPA*, 964 F.3d 1145, 1159–60 (D.C. Cir. 2020) (state and city had "concrete and particularized" injuries from harms to their parks); *Rochester,* 541 F.2d at 972, 978 (town suffered injury due to "environmental damage within the city"); *City of Fernley v. Conant*, 763 F. Supp. 3d 1184, 1193 (D. Nev. 2025) (similar); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1177 (D.N.M. 2015) (similar).

As laid out above, it is more than "reasonably probable," *Navajo Nation*, 876 F.3d at 1160, that DHS's decision to establish a detention facility at the Warehouse "threaten[s]" harms to state and township resources. *Navajo Nation*, 876 F.3d at 1160. Construction and operation of the facility threaten the integrity and reliability

20

of public water systems as new water demands will exceed design capacity, *supra* at 14–15; compromise the sewer system and risk overflows that pollute waterways and threaten public health, *supra* at 16; physically harm lands covered by a state easement, *supra* at 16–17, and risk increased air pollution and increased traffic, *supra* at 17. And when any of these risks materialize, they will drain Roxbury's fiscal resources, requiring infrastructure repairs and upgrades. *See supra* at 15.

Causation and redressability are also met. *See, e.g.*, *Ondrusek*, 123 F.4th at 734 (discussing *Lujan*, 504 U.S. at 572 n.7, and  asking if "there is some prospect that fixing the alleged procedural violation could cause the agency to change its position on the substantive action," not that rendering a different decision would be "certain"); *Lowman v. FAA*, 83 F.4th 1345, 1355 (11th Cir. 2023) (asking "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider"); *Lujan*, 504 U.S. at 572 n.7 ("the normal standard[] for redressability" is relaxed for procedural claims). Here, had DHS properly considered environmental impacts under NEPA or state/local concerns under the ICA, it would have had to grapple with the unanswered challenges regarding how to handle water and sewage issues based on local systems that cannot handle these influxes, and how to maintain a detention facility at a site that has four toilets for over 1,500 people. *See supra* at 11–13, 14–16. DHS could plausibly decide this Warehouse is a poor fit for a new mass detention facility—and consider alternatives instead. That satisfies Article III.

21

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

DHS's rushed decision to establish a mass detention facility at the Warehouse site without engaging in either the required environmental analyses or intergovernmental consultations plainly violates both NEPA and the ICA.

### A.    DHS's Decision Violates NEPA.

As another court concluded when assessing analogous claims based on similar circumstances, DHS violated NEPA by failing to complete *any* such review before deciding to convert the Warehouse into a detention facility. *See Maryland*, 2026 WL 691507, at *4 (finding NEPA claim likely to succeed and issuing TRO). This is not a case where this Court must grapple with whether NEPA calls for a detailed EIS or a less detailed EA or even evaluate the substance of a particular EIS or EA. Rather, this is a case where DHS did not issue *any* EIS or EA before making and implementing a final decision with sweeping consequences. *See id.* (agreeing ICE must issue EIS or EA before deciding and starting to establish analogous detention facility). Nor is DHS's noncompliance excused by NEPA's statutory exceptions. That is all this Court must hold.

As explained in detail above, the NEPA framework is clear. Federal agencies must assess the environmental impacts of proposed major federal actions by taking one of two steps: (i) preparing a detailed EIS for actions that significantly affect the environment; or (ii) preparing a less detailed EA concluding either that there are no

22

significant environmental effects or that a more robust EIS is required. 42 U.S.C. § 4336(b)(1)–(2); *see Maryland*, 2026 WL 691507, at *3 ("NEPA requires federal agencies to consider the environmental implications of any ... 'major federal action'" (quoting 42 U.S.C. § 4332(2)(C))). It must issue the EIS or EA before it finalizes its decision, as the statute "ensur[es] that environmental concerns are integrated into the very process of agency decisionmaking," not that the EIS or EA is window-dressing for a decision the agency already made. *Trenton Threatened Skies*, 90 F.4th at 131 (quotation omitted); *Del. DNR*, 685 F.3d at 269 (NEPA requires agencies to "consider the environmental consequences of projects before committing resources"). So if the agency proposes to take any "major federal action," it must publish an EIS or EA first. Otherwise the action is invalid unless it falls into one of NEPA's cabined exceptions.

