**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br><br>Defendants. | Hon. Jamel K. Semper, U.S.D.J.<br><br>Hon. James B. Clark, U.S.M.J.<br><br>Civil Action No.: 26-02884 |

---

**MEMORANDUM OF LAW OF AMICI CURIAE CITIZEN AND ENVIRONMENTAL GROUPS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

Susan Kraham
Dror Ladin (*pro hac vice* to be filed)
Casandia Bellevue (admission pending)
EARTHJUSTICE
48 Wall Street
New York, New York 10005
(212) 284-8035

Renée Steinhagen
NEW JERSEY APPLESEED PUBLIC
INTEREST LAW CENTER
23 James Street
Newark, New Jersey 07102
(973) 735-0523
renee@njappleseed.org

David N. Cinotti
PASHMAN STEIN WALDER
HAYDEN, P.C.
Court Plaza South
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 270-4901
dcinotti@pashmanstein.com

*Attorneys for Amici Curiae*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION ................................................................................................1

ARGUMENT .......................................................................................................3

   I.  DHS seeks to rush a massive project in a particularly ecologically sensitive community. ..................................................................................................3

      A.  Roxbury is in an area specially designated under federal and state law to safeguard its critical environment, including its role in supplying water to more than 70% of New Jersey residents. ..............................................4

      B.  Roxbury is already subject to several environmental stressors recognized under the New Jersey Environmental Justice Law.................9

   II.  DHS's failure to adhere to NEPA's and the ICA's requirements risks missing numerous additional environmental and public-health threats. ........13

      A.  Confining 1,500 people in a warehouse located in a small township creates significant public-health risks for detainees and the local community. ...............................................................................................14

      B.  Numerous site-specific environmental factors must be addressed. ........17

   III.  Requiring DHS to comply with its obligations under NEPA and the ICA would help avoid the serious threats posed by the agency rushing to convert the warehouse. ..................................................................................19

CONCLUSION...................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Concerned Citizens All., Inc. v. Slater*,
  176 F.3d 686 (3d Cir. 1999)..................................................................................20

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ...........................................................................................21

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................ 20, 21, 22

**Statutes**

42 U.S.C. § 4331(a) .............................................................................................20

N.J. Stat. Ann. § 13:1D-157....................................................................9, 10, 11

N.J. Stat. Ann. § 13:20-2.............................................................................6, 7

N.J. Stat. Ann. § 13:20-4.....................................................................................7

N.J. Stat. Ann. §§ 13:20-1 to -35 .......................................................................6

Pub. L. No. 108-421, 118 Stat. 2375.................................................................4

**Regulations**

N.J. Admin. Code § 7:15-3.5(h)............................................................................7

N.J. Admin. Code § 7:15-3.5(j)(2)........................................................................7

**Other Authorities**

American Lung Assoc., 2025 State of the Air Report,
https://www.lung.org/getmedia/5d8035e5-4e86-4205-b408-865550860783/State-of-the-Air-2025.pdf..............................................................................................11

Camilo Montoya-Galvez, *ICE's detainee population reaches new record high of 73,000, as crackdown widens*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000 .16

DEP, EJMAP, Overburdened Community Stressor Summary, Block Group 340270454024 ("Stressor Summary"), https://www.nj.gov/dep/ej/docs/effective-20260331-20270130/MORRIS_BG_340270454024.pdf.......................................10

Dep't of Energy, *"Quiet" Success Stories Illustrate NEPA's Value*, https://www.energy.gov/nepa/articles/quiet-success-stories-illustrate-nepas-value ................................................................................................................. 21

DHS NEPA Instruction Manual at II-2, V-12, https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf .................................................................10, 13

Drinking Water, EPA, https://www.epa.gov/report-environment/drinking-water (last updated June 17, 2025) .................................................................................12

FHWA, Route 52 Reconstruction Project: Final Environmental Impact Statement/Section 4 (f) Evaluation I-3 (July 1, 2002), https://www.nj.gov/transportation/works/studies/rt52/eis/fulldoc.pdf ....................22

"Highlands Level 3 Priority Threats," https://dep.nj.gov/wp-content/uploads/swap/highlands-l3-priority-threats.pdf...........................................6

Influenza, Varicella, and Mumps Outbreaks in US Migrant Detention Centers, https://pmc.ncbi.nlm.nih.gov/articles/PMC7596678/ ...............................................17

Jesus Jiménez and Pooja Salhotra, *13 Measles Cases Reported at Texas Immigration Detention Facility,* New York Times (Feb. 27, 2026), https://www.nytimes.com/2026/02/27/us/measles-camp-east-montana-detention-texas.html .................................................................................................16

JT Moodee Lockman, Bryant Reed, *Alleged Legionella outbreak at Baltimore ICE facility prompts concerns from Maryland leaders*, CBS News (Mar. 9, 2026), https://www.cbsnews.com/baltimore/news/legionella-outbreak-ice-immigration-gsa-maryland...............................................................................................16

Marty Kane, *Jefferson sewers: an update* (April 21, 2023), https://www.lakehopatcongfoundation.org/news/jefferson-sewers-an-update  19

Nat'l Wild & Scenic River Sys., https://rivers.gov/river/musconetcong...................5

Nicole J. Boardman et al., Pulmonary Tuberculosis Disease Among Immigrant Detainees: Rapid Disease Detection, High Prevalence of Asymptomatic Disease, and Implications for Tuberculosis Prevention, 73 Clinical Infectious Diseases (July 1, 2021 ), https://academic.oup.com/cid/article/73/1/115/5820624 ...........................15