DHS did not comply with its obligation. Establishing a mass detention facility at the site is a major federal action—that is, an action within DHS's "substantial ... control and responsibility." 42 U.S.C. § 4336e(10)(A);[4] *see Maryland*, 2026 WL 691507, at *4 (finding "major federal action" requirement met for DHS decision to convert warehouse into detention facility). That is why DHS itself identified "mission and operations planning," "[a]cquisitions and procurements," and "[a]sset

---

[4] A "major" action is not defined by the extent of impacts (which bears instead on whether an EIS or EA is required), but on the extent of federal involvement.

management" as federal actions in which it engages that require NEPA review. *Envt'l Planning Prog.*, 71 Fed. Reg. at 16,801; Ex. L at V-1–V-2. And that is why, until this year, DHS routinely issued an EIS or EA—as NEPA requires—before it renovated or constructed an immigration detention facility. *See supra* at 7–8.[5] Yet DHS failed to publish an EIS or an EA before making the final decision to establish a mass detention facility at this site. *See* Pepe Decl., Ex. A at 1 (DHS plan to "purchase, occupy, and rehabilitate [Warehouse] … in support of ICE operations"); Murphy Decl. ¶ 14 (DHS statements to local officials). In short, DHS decided to take a major federal action, and that action requires an EIS or at least EA, yet DHS has issued neither. Under NEPA, this is an open and shut case.

The impacts of this action illustrate why Congress required agencies like DHS to issue an EIS or an EA before making such decisions—and why DHS has done so when undertaking projects at detention facilities in the past. *See supra* at 7–8. DHS's plans will overburden the State and Township's management of natural resources, including by increasing the planned water demand and sewage output more than 15-fold, beyond existing systems' capacities. *Supra* at 14–18. The risks are severe: sewage overflows that would pollute Lake Musconetcong, reduced water availability, drinking water contamination, and damage to equipment. *Supra* at 16.

---

[5] The Bureau of Prisons also recognizes an EIS or EA is required for correctional facilities. *See* 28 C.F.R. Pt. 61, App. A (Bureau's NEPA implementing regulation).

And other impacts abound, including to easements and wildlife, in the sensitive Highlands region. *Supra* at 16–17.

These are precisely the kinds of consequences that require a "hard look" by a federal agency under NEPA. *Robertson*, 490 U.S. at 350. *See, e.g.*, *Twp. of Bordentown v. FERC*, 903 F.3d 234, 256 (3d Cir. 2018) (discussing a prior analysis giving "detailed consideraion of the [proposed] Project's impacts to the area's geology; water resources; vegetation; wildlife; endangered species; cultural resources; land use, recreation, and visual resources; [and] air quality and noise"); *Del. DNR*, 685 F.3d at 276–78 (discussing EA with detailed studies addressing impacts on water contamination and endangered species); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) (noting "pressures on available water supplies [and] sewage treatment facilities" as impacts to be considered under NEPA); *Citizens Advisory Comm. on Priv. Prisons v. USDOJ*, 197 F. Supp. 2d 226, 264 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002) (EA "concluded that both water and sewer authorities have existing capacity to handle the project"). Moreover, that careful assessment is meant to be informed by "cooperation with State and local governments, and other concerned public and private organizations," 42 U.S.C § 4331(a), which possess critical factual information as to local impacts. Given that "no EIS and no EA were initiated or completed," DHS gave no "'hard look' at the

potential environmental consequences of their plans for the [Roxbury] Warehouse."
*Maryland*, 2026 WL 691507, at *5.

Although NEPA establishes four specific and exclusive exceptions for which neither an EIS nor an EA is required, none of those enumerated exceptions apply to this case. *See* 42 U.S.C. § 4336(a)(1)–(4); *Maryland*, 2026 WL 691507, at *3 n.4 (finding none of these four "limited circumstances" likely apply to the establishment of a mass detention facility at an industrial warehouse site, given the lack of "evidence of any exclusion applying" and proffered evidence that "DHS has previously applied NEPA to detention facility construction").