NJDEP*,* Lake Hopatcong Water Management Plan (2011), https://dep.nj.gov/wp-content/uploads/newsrel/2010/hopatcong_wlmp.pdf ...............................................18

N.J. Highlands Coal., https://njhighlandscoalition.org/the-region ...........................5

Office of Professional Responsibility, *ERO El Paso Camp East Montana Inspection 2026-001-098*, ICE (Feb. 10-12, 2026), https://www.ice.gov/doclib/foia/odo-compliance-inspections/eroElPasoCampEastMontana_ElPasoTX_Feb10-12_2026.pdf .................................................................................................................16

Pooja Salhotra, *Measles Hits ICE Family Detention Center in Texas*, New York Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/ice-measles-texas.html. ...................................................................................................................15

Timothy F. Jones et al., Increased Incidence of the Outbreak Strain of Mycobacterium Tuberculosis in the Surrounding Community After an Outbreak in a Jail, 96 Southern Med. J. 155 (Feb. 2003) .............................................................15

U.S. Fish & Wildlife Serv., 2024 New Jersey Highlands Fact Sheet, https://www.fws.gov/sites/default/files/documents/2024-07/hca-fact-sheet-new-jersey-2024.pdf ..........................................................................................4, 5, 6

U.S. Fish & Wildlife Serv., "The Highlands Region: Landscape Planning to Protect Vital Water and Wildlife Resources," https://www.fws.gov/media/highlands-region-landscape-planning-protect-vital-water-and-wildlife-resources  ..............................4

Amici Concerned Residents of the Roxbury Community, the New Jersey Highlands Coalition, Skylands Preservation Alliance, New Jersey Environmental Justice Alliance, Hackensack Riverkeeper, Climate Revolution Action Network, New Jersey Environmental Lobby, Action Together New Jersey, New Jersey Conservation Foundation, and the New Jersey League of Conservation Voters respectfully submit this brief in support of Plaintiffs' motion for a preliminary injunction.

## INTRODUCTION

This case is about whether a federal agency can rush a new, massive detention project in an environmentally sensitive area that provides a majority of New Jersey residents with their drinking water—the New Jersey Highlands Region (the "Highlands")—without meaningful consideration of the project's environmental impact and without meaningful consultation with local and state authorities, as required by federal law.

The consequences of the agency's failure to adhere to federal law are particularly acute in this case. Federal and state law recognizes that the Highlands is distinctly vulnerable to environmental degradation; and is essential to New Jersey's water supply, farming, flora and fauna, and quality of life. Moreover, the warehouse is located in an area that New Jersey law already recognizes as an overburdened community under the State's Environmental Justice Law. Without proper mitigation,

1

introducing a mass detention facility into this community threatens to significantly exacerbate its existing environmental burdens. In fact, as the evidence presented by the plaintiffs demonstrates, converting a warehouse used by a limited number of workers to a detention facility occupied round-the-clock by 1,000 people or more will generate an enormous amount of additional pollution, sewage, and water-consumption. In addition, as described below, the agency's plan threatens additional environmental and public health risks requiring full and transparent examination.

Fortunately, Congress established a workable, tested framework for considering and addressing the environmental consequences of federal action. As federal agencies have themselves recognized, the required procedures are far from a formality. Instead, the transparency and collaboration they foster leads to better outcomes for communities affected by federal action—and for the agencies themselves. The Department of Homeland Security ("DHS") should be required to adhere to those requirements here.

Amici are residents of Roxbury and the surrounding community, and local organizations focused on the region's unique importance and environmental needs. They submit this brief to provide local context surrounding this dispute and to put in perspective the grave environmental risks of the proposed detention facility. As described below, that context makes clear that the State of New Jersey and the Township of Roxbury's motion for preliminary injunction should be granted. Amici

respectfully urge the Court to prevent the DHS from taking irrevocable steps that threaten this protected landscape, so proper consideration and consultation can take place.

## ARGUMENT

**I.    DHS seeks to rush a massive project in a particularly ecologically sensitive community.**

As explained below, federal and state law both recognize that the area at issue in this case should be subject to particularly careful consideration before steps are taken that may affect the local environment. First, Roxbury's location in the protected Highlands makes DHS's compliance with the National Environmental Policy Act ("NEPA") and the Intergovernmental Cooperation Act (the "ICA") particularly important, as development in the Highlands stands to affect sensitive water systems on which much of the state depends. *See infra* Point I.A. Second, under New Jersey's Environmental Justice Law, the Roxbury community surrounding the warehouse is already considered "overburdened," and is subject to numerous environmental stressors. As New Jersey law recognizes, such communities run the risk of significant adverse public health effects if they are forced to host additional sources of pollution—requiring adequate review of any proposed development. *See infra* Point I.B.

**A.      Roxbury is in an area specially designated under federal and state law to safeguard its critical environment, including its role in supplying water to more than 70% of New Jersey residents.**

DHS's obligations under NEPA to assess the environmental impact of a detention center in Roxbury and under the ICA to consult with state and local bodies are particularly important because Roxbury lies within the Highlands, an environmentally sensitive area that is essential to the State's drinking water, farming, and natural resources.