Subsection (a)(2)—the sole exception on which DHS has relied to defend its similar decision in Maryland—is inapplicable. That subsection has a limited role: it allows agencies to create and apply pre-existing and agency-specific "categorical exclusions" that replace an EIS or EA for the particular major federal action. *See* 42 U.S.C. §§ 4336(a)(2), 4336c. The agency can  identify "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment." 42 U.S.C. § 4336e(1). And if that agency takes a specific action falling within the category that would not significantly affect environmental quality, it need not create an individual EA to reach that same conclusion. But DHS's categorical exclusions plainly do not apply here, and even if they did, DHS still had to publish an EIS or an EA given the presence of extraordinary circumstances.

26

Crucially, none of the agency's actual categorical exclusions apply—which is likely why DHS has conducted and published EAs for other detention facilities under its control, including for less dramatic renovations. *See supra* at 7–8 (counting six prior EAs for detention facilities). DHS maintains its list of categorical exclusions in its Manual. Ex. L, App. A. In responding to a similar NEPA challenge, DHS claimed the application of three exclusions—known as C1, D1, and E2—to defend the acquisition and renovation of a warehouse in Maryland. *See Maryland v. Mullin*, No. 26-733, ECF 34 at 12 (Apr. 2, 2026).[6] None of those three exclusions apply here.

Begin with DHS's so-called C1 exception. C1 allows DHS to generally avoid publishing an EIS or EA where the action is merely the "acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas … which does not result in a change in the functional use of the property." Ex. L at A-6. But on its face neither condition is met. As to the former, the Warehouse site is within or adjacent to environmentally sensitive areas, including protected wetlands, and most of the property is covered by an NJDEP conservation easement. Kane

---

[6] To the degree it relies on these same exclusions in this case, DHS will need to show that it contemporaneously considered and documented application of these categorical exclusions before making its final decision. *See, e.g.*, *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 56 (D.D.C. 2022) (collecting cases seeking evidence of "contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a Categorical Exclusion to the facts of a particular decision").

Decl., ¶¶ 13, 25, 28; Kane Decl., Ex. B. Particularly absent consultation with state or local officials, it is unlikely that DHS considered these environmental sensitivities. In any event, as to the latter, it is an understatement to describe this DHS action as "a change in the functional use of the property": it plans to overhaul use from an industrial warehouse into a detention center that houses up to 1,500 individuals. Since humans are not akin to Amazon packages, a logistics center and a detention facility are not the same "function." *See, e.g.*, *Function*, Oxford English Dictionary, https://www.oed.com/dictionary/function_n (last visited Apr. 7, 2026) ("the purpose or intended role of a thing"); *Functional*, Black's Law Dictionary (12th ed. 2024) ("Serving, or designed to serve, some particular purpose"). And since this detention facility requires over 15-fold increases in water inputs and sewage outputs, these changes in function are precisely the kind that trigger a NEPA hard look, not an exclusion. *See, e.g.*, *Nat'l Post Off. Collaborative v. Donahoe*, No. 13-1406, 2013 WL 5818889, at *11–15 (D. Conn. Oct. 28, 2013) (USPS application of exclusion arbitrary and capricious where it did not assess change of use from post office to a high-rise apartment); *Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1183 (D. Colo. 2002) (categorical exclusion for property transfer inapplicable where transfer was for new use of property).

DHS's reliance on D1 fails for overlapping reasons. D1 generally exempts an agency from publishing an EIS or EA where the action involves "minor renovations

28

and additions to … facilities that do not result in a change in the functional use of the real property." Ex. L at A-7. For one, because the D1 exclusion (like C1) does not apply to any "change in the functional use of the real property," conversion from warehouse to detention facility cannot qualify. For another, the changes DHS contemplates are hardly "minor renovations": creation of new "cafeterias, bathrooms, and health care spaces"; construction of new "piers and fence posts" involving "ground disturbing work"; installation of a "guard shack," "drainage/stormwater" systems,"fencing," and "cameras"; "installing, upgrading, or rehabilitating existing parking areas"; changes to "site lighting"; "landscaping"; new "recreation areas"; and making "underground utility improvements." Pepe Decl., Ex. A.[7] DHS has repeatedly issued EAs for less significant renovations at processing centers, *see supra* at 7–8, because these changes cannot count as "minor."