For more than twenty years, federal law has "recognize[d] the importance of the water, forest, agricultural, wildlife, recreational, and cultural resources of the Highlands region, and the national significance of the Highlands region to the United States." Highlands Conservation Act, Pub. L. No. 108-421, 118 Stat. 2375. The New Jersey Highlands are part of the federally protected Federal Highlands Region, and New Jersey has received more than $10 million in federal grants under the Highlands Conservation Act to preserve over 2,300 acres of land in the Highlands. U.S. Fish & Wildlife Serv., 2024 New Jersey Highlands Fact Sheet, https://www.fws.gov/sites/default/files/documents/2024-07/hca-fact-sheet-new-jersey-2024.pdf.

Critically, more than 70% of New Jersey residents get some or all their drinking water from the Highlands. N.J. Highlands Water Prot. & Planning Council, https://www.nj.gov/njhighlands; *see also* U.S. Fish & Wildlife Serv., "The

4

Highlands Region: Landscape Planning to Protect Vital Water and Wildlife Resources," at 2, https://www.fws.gov/media/highlands-region-landscape-planning-protect-vital-water-and-wildlife-resources (recognizing that "New Jersey's Highlands provide an essential source of clean and plentiful drinking water"); Ingelido Decl. ¶ 42. Approximately 6.2 million people rely on the Highlands for their water supply. N.J. Highlands Coal., https://njhighlandscoalition.org/the-region/.

The Highlands are environmentally important to New Jersey for other reasons. More than 10% of the Highlands, about 110,000 acres, is agricultural, "with some of the most productive soils in the world." U.S. Fish & Wildlife Serv., *supra*, at 2. "The Highlands are [also] regionally important for biodiversity, particularly breeding and migratory birds, resident amphibians and reptiles, and rare plants and communities." *Id.* In addition, the Highlands are home to numerous freshwater lakes and rivers, including Lake Hopatcong, New Jersey's largest lake; Lake Musconetcong; and the Musconetcong River. The latter has been designated a National Wild and Scenic River by the National Park Service, the nation's highest designation for free-flowing rivers of outstanding natural, cultural, and recreational value. *See, e.g.*, Nat'l Wild & Scenic River Sys., https://rivers.gov/river/musconetcong.

While essential for drinking water, agricultural resources, and flora and fauna, the Highlands are environmentally sensitive and vulnerable to pollutants and

5

development. The U.S. Fish and Wildlife Service has recognized that "[t]he vital resources of the Highlands are at risk. The crystalline rocks that transmit drinking water are poor filters of pollution, making both ground and surface water supplies vulnerable to degradation." U.S. Fish & Wildlife Serv., *supra*, at 3. Development in the Highlands threatens water quality and biodiversity. *Id*. The New Jersey Department of Environmental Protection ("NJDEP") has identified liquid domestic water discharged primarily by the sewage system as a "Level 3 Priority Threat"— the highest level of environmental threat—to the Highlands. NJDEP, "Highlands Level 3 Priority Threats," https://dep.nj.gov/wp-content/uploads/swap/highlands-l3-priority-threats.pdf.

In recognition of the Highlands' importance and vulnerability, the New Jersey Legislature enacted the Highlands Water Protection and Planning Act, N.J. Stat. Ann. §§ 13:20-1 to -35 (the "Highlands Act"). The Legislature found that the Highlands "is an essential source of drinking water [and] contains other exceptional natural resources such as clean air, contiguous forest lands, wetlands, pristine watersheds, and habitat for fauna and flora, includes many sites of historic significance, and provides abundant recreational opportunities for the citizens of the State." N.J. Stat. Ann. § 13:20-2. The Legislature concluded that "it is in the public interest of all the citizens of the State of New Jersey to enact legislation setting forth a comprehensive approach to the protection of the water and other natural resources

6

of the New Jersey Highlands" because of the Highlands' "vital link to the future of the State's drinking water supplies and other key natural resources." *Id.*

To ensure that development is appropriate and does not jeopardize the sensitive Highlands Region, the Highlands Act created consultative bodies charged with overseeing the unique needs of this region. The Highlands Act established the NJ Highlands Water Protection and Planning Council (the "Highlands Council") and gave it both regional planning and regulatory powers to protect the Highlands' resources. *See* N.J. Stat. Ann. § 13:20-4 to -6. Among other things, the Highlands Council, along with NJ DEP, reviews amendments to water quality-management plans for areas within the Highlands. N.J. Admin. Code § 7:15-3.5(h). Any development (including any change in use of an existing development) within the Highlands that would generate 20,000 gallons per day or more of wastewater requires additional analysis to ensure sufficient sewage capacity. N.J. Admin. Code § 7:15-3.5(j)(2).

The Highlands Council has included the warehouse site as part of a sub-section of the Highlands Region subject to special protection: The warehouse is located in the Protection Zone within the Highlands Planning area, a designation meaning that the area has "limited or no capacity to support human development without adversely affecting overall ecological function of the Highlands Region."

Kane Decl. ¶ 13. The warehouse is located 1,000 feet from Lake Musconetcong, which flows into the Musconetcong River. Compl. ¶ 107.

Wastewater from the warehouse is limited by permit and must be treated at the Musconetcong Sewerage Authority Sewage Treatment Plant, which itself discharges a limited amount of treated wastewater into the Musconetcong River. Ferriero Decl. ¶ 12. The warehouse is surrounded by more than 74 acres of undisturbed habitat subject to a conservation easement to protect habitat for an endangered species. Kane Decl. ¶¶ 24-25, 34. The area surrounding the warehouse also contains freshwater wetlands and temporary spring wetlands called vernal pools, both of which are legally protected. *Id.* ¶ 36. The maps in the appendix to this brief, which were downloaded from the Highlands Council's publicly accessible government website (nj.gov/njhighlands/gis/REX/) show the warehouse's location in an area critical for wildlife habitat, protected vernal pools, and water resources. *See* App'x.