For its part, the E2 categorical exclusion is for construction activity when five requirements are met,[8] at least four of which are plainly not met here. The detention

---

[7] These changes are in sharp contrast to the usual meaning of "minor," which refers to changes that are "comparatively unimportant," *see e.g., United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023), and which DHS recognized extends to less impactful changes like "realigning interior spaces" or "adding a small storage shed" or "a small antenna on an already existing antenna tower," Ex. L at A-7.

[8] E2 applies exclusively to "New construction upon or improvement of land where all of the following conditions are met: (a) The structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs, (b) The

29

facility is not "compatible with … local planning and zoning standards," which limit this area to offices and industrial uses, *see* Murphy Decl. ¶¶ 21–24 (discussing local zoning); the proposed development threatens areas not "previously disturbed," namely a site covered by an enforceable state conservation easement; the use will "substantially increase the number of motor vehicles"; and construction will "result in uses that exceed existing support infrastructure," including sewer and water infrastructure. *Compare* Ex. L at A-8, *with supra* 14–16.

Second and independently, DHS cannot rely on any of these three categorical exclusions (even if their plain language were to apply) given the presence of multiple extraordinary circumstances. As a matter of hornbook law, an agency cannot apply its pre-written categorical exclusions to an individual development project for which "extraordinary circumstances" suggest heightened risk of significant environmental effects. Ex. L at V-4–V-6 (explaining that a categorical exclusion applies only if an action "clearly fits the category" *and* "[n]o extraordinary circumstances exist"); *see also, e.g., BRRAM, Inc. v. FAA*, 721 F. App'x 173, 175 (3d Cir. 2018) (agreeing that before applying a categorical exclusion, "the agency must consider whether any of

---

site is in a developed area and/or a previously-disturbed site, (c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area, (d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and, (e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.)." Ex. L at A-8.

its delineated extraordinary circumstances apply"); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (same); *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 330 (D.N.J. 2025). In other words, even if an agency has found the category of actions might not "normally … significantly affect the quality of the human environment," 42 U.S.C. § 4336e(1), it still has to consider whether a specific project within that category nevertheless abnormally does.

Here, establishing a detention facility at the Warehouse implicates several of the extraordinary circumstances DHS itself has agreed "preclud[e] the application" of a categorical exclusion. Ex. L at V-5–V-6. For one, this major federal action has at least a "potentially significant effect on public health and safety," *id.* at V-6(i): the above-described burdens that the facility will place on local water and sewer systems risk contamination of the water system and the overflow of sewage into waterways. *See supra* at 14–18 (discussing not only these water and sewage-related harms, but also a series of other local public health and safety related harms); *compare Arkansas Nature All., Inc. v. U.S. Army Corps of Eng'rs*, 266 F. Supp. 2d 876, 885–90 (E.D. Ark. 2003) (agency could not use categorical exclusion because it failed to address potentially significant environmental consequences raised by state agencies, including impacts on water quality). For another, the action presents a "potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment," Ex. L at V-6(v): it will require DHS to violate an NJDEP

31

easement—a property mandate. *See* Kane Decl. ¶¶ 24–29. Further, the action has both "a potentially significant effect on an environmentally sensitive area," and a "potentially significant effect on species or habitats protected by" law. Ex. L at V-6(iv), (ii). The property contains protected conservation lands, environmentally sensitive wetlands, and habitat for several species protected by federal and state law. *See* Kane Decl. ¶¶ 24, 34–36. And last, this action is of "[s]ignificantly greater scope or size than normally experienced for this particular category of action," Ex. L at V-6(viii): it is the establishment of an entirely new mass detention facility to house 1,500 people per day. That is why DHS has used EAs, not categorial exclusions, for less significant actions, even for detention facilities. *See supra* at 7–8.[9]