DHS's proposed detention center will tax this environmentally essential and delicate area. Although the government's failure to perform an environmental assessment and its reluctance to specify the precise number of detainees it intends to house in Roxbury make it difficult to assess potential harm with precision,  the Roxbury municipal engineer has estimated that a 1,500-bed detention facility would generate *187,500 gallons per day of sewage*, far more than the 20,000 gallons per

8

day of wastewater that trigger additional requirements under N.J law. Ferriero Decl. ¶ 9. That new influx of wastewater directly threatens the protected and sensitive Highlands ecosystem and, more specifically, the area of the Highlands in which Roxbury is located, close to Lake Musconetcong and the Musconetcong River.

Moreover, development in the Highlands, like the kind DHS is framing as "site improvements" to install fencing, fiberoptic cables and potentially updating water and sewer connections, threatens the water quality and biodiversity of the area. *See* Compl., Ex. 1 (DHS letter); Kane Decl. ¶¶ 28, 37, 38.

**B.      Roxbury is already subject to several environmental stressors recognized under the New Jersey Environmental Justice Law.**

New Jersey's Environmental Justice Law acknowledges that certain communities in the state have borne disproportionate environmental burdens and requires that the unique vulnerabilities of these communities be considered in decisionmaking, including decisions regarding development. *See* N.J. Stat. Ann. § 13:1D-157. That law further recognizes that when a community is subject to several environmental stressors, those stressors can interact to create cumulative adverse effects on a community. *See id.*

These burdens and vulnerabilities are not abstract. As the State of New Jersey has found, they can lead to concrete health harms: "[O]verburdened communities have suffered from increased adverse health effects including, but not limited to,

9

asthma, cancer, elevated blood lead levels, cardiovascular disease, and developmental disorders." N.J. Stat. Ann. § 13:1D-157. These effects can fall particularly heavily on children in the community, who are "especially vulnerable to the adverse health effects caused by exposure to pollution. *Id.* And the potential harm is irreversible, as "such health effects may severely limit a child's potential for future success" and can "impede the growth, stability, and long-term well-being of individuals and families living in overburdened communities." *Id.* As part of the process established by the Environmental Justice Law, NJDEP evaluates the environmental and public-health stressors affecting different communities, and the industries, facilities, and health challenges contributing to the stressor.[1]

NJDEP has recognized that Roxbury is subject to a variety of environmental stressors, several of which the proposed detention facility will exacerbate. And it has designated the area where the warehouse is located as an overburdened community. *See*  DEP, EJMAP, Overburdened Community Stressor Summary, Block Group 340270454024 ("Stressor Summary"), https://www.nj.gov/dep/ej/docs/effective-

---

[1] DHS's NEPA implementation instruction manual also requires the assessment and consideration of cumulative impacts for both EJIS' and an environmental assessment. DHS NEPA Instruction Manual at II-2, V-12, https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf.

20260331-20270130/MORRIS_BG_340270454024.pdf. Of the 26 different stressors that NJDEP considers, the area in which the detention facility has been proposed is already adverse for 12. *See* Stressor Summary. Those stressors include several related to vehicle traffic, along with existing contamination and threats to the community's water. *See id*. In fact, just one more stressor would tip the area surrounding the warehouse into the "cumulatively adverse" category and apply heightened permitting requirements. DHS's proposed warehouse conversion project would likely go much further than tipping the census block into "cumulatively adverse" territory: it would likely push the area's ground level ozone and fine particulate matter past the state threshold for environmental stressors, while intensifying several existing stressors.

DHS's plan will substantially increase the community's existing air pollution, which poses significant dangers for the residents of Roxbury and the surrounding area. Traffic-related air pollution is particularly harmful to communities, as it has documented health impacts ranging from asthma to increased risk of respiratory and cardiovascular illnesses, to premature death. American Lung Assoc., 2025 State of the Air Report at 25-27, https://www.lung.org/getmedia/5d8035e5-4e86-4205-b408-865550860783/State-of-the-Air-2025.pdf. The area already suffers from excessive vehicle and rail traffic generated by the industries in the area and Interstate 80 and Route 46. *See* Stressor Summary. The proposed detention center is expected to create

11

over 900 trips a day based solely on peak morning and afternoon estimations, not counting off-peak trips, which would clearly worsen the census block's existing traffic stressors. *See* Ferriero Decl., Ex. A, Table 3. In addition, this significant increase of gas and diesel usage stands to push two additional stressors—ground level ozone and fine particulate matter—well past the state's threshold for environmental stressors. This is because these existing pollutants are already at the threshold to be considered adverse, requiring only a fractional addition to tip the balance. *See* Stressor Summary. The result would be an almost certain change in the area's designation from overburdened to cumulatively adverse for over a dozen environmental stressors.

Similarly, DHS's plan places additional pressure on the community's drinking water and ground water, which the Environmental Justice Law recognizes as already stressed due to contamination. *See* Stressor Summary. This poses serious risks for Roxbury residents: Ingesting contaminated drinking water can cause a variety of health effects from gastrointestinal illnesses to nervous system or organ damage. Drinking Water, EPA, https://www.epa.gov/report-environment/drinking-water (last updated June 17, 2025). Any notable increase of water use, particularly so significant an increase as would be posed by a massive detention-center population and the attendant DHS staff, would place severe additional strain on already stressed groundwater and drinking water resources. *See* Ingelido Decl. ¶ 9 ("Exceeding the

12

system capacity creates a substantial risk of reduced water pressure . . . [which] creates serious risks of water contamination. . . . .”); *id.* ¶ 26 (“even if the facility had no staff and only 323 detainees[,]” it would exceed Skyview System’s capacity). This increased strain further endangers and harms the surrounding overburdened community—and threatens the detained population as well.