---

[9] The remaining NEPA exceptions to conducting an EIS or EA at 42 U.S.C. § 4336 are also inapplicable. Subsection (a)(1) exempts from review a "proposed agency action [that] is not a final agency action," 42 U.S.C. § 4336(a)(1), but the decision to establish a detention facility at the Warehouse is plainly final: the agency bought the Warehouse to convert it to, and use it as, a detention facility. *See supra* at 11–14. Subsection (a)(3) exempts agencies from publishing an EIS or EA if "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law." 42 U.S.C. § 4336(a)(3); *Limerick Ecology Action, Inc. v. U.S. Nuclear Regul. Comm'n*, 869 F.2d 719, 729 (3d Cir. 1989) ("[C]ompliance with NEPA is required unless specifically excluded by statute or existing law makes compliance impossible"). But it is unclear what law forbids DHS from producing an EIS or EA before deciding to establish this detention facility—particularly as DHS has published EAs before. Nor can DHS rely on subsection (a)(4), which applies if "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration." 42 U.S.C. § 4336(a)(4). While the INA and appropriations laws doubtless permit ICE to detain noncitizens and to establish detention centers, ICE

Absent any statutory exception, DHS cannot justify its failure to conduct and publish *any* NEPA-required document—whether an EIS or EA—before the agency made and implemented its final decision to establish this mass detention facility.

## B.   DHS's Decision Violates The ICA.

DHS's decision to establish a mass detention facility at the Warehouse without engaging in any meaningful consultation with state or local officials violates the ICA. The ICA requires that "State[] and local viewpoints … be considered in [federal] planning development programs and projects" and that the "needs of regions, States, and localities … be considered in plan formulation, evaluation, and review." 31 U.S.C. § 6506(c). Yet although ICE's plan to establish a detention facility at the Warehouse is a federal development project, ICE never considered the views of New Jersey or Roxbury prior to finalizing this plan—in contrast to other States.

ICE's plan to convert the Warehouse into a mass detention facility is a "development … project[] of the United States Government." 31 U.S.C. § 6506(c). As executive branch guidance and case law make clear, federal development projects encompass the construction or renovation of buildings federal agencies own and operate. *See* Exec. Order No. 12372; *Waltham*, 11 F.3d at 238 (applying ICA to USPS

retains considerable discretion over whether and when and where to establish new mass detention facilities.

purchase of land and conversion into a 400,000 square foot mail distribution facility); *Azzolina v. USPS*, 602 F. Supp. 859, 863–4 (D.N.J. 1985) (similar)*; Olmsted Citizens for a Better Cmty. v. United States*, 606 F. Supp. 964, 968, 980–81 (D. Minn. 1985), *aff'd*, 793 F.2d 201 (8th Cir. 1986) (applying ICA to Bureau of Prisons' plan to convert former state hospital to treatment center for federal inmates).

Yet DHS did nothing to consider "to the extent possible" New Jersey's or Roxbury's views on that plan before proceeding with it. 31 U.S.C. § 6506(c). To the contrary, DHS "finally determined" that the Warehouse was "the best available site for the new [mass detention] facility," even purchasing it expressly for that purpose, without consulting or soliciting views from the State or Township on the range of local impacts. *Rochester*, 541 F.2d at 972. Although DHS had some limited contacts with state and local officials, all were either "at the request of [state or local] officials," *id.* at 976, for the limited purpose of DHS unilaterally conveying information about its purchase and intended use, or related to historic preservation. Murphy Decl. ¶¶ 13–16; Pepe Decl. ¶¶ 8–11. "[T]his falls far short of indicating that [DHS] did anything to promote the purposes of, or to comply with the language of, the ICA." *Rochester*, 541 F.2d at 976. Given the total absence of evidence that DHS "gave full consideration"—let alone any—"to the interests of the local agencies," *id.*, this is

34

another basis to "preliminarily enjoin[]" DHS from proceeding with construction at the Warehouse "pending compliance with NEPA and the ICA." *Id.* at 979.[10]

This case powerfully illustrates the importance of the ICA, and federal agencies at least soliciting state and local input on potential impacts of development projects. In sharp contrast to its conduct at the Warehouse, DHS was responsive to concerns New Hampshire raised as to DHS's similar plan there: DHS met the governor, listened to state and local officials, and abandoned a detention facility in Merrimack. Ex. I. DHS declined similar requests from Roxbury, *see* Murphy Decl. ¶¶ 13–17, and ignored communications from state and local officials, *see supra* at 11–13. Because DHS declined to consider New Jersey and Roxbury's concerns and produce a "reviewable record" to support its "decision to act in disharmony" with the concerns, *Rochester*, 541 F.2d at 976, it is unclear why DHS heeded the concerns of an allied State's officials but turned a cold shoulder to those expressed by New Jersey.