In short, New Jersey’s Environmental Justice Law reflects the basic fact that the Roxbury community is not simply a blank slate on which DHS can make decisions without consideration of the existing context. The community is already overburdened, and any significant change to its traffic, water, and sewage is likely to exacerbate its existing vulnerabilities even as it imposes new and serious dangers. DHS’s own manual acknowledges that “[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time.” DHS NEPA Instruction Manual at II-2. The hasty establishment of a massive detention center in a small, vulnerable community is far from a minor action. Its impacts will be cumulative and compounding—and they should be fully and transparently considered, as NEPA requires.

## II. DHS’s failure to adhere to NEPA’s and the ICA’s requirements risks missing numerous additional environmental and public-health threats.

In addition to the federal and state laws that protect the Highlands region and New Jersey’s overburdened communities from unconstrained and unplanned

development, DHS's plan presents several specific risks to the human environment that have yet to be transparently considered and addressed. A series of well-documented infectious disease outbreaks at DHS facilities demonstrate the potential for significant public health dangers to detainees and the Roxbury community—particularly in light of the Roxbury community's limited medical resources. And the limited sewage capacity of Musconetcong Sewerage Authority points to numerous problems with DHS's plan, ranging from compliance with a conservation easement that recognizes the warehouse site's hydrological import to broader threats to the Musconetcong River. Without the transparent and credible environmental review process that federal law requires, there is no indication that DHS has adequately considered and addressed these risks.

> **A.    Confining 1,500 people in a warehouse located in a small township creates significant public-health risks for detainees and the local community.**

DHS's planned detention of 1,500 people in a converted warehouse with rudimentary ventilation and minimal infrastructure poses serious health risks that must be considered and accounted for. Infections can spread particularly rapidly in closed spaces—like warehouses—that were never intended to house large numbers of people in close proximity. And once a contagious disease is introduced, any outbreak is unlikely to remain confined to the grounds of a detention center. Instead,

14

infectious diseases can spread rapidly from guards and staff to their families and neighbors, to their children and schoolmates, and throughout a community.[2]

DHS's recent track record establishes ample cause for concern, as it shows repeated failures in provision of adequate medical care and infectious disease control. In just the past three months:

- Several measles cases were reported in January in DHS detention facilities in Texas and Arizona, necessitating quarantines.[3]

- ICE conducted a self-evaluation at one facility over three days in February and found multiple failures to contain and treat infectious diseases, including a failure to house a detainee with "symptoms suggestive of

---

[2] *See, e.g.*, Nicole J. Boardman et al., Pulmonary Tuberculosis Disease Among Immigrant Detainees: Rapid Disease Detection, High Prevalence of Asymptomatic Disease, and Implications for Tuberculosis Prevention, 73 Clinical Infectious Diseases 115, 118-19 (July 1, 2021 ), https://academic.oup.com/cid/article/73/1/115/5820624 (presenting risk of transmission of tuberculosis from immigration detention facilities to communities); Timothy F. Jones et al., Increased Incidence of the Outbreak Strain of Mycobacterium Tuberculosis in the Surrounding Community After an Outbreak in a Jail, 96 Southern Med. J. 155, 156 (Feb. 2003) ("[T]he lesson to be learned from this observation is important. Jails may play an important role in the epidemiology of tuberculosis in the surrounding community, serving as reservoirs of disease and potential accelerants of dissemination.").

[3] Pooja Salhotra, *Measles Hits ICE Family Detention Center in Texas*, New York Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/ice-measles-texas.html.

15

pulmonary tuberculosis disease (TB)" in a proper airborne isolation room, and failures to test for human immunodeficiency virus (HIV).[4] Later in February, the same facility also reported an outbreak of measles.[5]

- In March, an outbreak of Legionella bacteria was reported at a DHS facility in Baltimore.[6]

The recent surge in DHS detention has served to exacerbate the agency's troubling history of medical-care failures. Even when DHS detained far fewer people than it detains today,[7] the agency's own records show a consistent susceptibility to outbreaks of infectious disease: DHS records document outbreaks of influenza,

---

[4] Office of Professional Responsibility, *ERO El Paso Camp East Montana Inspection 2026-001-098*, ICE (Feb. 10-12, 2026), https://www.ice.gov/doclib/foia/odo-compliance-inspections/eroElPasoCampEastMontana_ElPasoTX_Feb10-12_2026.pdf.

[5] Jesus Jiménez and Pooja Salhotra, *13 Measles Cases Reported at Texas Immigration Detention Facility,* New York Times (Feb. 27, 2026), https://www.nytimes.com/2026/02/27/us/measles-camp-east-montana-detention-texas.html.

[6] JT Moodee Lockman, Bryant Reed, *Alleged Legionella outbreak at Baltimore ICE facility prompts concerns from Maryland leaders*, CBS News (Mar. 9, 2026), https://www.cbsnews.com/baltimore/news/legionella-outbreak-ice-immigration-gsa-maryland/.

[7] Camilo Montoya-Galvez, *ICE's detainee population reaches new record high of 73,000, as crackdown widens*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/ (reporting that ICE detention had reached "the highest level recorded by the agency and an 84% increase from the same time in 2025").