---

[10] This Court has denied ICA claims only where federal agencies gave significant consideration to state and local concerns. *See Clinton Twp. v. USPS*, 638 F. Supp. 763, 767 (D.N.J. 1986) (USPS met with local officials, "requested a statement of concerns," and took responsive mitigation efforts); *Bergen Cnty. v. Dole*, 620 F. Supp. 1009, 1065 (D.N.J. 1985), *aff'd*, 800 F.2d 1130 (3d Cir. 1986) (record "replete with documentation of the conferences and correspondence" with state and local agencies); *Azzolina*, 602 F. Supp. at 863–64 (agency "especially sensitive" to state and local concerns). None of these cases involved the extraordinary facts here or in *Rochester*, where the agency refused to entertain state and local concerns entirely.

**III.    THE EQUITIES FAVOR PRELIMINARY RELIEF.**

Plaintiffs would suffer myriad irreparable harms absent relief. The State and Roxbury already established the range of harms they would suffer if construction and operation of the mass detention facility proceed, including serious negative impacts on water and sewer systems, waterways and critical natural resources, and land protected by a state property easement—which was carefully demanded of the site's prior owner before the Warehouse itself could be connected to the sewer system. *See supra* at 14–18, 20–21. Indeed, the harms to the State and Roxbury would begin while this case proceeds, necessitating emergency judicial relief. *See* Murphy Decl. ¶ 20 (DHS plans to start construction as early as late May).

These harms are unquestionably irreparable. For one, harms to the State's and Roxbury's own environmental resources are classically irreparable: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also, e.g.*, *NRDC v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 506 (3d Cir. 1993) ("discharges of pollutants" into river constitutes irreparable harm); *J.P. Rail, Inc. v. N.J. Pinelands Comm'n*, 404 F. Supp. 2d 636, 638–39, 652 (D.N.J. 2005) (construction of waste transfer facility would irreparably harm "valuable surface and groundwater resources"); *Colorado v. EPA*, 989 F.3d 874, 888–89 (10th Cir. 2021) ("harm [to State's] wetlands, wildlife, and

36

water resources" is irreparable). For another, because the State and Roxbury are bringing an APA case, and no relief can be had against DHS via damages for interim harms that construction of the detention facility imposes on them while the case plays out, there is no way for the State and Roxbury to get full relief at the end. *See Maryland*, 2026 WL 691507, at \*5 (explaining that a harm is irreparable if it "cannot be fully rectified by the final judgment after trial"). Because DHS's "[i]ll-informed construction activity" will work immediate "injury to the State's environment," and the harms cannot later be fully remedied, preliminary relief is needed. *Id.* at \*6.

That this is a NEPA and ICA case only confirms the need for a court to step in *before* the damage is done. After all, the NEPA and ICA regimes specifically exist to ensure that the relevant federal agencies discover and consider the entire range of environmental and state/local harms before acting. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (affirming order preliminarily enjoining construction and explaining that "failure to comply with NEPA[] causes harm itself, specifically the risk that real environmental harm will occur through inadequate foresight and deliberation"); *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (reversing denial of preliminary injunction where "inadequate study" of "massive" project's water impacts "threatened" depletion of "water resources"). Said another way, if the entire thrust of NEPA and the ICA is to ensure the federal

37

agency can consider potentially serious environmental and state-local harms before a project is completed, it makes sense to enjoin further construction until the lawful process occurs—not to wait months or longer for a final judgment at which point the detention facility has been constructed and it is simply too late.