16

varicella, and mumps, leading a study to conclude that "ICE detention centers are high-risk environments for infectious disease outbreaks."[8]

DHS's documented medical failures are particularly concerning when it comes to the proposed detention warehouse in Roxbury, as the agency has not attempted to address or consider the community's existing health challenges. Any outbreak in Roxbury threatens to overwhelm the local health system, resulting in worse care for both detainees and the local community. Roxbury is already subject to public health vulnerabilities, and its health department and volunteer emergency medical services have five full-time employees and two ambulances between them. Murphy Decl. ¶¶ 31-34. Where there is so little margin for error, DHS should not be permitted to short-circuit the ordinary procedures for environmental and public health consideration and consultation. The Court should instead allow the parties and the public sufficient time to ensure a fair and transparent evaluation of a project that carries potentially devastating public health consequences.

**B.      Numerous site-specific environmental factors must be addressed.**

Because DHS has not complied with its requirements to involve state and local authorities and the affected public in considering the impacts of its planned detention project, the precise site-specific factors that should inform decisionmaking have not

---

[8] *See, e.g.*, Influenza, Varicella, and Mumps Outbreaks in US Migrant Detention Centers, https://pmc.ncbi.nlm.nih.gov/articles/PMC7596678/.

been fully identified. But even at this stage, it is clear that numerous additional environmental considerations are presented by DHS's mass detention project:

- The site is subject to a Conservation Restriction/Easement held by NJDEP, which recognizes the ecological and hydrological significance of the warehouse site. Kane Decl. ¶¶ 13, 23, 25, 28; Kane Decl., Ex. B.

- The property lies directly uphill from Lake Musconetcong and is serviced by the Musconetcong Sewerage Authority Treatment Plant, which discharges treated effluent into the Musconetcong River. If there were to be sewage overflows from the facility into that lake, and/or if the treatment plant was unable to effectively treat the additional sewage generated by the facility and had to discharge untreated sewage into the river, the lake and the river could become subject to massive amounts of pollution. This would endanger the life and health of the people and wildlife who live in and around these sensitive water sources.

- If additional pollution were to flow into the Musconetcong River, NJDEP would also be obligated to discharge additional amounts of water from Lake Hopatcong in order to dilute the pollution in an effort to preserve the lives of the trout and other fish that live in that river.   *See* NJDEP*, Lake Hopatcong Water Management Plan* 31, 35 (2011), https://dep.nj.gov/wp-content/uploads/newsrel/2010/hopatcong_wlmp.pdf.  This could pollute

18

the lake and prevent safe boating, an activity critical to the local economy; and

- If DHS were to claim for the facility the remaining unused capacity of the treatment plant, then it would prevent the completion of a federally funded project to replace existing septic systems surrounding Lake Hopatcong with sewers serviced by the Musconetcong Sewerage Authority. *See* Kane, Marty, *Jefferson sewers: an update* (April 21, 2023), https://www.lakehopatcongfoundation.org/news/jefferson-sewers-an-update. This, in turn, would exacerbate the pollution at the lake, leading to larger and more frequent harmful algal blooms that already plague the lake.

## III. Requiring DHS to comply with its obligations under NEPA and the ICA would help avoid the serious threats posed by the agency rushing to convert the warehouse.

NEPA and the ICA require DHS to consult with state and local authorities to ensure that local expertise can be brought to bear, and local concerns addressed. In addition, agency adherence to the requirements of NEPA and the ICA also enables affected communities to participate directly in the agency's decisionmaking process, further enhancing the information available for the agency's consideration. The statutory requirements of transparency and collaboration are not mere box-checking exercises. Instead, experience has borne out time and again that involving local authorities and affected communities materially improves federal agency decisions.

19

NEPA reflects Congress's determination that agency decisionmaking is improved when local, state, federal, and community expertise are brought to bear on major federal actions affecting the environment. 42 U.S.C. § 4331(a) (declaring policies animating NEPA, including "cooperation with State and local governments . . . to create and maintain conditions under which man and nature can exist in productive harmony"). "NEPA ensures that an agency has before it detailed information on significant environmental impacts when it makes its decisions and guarantees that this information is available to a larger audience." *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 705 (3d Cir. 1999). To accomplish this, NEPA requires "broad dissemination of relevant environmental information" and "provides a springboard for public comment[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

The cooperation and transparency NEPA and the ICA require is particularly important in areas like Roxbury and the surrounding Highlands region, where a web of overlapping environmental protections is managed by state and regional authorities. In a landmark NEPA case, the Supreme Court recognized that where a federal action would cause predictable effects that were "subject to regulation by other governmental bodies," NEPA's requirements ensured that those other government bodies have "adequate notice" of those effects and the ability to respond "in a timely manner." *Robertson*, 490 U.S. at 350. NEPA "permits the public and

other government agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 371 (1989). In turn, "these procedures are almost certain to affect the agency's substantive decision." *Robertson*, 490 U.S. at 350.