The remaining equitable considerations—which merge in this case, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—likewise favor relief. "When irreparable environmental harms are sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Maryland*, 2026 WL 691507, at \*6; *see Amoco Prod. Co.*, 480 U.S. at 545. That is particularly true here. On the positive side of the ledger, an injunction aids the State, Roxbury, and the public writ large by temporarily stopping DHS from implementing its plan to convert the Warehouse into a mass detention facility. That has significant practical benefits, because it would protect Roxbury's water and sewer systems, avoid worsening dangerous traffic conditions near the site, avoid straining public health resources in Roxbury, and avoid a range of other environmental harms. *See supra* at 14–18. It has significant legal benefits, in that it ensures the environmental review and public participation NEPA and the ICA envision, rather than simply ordering participation when it is too late. *See, e.g.*, *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011) (where statute "ensur[es] public participation in agency" decision-mak-

38

ing, enjoining action taken without such public input "vindicate[s] the public's interests" in such participation); *S. Fork Band*, 588 F.3d at 728. And it has significant public taxpayer benefits too, as it ensures that DHS will not expend further taxpayer dollars on constructing this facility when those funds "may be wasted" if the State and Roxbury ultimately prevail. *Env't Def. Fund v. Corps of Eng'rs of U.S. Army*, 324 F. Supp. 878, 880–81 (D.D.C. 1971).[11]

These equities are not outweighed by DHS's interests in immigration enforcement more generally. *See, e.g.*, *Maryland*, 2026 WL 691507, at *6; *Friends of the Everglades v. Noem*, 796 F. Supp. 3d 1234, 1284 (S.D. Fla. 2025) (preliminarily enjoining construction of detention facility where "government's interest in immigration enforcement" was outweighed by substantial evidence of "irreparable harm posed by Defendants' flouting NEPA protocols"). DHS appears motivated by its desire "to meet the growing demand for bedspace and streamline the detention and removal process, focusing on non-traditional facilities." Ex. B at 1. But enjoining DHS from harmful construction activities at the Roxbury site does not preclude them

---

[11] That DHS "invested considerable resources into the purchase of the" Warehouse is not to the contrary, both because this is a pause in construction until this Court can reach a final judgment, *Maryland*, 2026 WL 691507, at *6 (noting the "pause in the warehouse conversion project will do nothing more than prolong the status quo"), and because DHS itself chose to hide the fact of this project until after the purchase, even denying its intent days before, preventing the State and Roxbury from pursuing (and this Court from considering) such claims until after the purchase.

39

from building "non-traditional facilities" elsewhere, nor does it preclude them from utilizing existing, traditional facilities for detention they otherwise plan to shut down. *See supra* 11. Indeed, DHS's decision to stand down with a facility in New Hampshire, *see supra* 35—based on consultation with state and local officials they denied here—shows DHS is capable of meeting operational needs in other ways. And DHS would not be enjoined indefinitely, but only pending litigation. The "slight inconvenience" to DHS "of a delay in construction" is not outweighed by "irreparable harms" to the State "caused by Defendants' likely [legal] violation[s]." *Maryland*, 2026 WL 691507, at *6.[12]

### CONCLUSION

This Court should grant the motion for a preliminary injunction.

Respectfully Submitted,

Dated: April 7, 2026

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ *Lauren E. Van Driesen*
Lauren E. Van Driesen

---

[12] To the extent DHS asserts a need for more detention space, that appears driven by a July 2025 policy that subjects all noncitizens "present in the United States who ha[ve] not been admitted" to mandatory detention without a bond hearing. *Rodriguez v. Hermosillo*, 802 F. Supp. 3d 1297, 1308 (W.D. Wash. 2025). Scores of courts, including judges of this Court, have held this policy "belies the statutory text of the INA, canons of statutory interpretation, legislative history, and longstanding agency practice." *Id.* at 1303–04 & n.3 (collecting cases). Yet DHS has routinely violated these court orders. Ex. J. To say the obvious, DHS has no equitable interest in expanding capacity to satisfy a detention policy that violates court orders.

# CERTIFICATE OF SERVICE

I certify that on April 7, 2026, I electronically filed this Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction and accompanying papers, with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

Dated:        April 7, 2026                    */s/ Lauren E. Van Driesen*
                                               Lauren E. Van Driesen