For decades, NEPA has delivered material improvements in agency decisionmaking that federal agencies have themselves recognized. For example, the Department of Energy describes a retrospective study showing that "when the experts work together, public and Federal government collaboration results in better decisions." Dep't of Energy, *"Quiet" Success Stories Illustrate NEPA's Value*, https://www.energy.gov/nepa/articles/quiet-success-stories-illustrate-nepas-value. NEPA establishes requirements that can significantly alter outcomes by "provid[ing] perspectives not considered by Federal officials," including "alternatives, data, and environmental issues that a Federal agency would not have otherwise identified or studied." *Id.* The agency highlighted an example where drinking water was placed at risk by an agency action but "a thorough NEPA review of reasonable alternatives and their environmental consequences—including those identified by members of the public —le[d] to better decisionmaking." *Id.* In that case the agency "held public scoping meetings and issued a draft [Environmental Impact Statement] that explored" an alternative that would be more protective of drinking water. *Id.* The NEPA process provided an opportunity for the agency to receive comments from

21

"Federal, state, and local agencies; conservation groups; and members of the public." *Id.* And the comments had a direct effect: "As a result of these comments, DOE gave greater consideration to the alternative of offsite disposal based on the risks of water contamination and to remediation alternatives," ultimately selecting "the preferred alternative." *Id.*

And one need not look far afield to find NEPA success stories. Closer to home, the rebuilding of New Jersey's Route 52 causeway, which connects Somers Point to Ocean City, benefitted from adherence to NEPA's requirements. There, citizens used the collaborative NEPA process to raise concerns regarding potential adverse impacts to their physical environment, including impacts to wetlands and safety hazards to pedestrians that would result from the design of the reconstructed route. Over the course of the NEPA process, the agency was able to identify an alternative that avoided significant dredging and minimized damage to wetlands. The plan that the agency ultimately adopted reduced the number of lanes provided in residential areas and created bike shoulders and a protected sidewalk, among other mitigation efforts. *See* FHWA, Route 52 Reconstruction Project: Final Environmental Impact Statement/Section 4 (f) Evaluation I-3 (July 1, 2002), https://www.nj.gov/transportation/works/studies/rt52/eis/fulldoc.pdf.

As these examples and many others illustrate, NEPA and the ICA are not merely empty procedures or administrative red tape—they affirmatively produce

22

better outcomes. By contrast, DHS's comprehensive failure to abide by NEPA and the ICA threatens significant and irreversible environmental damage and deprives the affected public, state and local authorities, and even DHS itself of vital information that can improve the agency's decisionmaking.

## CONCLUSION

At this stage, DHS has provided almost no information about a massive detention facility that stands to have significant adverse impacts for the residents of Roxbury and surrounding communities. DHS has excluded the public and their elected authorities from considering and weighing in on a significant federal decision impacting their community, and the agency has given no indication that it is itself undertaking any consideration of local needs and vulnerabilities. Amici respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction and allow time for proper consideration and consultation before DHS can irrevocably alter the status quo.

Dated: April 14, 2026                           Respectfully submitted,

/s/ Susan Kraham                                /s/ David N. Cinotti
Susan Kraham                                    David N. Cinotti
Dror Ladin (*pro hac vice* to be filed)         PASHMAN STEIN WALDER
Casandia Bellevue (admission pending)           HAYDEN, P.C.
EARTHJUSTICE                                     Court Plaza South
48 Wall Street                                   21 Main Street, Suite 200
New York, New York 10005                         Hackensack, New Jersey 07601
(212) 284-8035                                   (201) 270-4901
skraham@earthjustice.org                         dcinotti@pashmanstein.com
*Counsel for Amicus New Jersey Environmental*    *Counsel for Amici New Jersey*
*Justice Alliance*                               *Highlands Coalition, Skylands*
                                                 *Preservation Alliance,*
                                                 *Hackensack Riverkeeper,*
/s/ Renée Steinhagen                             *Climate Revolution New Jersey,*
Renée Steinhagen                                 *New Jersey Environmental*
NEW JERSEY APPLESEED PUBLIC                       *Lobby, Action Together New*
INTEREST LAW CENTER                              *Jersey, New Jersey Conservation*
23 James Street                                  *Foundation, and New Jersey*
Newark, New Jersey 07102                         *League of Conservation Voters*
(973) 735-0523
renee@njappleseed.org
*Counsel for Amicus Concerned Residents of*
*the Roxbury Community*

24

# APPENDIX

# Critical Wildlife Habitat



4/13/2026

☐ Parcels (zoom to 1:12500)   ☐ Critical Wildlife Habitat

☐



NJ Highlands Council, New Jersey Department of Environmental Protection (NJDEP), Division of Fish Wildlife, Endangered Nongame Species Program

# Confirmed Vernal Pools with 300m buffer



Block: 10301 Lot: 26
Block: 10301 Lot: 2.03
Block: 9801 Lot: 5
Block: 10603 Lot: 1
Block: 9902 Lot: 1
Block: 9918 Lot: 1
Block: 1 Lot: 17
Block: 10301 Lot: 1
Block: 10301 Lot: 2.04
Block: 10603 Lot: 2
Block: 10604 Lot: 2
Block: 9904 Lot: 1
Block: 9911 Lot: 1
Block: 10008 Lot: 1
Block: 9801 Lot: 3
Block: 9801 Lot: 4
Block: 9802 Lot: 11
Block: 9907 Lot: 1
Block: 9914 Lot: 1
Block: 10002 Lot: 4
Block: 9801 Lot: 2
Block: 9801 Lot: 6
Block: 9802 Lot: 9
Block: 9802 Lot: 12
Block: 9910 Lot: 1
Block: 9916 Lot: 1
Block: 10007 Lot: 1
Block: 8 Lot: 32
Block: 9802 Lot: 13
Block: 10604 Lot: 3
Block: 10001 Lot: 1
Block: 10010 Lot: 1
Block: 8 Lot: 36.07
Block: 9802 Lot: 14
Block: 10006 Lot: 1
Block: 8 Lot: 36.05
Block: 10604 Lot: 4
Block: 10014 Lot: 5
Block: 8 Lot: 1.01
Block: 45 Lot: 4
Block: 10604 Lot: 4
Block: 45 Lot: 5.08
Block: 9502 Lot: 1
Block: 9501 Lot: 1
Block: 9501 Lot: 4.01
Block: 9502 Lot: 2
Block: 45 Lot: 1
Block: 9501 Lot: 5
Block: 9501 Lot: 6
Block: 9502 Lot: 3
Block: 9501 Lot: 7
Block: 9601 Lot: 1.01
Block: 9402 Lot: 9
Block: 9402 Lot: 8
Block: 9501 Lot: 15
Block: 9501 Lot: 18
Block: 9502 Lot: 5
Block: 9402 Lot: 7
Block: 9402 Lot: 12
Block: 9501 Lot: 14
Block: 9401 Lot: 13.01
Block: 9402 Lot: 10
Block: 9402 Lot: 14
Block: 9501 Lot: 13
Block: 9402 Lot: 13.01
Block: 9501 Lot: 9
Block: 9501 Lot: 2
Block: 9501 Lot: 8
Block: 9503 Lot: 1

4/13/2026

 Parcels (zoom to 1:12500)    Confirmed Vernal Pool 300m Buffer

NJ Highlands Council, New Jersey Department of Environmental Protection (NJDEP), Division of Fish Wildlife, Endangered Nongame Species Program

# Open Water Protection Area



4/13/2026

Parcels (zoom to 1:12500)    Open Water Protection Area



NJ Highlands Council

# Prime Groundwater Recharge Area



Block: 10301
Lot: 2.03

Block: 10301
Lot: 26

Block: 10301
Lot: 2.04

Block: 10301
Lot: 1

Block: 9801
Lot: 5

Block: 10603
Lot: 1

Block: 10603
Lot: 2

Block: 10604
Lot: 2

Block: 9902
Lot: 1

Block: 9904
Lot: 1

Block: 9911
Lot: 1

Block: 9918
Lot: 1

Block: 1
Lot: 17

Block: 9801
Lot: 3

Block: 9801
Lot: 4

Block: 9802
Lot: 11

Block: 9802
Lot: 12

Block: 9907
Lot: 1

Block: 9914
Lot: 1

Block: 10008
Lot: 1

Block: 9801
Lot: 2

Block: 9801
Lot: 6

Block: 9802
Lot: 9

Block: 9802
Lot: 13

Block: 9910
Lot: 1

Block: 9916
Lot: 1

Block: 10002
Lot: 4

Block: 10007
Lot: 1

Block: 8
Lot: 32

Block: 8
Lot: 36.07

Block: 8
Lot: 36.08

Block: 9802
Lot: 14

Block: 10604
Lot: 3

Block: 10001
Lot: 1

Block: 10010
Lot: 1

Block: 8
Lot: 36.05

Block: 10006
Lot: 1

Block: 10014
Lot: 5

Block: 8
Lot: 1.01

Block: 45
Lot: 4

Block: 9501
Lot: 1

Block: 10604
Lot: 4

Block: 45
Lot: 5.08

Block: 10604
Lot: 4

Block: 45
Lot: 1

Block: 9501
Lot: 4.01

Block: 9502
Lot: 1

Block: 9502
Lot: 2

Block: 9501
Lot: 5

Block: 9502
Lot: 3

Block: 9402
Lot: 9

Block: 9501
Lot: 6

Block: 9501
Lot: 7

Block: 9402
Lot: 8

Block: 9402
Lot: 7

Block: 9501
Lot: 15

Block: 9501
Lot: 18

Block: 9502
Lot: 5

Block: 9601
Lot: 1.01

Block: 9402
Lot: 12

Block: 9501
Lot: 14

Block: 9501
Lot: 9

Block: 9503
Lot: 1

Block: 9401
Lot: 13.01

Block: 9402
Lot: 14

Block: 9501
Lot: 13

Block: 9501
Lot: 2

Block: 9501
Lot: 8

Block: 9402
Lot: 10

Block: 9402
Lot: 13.01

4/13/2026

▢ Parcels (zoom to 1:12500)   ▢ Prime Groundwater Recharge

NJ Highlands Council

NJ Highlands Coalition

# Net Water Availability

Block: 9801
Lot: 3

Block: 9801
Lot: 4

Block: 9801
Lot: 6

Block: 9802
Lot: 5

Block: 9802
Lot: 10

Block: 9802
Lot: 14

Block: 9802
Lot: 1

Block: 8
Lot: 36.08

Block: 45
Lot: 1

Block: 9402
Lot: 9

Block: 9402
Lot: 7

Block: 9501
Lot: 16

Block: 9501
Lot: 15

Block: 9501
Lot: 17

Block: 9802
Lot: 13

Block: 9802
Lot: 12

Block: 10604
Lot: 2

Block: 9913
Lot: 2

Block: 9913
Lot: 3

Block: 10604
Lot: 3

Block: 10604
Lot: 4

Block: 9501
Lot: 4.01

Block: 9502
Lot: 1

Block: 9501
Lot: 5

Block: 9501
Lot: 6

Block: 9501
Lot: 1

Block: 9501
Lot: 2

Block: 9501
Lot: 7

Block: 9501
Lot: 9

4/13/2026

Municipalities

Parcels (zoom to 1:12500)

Net Water Availability by Subwatershed

-0.99-(-0.10)



New Jersey Office of Information Technology (NJOIT), Office of Geographic Information Systems, NJ Highlands Council, Grant F. Walton Center for

NJ Highlands Coalition