**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY, ) ) ) | |
| Plaintiffs, ) ) | Hon. Jamel K. Semper, U.S. District Judge |
| v. ) ) | Hon. James B. Clark, U.S. Magistrate Judge |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., ) ) ) ) | No. 2:26-cv-2884-JKS-JBC |
| Defendants. ) ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


KRYSTAL-ROSE PEREZ, Texas Bar No. 24105931
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 532-3266
krystal-rose.perez@usdoj.gov

*Attorney for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

STANDARD OF REVIEW ....................................................................................5

ARGUMENT .........................................................................................................6

     I.      Plaintiffs lack Article III standing because they fail to establish an injury in fact...............................................................................6

     II.    Plaintiffs fail to establish a likelihood of success on the merits of their NEPA and ICA claims. ................................................9

          A.    Defendants complied with NEPA's procedural mandates..........9

          B.    Defendants are complying with the ICA's requirement to consider local viewpoints.........................................................18

     III.   Plaintiffs have not established irreparable harm. ...............................20

     IV.   The balance of equities favor the public interest in denying Plaintiffs' Motion.................................................................................25

     V.    If the Court enjoins activities, Plaintiffs are required to post a bond. ....................................................................................................28

CONCLUSION.....................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Amoco Production Company v. Village of Gambell*,
  480 U.S. 531 (1987) ..................................................................................22

*Azzolina v. U.S. Postal Serv.*,
  602 F. Supp. 859 (D.N.J. 1985).............................................................. 13, 18

*Back Country Horseman of Am. v. Johanns*,
  424 F. Supp. 2d 89 (D.D.C. 2006) .........................................................17

*Bergen Cnty. v. Dole*,
  620 F. Supp. 1009 (D.N.J. 1985)............................................................18

*Border Power Plant Working Grp. v. Dep't of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003) ....................................................13

*BRRAM, Inc. v. Fed. Aviation Admin.*,
  721 F. App'x 173 (3d Cir. 2018)..............................................................15

*California v. Norton*,
  311 F.3d 1162 (9th Cir. 2002)................................................................11

*City of Crossgate v. U.S. Dep't of Veterans Affs.*,
  526 F. Supp. 3d 239 (W.D. Ky. 2021) ....................................................11

*City of Oberlin v. Fed. Energy Regul. Comm'n*,
  937 F.3d 599 (D.C. Cir. 2019) ...............................................................13

*City of Waltham v. U.S. Postal Serv.*,
  11 F.3d 235 (1st Cir. 1993) ....................................................................19

*Clapper v. Amnesty Int'l*,
  568 U.S. 398 (2013) .................................................................................7

*Clinton Twp. v. U.S. Postal Serv.*,
  638 F. Supp. 763 (D.N.J. 1986)..............................................................18

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
  614 F.2d 351 (3d Cir. 1980) ............................................................. 22, 26

*CoreCivic, Inc. v. Governor of New Jersey*,
  145 F.4th 315 (3d Cir. 2025)....................................................................1

*Del. State Sportmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
 108 F.4th 194 (3d Cir. 2024)..................................................................................20

*Dep't of Educ. v. Brown*,
 600 U.S. 551 (2023) ..............................................................................................9

*Earth Island Inst. v. Muldoon*,
 82 F.4th 624 (9th Cir. 2023)......................................................................... 10, 17

*Ethicon, Inc. v. Randall*,
 No. 2:20-cv-13524-BRM-JBC, 2021 WL 3144702 (D.N.J. July 26, 2021)........29

*Friends of the Earth v. Laidlaw Env't Servs*,
 528 U.S. 167 (2000) ..............................................................................................7

*Gunn v. Minton*,
 568 U.S. 251 (2013) ..............................................................................................7

*Holland v. Rosen*,
 895 F.3d 272 (3d Cir. 2018) ..................................................................................6

*Hope v. Warden York Cnty. Prison*,
 972 F.3d 310 (3d Cir. 2020) ............................................................................ 25, 26

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
 882 F.2d 797 (3d Cir. 1989)..................................................................................28

*Khalil v. President, United States*,
 164 F.4th 259 (3d Cir. 2026)................................................................................27

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
 785 F. App'x 467 (9th Cir. 2019)..........................................................................26

*Kos Pharm., Inc. v. Andrx Corp.*,
 369 F.3d 700 (3d Cir. 2004) ..................................................................................6

*Lands Council v. McNair*,
 537 F.3d 981 (9th Cir. 2008)................................................................................26

*Lujan v. Def. of Wildlife*,
 504 U.S. 555 (1992) ..............................................................................................7

*Maryland v. Mullin*,
 No. 26-733-BAH, 2026 WL 1045503 (D. Md. Apr. 17, 2026) .................... 16, 21

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ..............................................................................................5

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................................... 25, 27

*NutraSweet Co. v. Vit-Mar Enterp., Inc.*,
176 F.3d 151 (3d Cir. 1999) ...................................................................................6

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) .................................................................................20

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .............................................................................................10

*Rochester v. U.S. Postal Serv.*,
541 F.2d 967 (2d Cir. 1976) .................................................................................20

*Sampson v. Murray*,
415 U.S. 61 (1974) ...............................................................................................25

*Save Long Beach Island v. U.S. Dep't of Com.*,
794 F. Supp. 3d 273 (D.N.J. 2025)......................................................................10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ....................................................................... 10, 11, 17, 18

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ...........................................................................................7, 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...............................................................................................7

*United States v. Fruehauf*,
365 U.S. 146 (1961) ...............................................................................................7

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ......................................................................... 5, 20, 22, 25

**Statutes**

31 U.S.C. § 6506(c) ...............................................................................................18

42 U.S.C. § 4336(a)(2).............................................................................................17

42 U.S.C. § 4336(b)(1)-(2) .....................................................................................10

42 U.S.C. § 4336e(1) ...............................................................................................10

**Rules**

Fed. R. Civ. P. 65(c)................................................................................................28

iv – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

**Regulations**

28 C.F.R. Pt. 61, App. A ¶ 8 ................................................................................16

**Other Authorities**

U.S. Const. art. III, § 2, cl. 1 ................................................................................7

## INTRODUCTION

The State of New Jersey clearly dislikes having immigration detention centers within the State. *See generally CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 319 (3d Cir. 2025) ("New Jersey . . . dislikes some of the federal government's immigration tools, so it passed a law with the 'intent' to forbid new contracts for civil immigration detention."). The State was unsuccessful in its attempt to foreclose such centers before. And now, together with the Township of Roxbury, the State will likely not succeed again.

U.S. Immigration and Customs Enforcement (ICE), an agency within the U.S. Department of Homeland Security (DHS), is charged with enforcing the Nation's immigration laws. That enforcement includes carrying out removal orders issued by immigration judges who determine the need for deporting aliens. Within New Jersey, there are 351,008 individuals who have final orders of removal, including 11,568 with criminal records, and 13,325 with pending criminal charges—all who must be deported. The deportation process requires DHS to temporarily detain the aliens with removal orders. To serve the urgent need for a detention center because of the surge in unlawful immigration, DHS has acquired a property in Roxbury, New Jersey.

Plaintiffs oppose the plans for a detention center in Roxbury and have brought claims alleging violations of the National Environmental Policy Act (NEPA), the

1 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

Intergovernmental Cooperation Act (ICA), and the Immigration and Nationality Act (INA).  Plaintiffs ask the Court to preliminarily enjoin DHS from taking any steps to retrofit the Roxbury Property into an immigration processing and detention center. But Plaintiffs lack standing to pursue their claims, and they fail to meet their heavy burden of establishing that all the *Winter* factors support an injunction.  Indeed, none of the factors support an injunction.  The Court should therefore deny Plaintiffs' Motion for a Preliminary Injunction.

## BACKGROUND

In February 2026, ICE acquired an existing industrial facility located at 1879 Route 46, Roxbury Township, New Jersey, 07054, to serve as an immigration detention and processing center.  *See* Record of Environmental Consideration (REC), attached as Exhibit 1.  The 470,044 square foot facility, which sits on 109 acres, "will be designed to accommodate 542 detainees within housing areas that will include standard dormitory pods, ADA compliant pods, and behavioral and special housing units." *Id.* at 1; DeGregorio Decl. ¶ 8.  "The facility is located within an established industrial area," Ex. 1 at 5.  As shown below, the Roxbury Property is situated between major thoroughfares, including Interstate 80 and Highway 206.

2 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*



REC at 24.

In December 2025, ICE began analyzing the potential environmental and historical preservation impacts of retrofitting the Roxbury Property. *See* Ex. 1 at 7; DeGregorio Decl. ¶ 12. The Agency documented its conclusions in the REC. Ex. 1. The REC explains that proposed improvements include fencing around the property for security, building a small security checkpoint structure about 150 square feet in total, adding four exterior recreation courts on existing asphalt surfaces, installing exterior lighting and security cameras mounted on the building façade or within existing paved areas to support operational monitoring, installing an

3 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

emergency generator with a large capacity unit, installing new telecom cabling routed through existing utility corridors or previously disturbed areas, and improving sanitary sewer connections if necessary.  Ex. 1 at 1.



*Id.* at 38.

In addition to the environmental analysis documented in the REC, ICE is also preparing an Environmental Assessment that will further analyze the potential environmental impacts of retrofitting the Roxbury Property along with the effects of operating it as a detention and processing center, which will result in a final decision separate from the challenged agency action in this case.  DeGregorio Decl. ¶ 10.

*4 – Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

No "substantial work" has started at the Roxbury Property. *Id.* ¶ 9. ICE will, however, erect temporary fencing, install security cameras and security lighting, and lay fiberoptic cable for an alarm system in the next few weeks to deter and prevent vandalism, including arson and damage to landscaping, that has occurred at other ICE facilities. Byers Decl. ¶ 13. None of these measures would involve disturbing the ground or permanent alteration of the site. *Id.* Additionally, ICE will reconfigure the office space in the warehouse by demolishing drywall and adding communications wiring and workstations. *Id.* If the building requires any minor repairs such as fixing the HVAC system or leaks in the roof, ICE will address them. Byers Decl. ¶ 14. No other work is planned until after ICE issues a final decision following the additional environmental analysis. *Id*.

## STANDARD OF REVIEW

A preliminary injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Courts must reserve this drastic remedy for cases where a plaintiff makes "a clear showing" that it is entitled to such relief. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

A plaintiff seeking emergency injunctive relief must show (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in

the public's interest. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). "A plaintiff's failure to establish any element in its favor renders" emergency relief "inappropriate." *NutraSweet Co. v. Vit-Mar Enterp., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos*, 369 F.3d at 708 (citation omitted). Accordingly, "the movant, by a clear showing, carries the burden of persuasion." *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018).

## ARGUMENT

Plaintiffs' Motion fails out of the gate because they cannot establish Article III standing to challenge DHS's purchase and retrofit of the Roxbury Property. Plaintiffs also fail to establish a likelihood of success on the merits of their NEPA and ICA claims, the only claims on which they have moved for preliminary injunctive relief. Because Plaintiffs' asserted injuries are mere speculation and not likely or imminent, they have not demonstrated any irreparable harm absent a preliminary injunction. Finally, the balance of equities tips sharply in favor of the public's interest in denying Plaintiffs' requested relief. The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

**I.   Plaintiffs lack Article III standing because they fail to establish an injury in fact.**

Plaintiffs' alleged injuries are not imminent and too speculative to satisfy Article III standing. Federal courts may exercise jurisdiction only over "Cases" and

"Controversies." U.S. Const. art. III, § 2, cl. 1; *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." (citation modified)); *United States v. Fruehauf*, 365 U.S. 146, 157 (1961) (prohibiting issuance of advisory opinions). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified).

For Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Imminent means "certainly impending," not speculative. *Lujan*, 504 U.S. at 564 n.2; *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) ("Allegations of *possible* future injury are not sufficient." (citation modified)); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[S]peculation does not suffice."). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Def. of Wildlife*, 504 U.S. at 561.

*7 – Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

There is no evidence that Plaintiffs face *imminent* injury. Plaintiffs base their standing on "risk" of possible injury contingent on the government failing to follow its own decision, disregarding local regulations, and the ultimate operation of the warehouse as a detention center, which is not imminent. Specifically, Plaintiffs are concerned that the detention center will strain water consumption and the sewer system and provide calculations assuming there will be thousands of people constantly present at the Roxbury Property. *See* Pls.' Mem. in Support of Pls.' Mot. for Prelim. Inj. ("Pls. Br.") 14-16, Dkt. No. 10-1. But the REC does not authorize operations, and ICE will conduct further analysis before "construction to retrofit the facility for housing detainees" occurs. *See* DeGregorio Decl. ¶ 10. In other words, before Plaintiffs' extreme calculations could ever materialize. Likewise, the impacts on traffic and public health that Plaintiffs speculate about stem from operating the detention center in the future and not the current development. *See* Pls. Br. 17-18. And Plaintiffs incorrectly assume that ICE will install fencing on undeveloped land within the conservation easement. *See id.* at 16-17. No such plan was made or authorized by the REC. *See* Ex. 1 at 8 ("Planned modifications, including perimeter fencing . . . will occur within the existing facility footprint or adjacent areas that have already been disturbed").

Further, deprivation of a procedural right alone does not establish injury; Plaintiffs must show a "concrete interest that is affected by the deprivation' of the

8 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

claimed right.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Plaintiffs' alleged procedural harm appears to be tied to their concerns about the water and sewer systems, the nearby conservation easement, and potential increase of air pollution and traffic. *See* Pls. Br. 20-21. But these concerns stem from the operation of the Roxbury Property—not the retrofit alone. And ICE will prepare an EA before construction to retrofit the facility for housing detainees begins. DeGregorio Decl. ¶ 10. Without imminent injury resulting from Plaintiffs' purported procedural harm, Plaintiffs lack standing. The Court need not consider any of the *Winter* factors because it lacks jurisdiction to address Plaintiffs' claims.

## II. Plaintiffs fail to establish a likelihood of success on the merits of their NEPA and ICA claims.

Plaintiffs move for a preliminary injunction based on their NEPA and ICA claims but not the INA claim. Plaintiffs have not demonstrated they are likely to succeed on the merits of these purely procedural statutes.

### A. Defendants complied with NEPA's procedural mandates.

Plaintiffs fail to establish a likelihood of success on their NEPA claim because the Roxbury Property is categorically excluded from further NEPA review, which DHS documented in its REC, Ex. 1.

9 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). It "is a procedural cross-check, not a substantive roadblock." *Seven Cnty.*, 605 U.S. at 173. A federal agency satisfies NEPA through (1) an environmental impact statement (EIS) if the agency determines the action will have significant environmental impacts, (2) an environmental assessment (EA) to assess whether the action will have significant environmental impacts, or (3) a categorical exclusion (CE) for types of actions that an agency has determined do not significantly affect the environment. *See* 42 U.S.C. § 4336(b)(1)-(2). Actions covered by CEs do not require an EA or EIS unless extraordinary circumstances exist. 42 U.S.C. § 4336e(1).

"Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 330 (D.N.J. 2025). "[T]he entire point of categorical exclusions is to reduce the administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th

Cir. 2023). Thus, "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002).

During a NEPA review, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 182-83 (emphasizing deference owed to agency in deciding "how far to go in considering indirect environmental effects from the project at hand").

Here, DHS reasonably exercised its discretion in documenting the three CEs that the Roxbury Property falls under and assessing the potential environmental effects. The Agency began its multi-step process by preparing or commissioning several reports to determine the "property's overall development potential," among other things. *See* DeGregorio Decl. ¶ 13; *Environmental Site Assessment*, Jan. 7, 2026 (excerpt attached as Exhibit 3) at 11. DHS then determined three different CEs would apply to separate components of the Project. *See* Ex. 1 at 2-3. DHS applied the CE for real estate activities, though unnecessary because "the mere acquisition of land" by a federal agency "does not implicate NEPA's requirements," *City of*

*Crossgate v. U.S. Dep't of Veterans Affs.*, 526 F. Supp. 3d 239, 259 (W.D. Ky. 2021). The Repair & Maintenance Activities CE, which the DHS Instruction Manual refers to as "CATEX D1" (attached here as Exhibit 2), applies to the planned minor renovations at the Roxbury Property. *See* Ex. 1 (REC) at 2-3. And any new construction, installation, and demolition activities will be consistent with the prerequisites of "CATEX E2" because the Project (a) will be compatible with applicable planning and zoning standards and coastal management programs, (b) is in a developed area and previously-disturbed site, (c) will not substantially increase motor vehicles at the warehouse, (d) will involve construction consistent with existing nearby buildings, and (e) does not propose to exceed existing support infrastructure capacities. Ex. 2 (DHS Instruction Manual) at 65; Ex. 1 at 1 ("All construction activity will be temporary, localized, and confined to previously disturbed areas. No new building additions, footprint expansions, off site construction, or capacity related improvements are included in the Project.").

After identifying the CEs that apply to the Project, DHS analyzed several resources to ensure that no extraordinary circumstances exist. For example, "ICE has determined that the Proposed Action will have no effect on listed species or birds." Ex. 1 at 3-4. The REC notes that traffic and related noise "generated by the Project, including routine vehicle operation and occasional generator use, are not expected to exceed typical residential ambient noise and traffic sounds." *Id.* at 5.

12 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

And all required approvals and permits will be obtained.  *Id.* at 4; *see also id.* at 5 (concluding no extraordinary circumstances with regard to public health and safety). By implementing environmental control and management strategies in accordance with permitting requirements, DHS reasonably determined that no extraordinary circumstances exist.  *See City of Oberlin v. Fed. Energy Regul. Comm'n*, 937 F.3d 599, 610 (D.C. Cir. 2019) (compliance with another agency's standards sufficient to show no significant impact under NEPA); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020-22 (S.D. Cal. 2003) (same).

DHS reasonably determined the Project is categorically excluded, especially considering that the Project "consists of security, operational, and infrastructure improvements located entirely within previously developed and disturbed areas." Ex. 1 at 17.  Ground disturbing activities required for facility improvements will be minor such as "surface preparation for a perimeter security fence, exterior recreation court installation, light poles, and associated utility work."  *Id.* at 10.  The Project does *not* propose to increase the facility's design capacity, building footprint, expansion areas, offsite improvements, or new utility corridors. *Id.* at 13.  By relying on well documented CEs, DHS complied with NEPA.  *See e.g., Azzolina v. U.S. Postal Serv.*, 602 F. Supp. 859, 863-64 (D.N.J. 1985) (affirming agency's invocation of CE to construction of new post office).

Nonetheless, Plaintiffs assert that DHS should have prepared an EIS, but they fail to identify any potential significant impact on the environment that would result from DHS's planned retrofitting. *See* Pls. Br. 24 (referring to purported impacts on water and sewer systems, the nearby conservation easement, local traffic, and public resources). Instead, Plaintiffs focus on highly speculative and unrealistic chain of events stemming from operating the Roxbury Property as a detention facility. *Id.* at 14-18. But the REC does not authorize operations. *See* Ex. 1 at 1 ("ICE is proposing to *acquire and retrofit* an existing industrial facility . . . to serve as a Detention Processing Center." (emphasis added)). The REC authorizes the Roxbury Property to be "designed to accommodate 542 detainees," but ICE will prepare an EA before operations begin—that is, before water consumption or waste increases to the exceedances that Plaintiffs claim, *see id.* at 14-16, traffic volume and "strain" on public resources multiplies, *see id.* at 5-6, or any development on the conservation easement occurs, *see* DeGregorio Decl. ¶ 9. In fact, any activities within the easement area will first be coordinated with the State. *Id.*

Plaintiffs rely on these same operational impacts to argue that extraordinary circumstances exist precluding invocation of any CE. Pls. Br. 31. But ICE will prepare an EA before operations could possibly cause these impacts. *See* DeGregorio Decl. ¶ 10. Plaintiffs also argue that "the action" threatens a violation of a New Jersey property mandate and has the potential to significantly affect an

14 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

environmentally sensitive area and protected species. Pls. Br. 31-32. Plaintiffs base their argument entirely on Mr. Kane's incorrect assumption that the REC authorizes "installing fencing on currently undeveloped land or increasing the size of the parking lot," Kane Decl. ¶ 28; Pls. Br. 31-32 (relying on Kane Decl. ¶¶ 24-29, 34-36). The Court should therefore reject Plaintiffs' attempt to create extraordinary circumstances where none exist. *See e.g., BRRAM, Inc. v. Fed. Aviation Admin.*, 721 F. App'x 173, 177 (3d Cir. 2018) (affirming agency's application of CE and analysis of extraordinary circumstances).

That DHS has prepared an EA for other processing and detention facilities is of no moment because the Roxbury Property will have different and less environmental impacts than the six that Plaintiffs identify, which all consisted of constructing new buildings on undeveloped land, not retrofitting an existing improvement. *See* Pls. Br. 7-8. The Agency's decision to prepare an EA for these other facilities does not in itself create a policy or requirement for DHS to do so for all other processing and detention centers in all places. Environmental impacts are necessarily site-specific and so is an agency's analysis of extraordinary circumstances. Thus, Plaintiffs' reliance on instances where DHS prepared an EA is misplaced. *See* Pls. Br. 8 (listing other facilities with EAs), 31-32 (suggesting that a new detention center itself is an extraordinary circumstance warranting an EA). And for this same reason the Court need not consider Plaintiffs' passing reference

15 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

to the Bureau of Prisons' NEPA regulation, which requires an EIS for new construction only "if the impact upon the quality of the human environment is likely to be significant." 28 C.F.R. Pt. 61, App. A ¶ 8.

Similarly, the District of Maryland's recent decision in *Maryland v. Mullin*, No. 26-733-BAH, 2026 WL 1045503 (D. Md. Apr. 17, 2026), has significant flaws that should limit its application here for at least four reasons. First, the court in that case considered factors irrelevant to NEPA compliance such as the time it took the agency to prepare its NEPA analysis. *See* 2026 WL 1045503, at *1 ("what review was done appears to have proceeded at a rocket's pace"), *id.* at *5 ("just hours before Defendants purchased the Williamsport Warehouse, they completed a Record of Environmental Consideration"), *23 ("the Court has serious concerns about the timing of Defendants' decision-making"). Second, the court did not consider that merely acquiring real estate does not implicate NEPA obligations. Third, the court misinterpreted the DHS manual to apply a much broader meaning of the phrase "functional use" in the Repair and Maintenance CE. *Id.* at *24-25. Fourth, the court conflated the project's *construction* specifications, which do not include any capacity-related improvements, with the ultimate *operation* of the facility. *Id.* at *26 (suggesting that the REC contained inconsistencies about the planned retrofit); *see also* Ex. 1 (describing proposed action as "ICE proposes to acquire and retrofit" without expressly authorizing operation).

16 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

Finally, NEPA contains no disclosure requirement for the application of CEs, much less any *public* disclosure requirements. 42 U.S.C. § 4336(a)(2) (NEPA stating that an environmental document is not required if the proposed agency action is categorically excluded, with no mention of any public documentation or notice requirement); *Back Country Horseman of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (holding that an "agency had no obligation to formally document its decision" to apply a CE); *Earth Island Inst.*, 82 F. 4th at 636 ("Where agency action falls under a categorical exclusion, it need not comply with the requirements of an environmental impact statement or environmental assessment." (citation omitted)). Further, DHS did disclose important facts about its plans for the facility in consultation and historic preservation letters sent to Native tribes, various local historical trust organizations, and the County Planning and Zoning Board. *See* Ex. 1 at 13-17. The DHS NEPA instruction manual recommends preparing a REC for the application of CE E2, which DHS prepared, but the instruction manual contains no requirement that the REC be made public.

In short, DHS made factual determinations about the scope and intensity of impacts, and after applying agency expertise and data collection, concluded that the Project falls within three CEs and involves no extraordinary circumstances. These factual determinations and conclusions are entitled to substantial deference as the Supreme Court's *Seven County* decision recently reaffirmed. 605 U.S. at 183.

17 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

Plaintiffs have clearly set out to prevent DHS from operating any detention facility within New Jersey. But "[c]itizens may not enlist the federal courts, 'under the guise of judicial review' of agency compliance with NEPA, to delay or block agency projects" as Plaintiffs seek to do here. *Id.* at 192. Plaintiffs weaponize NEPA to block a project that they oppose for policy reasons. That is exactly the type of use of NEPA that *Seven County* admonishes. The Court should deny Plaintiffs' Motion for Preliminary Injunction.

### B. Defendants are complying with the ICA's requirement to consider local viewpoints.

Plaintiffs complain that DHS did not meaningfully consult with the State or Township before deciding to convert the Roxbury Property into an immigration detention and processing center. *See* Pls. Br. 33. But DHS will consider the local viewpoints "to the extent possible" before construction begins in accordance with the Intergovernmental Cooperation Act (ICA), 31 U.S.C. § 6506(c). The ICA and Executive Order 12372 require federal agencies to "consult" with local representatives "in connection with *certain* federal projects." *Azzolina*, 602 F. Supp. at 862 (emphasis added). Importantly, the "ICA does not require that a federal agency incorporate the views of local planning agencies," *Bergen Cnty. v. Dole*, 620 F. Supp. 1009, 1065 (D.N.J. 1985), *aff'd*, 800 F.2d 1130 (3d Cir. 1986); *see also Clinton Twp. v. U.S. Postal Serv.*, 638 F. Supp. 763, 767 (D.N.J. 1986) ("No

18 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

provision in the ICA expressly or implicitly vests local planning boards with the power to veto proposed federal construction projects.").

Fatal to Plaintiffs' claim, "neither the Act nor the Order requires a federal agency to begin consultations before the agency makes *any* commitment to a particular project or takes *any* steps towards carrying out such a project." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993). Thus, DHS was not required under the ICA to consult with the State or Township before acquiring the Roxbury Property, especially considering that "speed is important" to ICE's plans to accommodate the surge in illegal immigration. *Id.*; *see also* Byers Decl. ¶ 12. Rather, DHS has to consider "local viewpoints" during the "planning" stages of the retrofit, which is exactly what the REC states will happen. *Waltham*, 11 F.3d at 244-45 (distinguishing ICA's consultation requirements, which can be fulfilled *during* development, from NEPA's procedural requirements).

As required, DHS will consider local viewpoints. For example, DHS will coordinate with the local municipal sewer authority to confirm the system's ability to accommodate anticipated flows, a key concern of Plaintiffs. Ex. 1 at 6. Likewise, DHS will not perform ground disturbing activities within the easement area without first notifying the State. *See* DeGregorio Decl. ¶ 9. All coordination will take place before any construction begins. *See Id.* ¶ 11. In addition, DHS considered the State and Township's opposition to the detention center and met with "Roxbury officials"

19 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

in March.  Murphy Decl. ¶¶ 15-16, Dkt. No. 10-17.  Plaintiffs' reliance on *Rochester v. U.S. Postal Serv.*, 541 F.2d 967 (2d Cir. 1976), is therefore misplaced because the agency in that case had already begun construction with 18 percent completed and still had not considered local concerns.  541 F.2d at 977.  And Plaintiffs' comparison to the New Hampshire plans are of no moment for determining ICA compliance here just like DHS's preparation of EAs for other detention centers has no bearing on NEPA compliance for *this* facility.  *See* Pls. Br. 35; *supra* 15-16.  Plaintiffs are therefore not likely to succeed on their ICA claim.

### III.    Plaintiffs have not established irreparable harm.

The Court should deny Plaintiffs' Motion for Preliminary Injunction because Plaintiffs have not demonstrated "that irreparable injury is *likely* in the absence of an injunction" while the case is pending. *Winter*, 555 U.S. at 22; *Del. State Sportmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204-05 (3d Cir. 2024) ("[Plaintiffs] must show that, without a preliminary injunction, they will more likely than not suffer irreparable injury while proceedings are pending." (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). Preliminary injunctions are intended to preserve the relative positions of the parties, not prevent harm; and "[c]ourts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case." *Id.* at 201; *see also id.* at 200-01

(explaining that preliminary injunctions are not intended to "prevent" harm but to preserve the court's power to render a decision on the merits).

Here, Plaintiffs' alleged harms are neither certain nor immediate because they stem from their environmental concerns about operation of the facility. Pls. Br. 38. But ICE will not begin operations until completing an EA and approving such work. *See* DeGregorio Decl. ¶¶ 8-11. As Mr. DeGregorio explains, "ICE is still developing its plan for retrofitting the warehouse" and will prepare an EA to analyze the potential environmental effects before operations begin. *See id.* ¶ 10. Indeed, the District of Maryland recognized in a similar challenge recently that the State's "alleged harm flows from the potential for significant construction at the site" and "the facility's ultimate operation as a detention and processing center." *Maryland*, 2026 WL 1045503, at *32. The court noted that "some actions Defendants seek to engage in now do not immediately relate to the imminent environmental harm alleged include installing security cameras and security lighting, laying fiberoptic cable within the warehouse for a building alarm system, repairing the warehouse's existing HVAC system, repairing leaks in the roof and walls, installing communications wiring within the warehouse, and internal drywall demolition and installation." *Id.* The court therefore excluded these activities from its preliminary injunction, allowing DHS to proceed with certain work. *Id.* But in this case, only those limited types of activities would go forward while ICE prepares an EA and

issues a new decision as to the retrofitting and operations at the facility. DeGregorio Decl. ¶ 10. Thus, Plaintiffs cannot show immediate irreparable harm.

Plaintiffs also rely on *Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 545 (1987), to argue all alleged environmental harm is irreparable. But Plaintiffs ignore that the Supreme Court in that case held the Ninth Circuit erred because the alleged harm was not sufficiently likely. *Amoco Prod. Co.* 480 U.S. at 545 (holding "presumption" of irreparable environmental harm "contrary to traditional equitable principles" with no basis in law). As *Winter* made clear, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22. Plaintiffs have not made the requisite clear showing here.

Further, even if the Court could look to alleged harms stemming from operations of the facility, they would not support preliminary injunctive relief. Plaintiffs allege five prospective harms: "threats" to the water system, "threats" to the sewage system, potential impacts to its conservation easement, traffic impacts, and public health impacts. Pls. Br. 14-18. None is sufficiently likely for "extraordinary" preliminary injunctive relief because they merely speculate about "[r]isk of harm" insufficient to establish imminent irreparable harm. *Cont'l Grp.,*

*Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358 (3d Cir. 1980) (vacating preliminary injunction because district court improperly assessed the equities).

First, Plaintiffs argue that increased water demand from operation of the warehouse as a detention center will "strain" the water system based on an "assumed" occupancy of 1,500 detainees and 1,000 staff. Pls. Br. 14-15; Ingelido Decl. ¶¶ 21, 23, Dkt. No. 10-3 ("Assuming that is accurate. . . ."). But the REC anticipated 542 detainees, not 1,500, Ex. 1 at 13, cutting Plaintiffs' "assumed" water use by nearly two thirds. The Agency's decision indicates that potable water systems may need to be upgraded for increased capacity, *id.* at 6, and that ICE will comply with all applicable state and local regulations governing potable water. *Id.* at 5. Plaintiffs' theoretical "threats" to the water system are neither likely nor imminent.

Second, Plaintiffs raise concerns about the sewer system capacity, Pls. Br. 24, but again these are unfounded. As stated in ICE's decision, "[a]ll required utility approvals, permits, and connection authorizations would be obtained to confirm the system's ability to accommodate anticipated flows." Ex. 1 at 6. And "[f]inal confirmation of capacity and compliance would be completed through coordination with the local municipal sewer authority and would be subject to detailed engineering design and permitting." *Id.* Plaintiffs' concerns regarding the sewer system are premature.

23 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

Third, Plaintiffs argue that "[a]ny development that goes beyond the Warehouse's existing footprint would implicate the State's property interests in the area covered by [its conservation] easement." Pls. Br. 25. This concern is also not likely irreparable harm. The decision is clear, "[n]o new building additions, footprint expansions, off site construction, or capacity related improvements are included in the Project." Ex. 1 at 1. Further, the project does not introduce "new impervious surfaces beyond courts installed on existing asphalt," *id.* at 13, and thus Plaintiffs are incorrect in their assumption that the parking lot will be expanded. Plaintiffs argue that the installation of "piers and fence posts" will violate the conservation easement. Pls. Br. 17. But the placement of fence posts is not itself irreparable, and Plaintiffs' make no argument to the contrary. Further, ICE's decision demonstrates that it will replace the existing fence, *id.* at 1, which would not encroach on the easement. *Compare* Ex. 1 at 35, *with* Kane Decl., Dkt. No. 10-5 at 35.

Fourth, Plaintiffs argue that the project will increase traffic once the facility is in operation. Pls. Br. 17-18. The warehouse already accommodates 119 trailer truck parking and 299 regular parking spots, Compl. ¶ 78, and ICE concluded that "[t]he facility's operations are not anticipated to result in significant changes to traffic patterns or modes of transportation." Ex. 1 at 6. Plaintiffs argue that according to their own traffic study, traffic volume will increase five to seven times once the detention center is in operation. Pls. Br. 17. But the detention center will not be

24 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

operational immediately and, as discussed above, Plaintiffs' assumed occupancy is wrong by three-fold.

Fifth, Plaintiffs argue that conversion of the warehouse "will likely create public health and safety risks that strain" local resources, citing the declaration of J.J. Murphy. Pls. Br. 18. Mr. Murphy, however, stated only that the conversion "*could* exceed the Township's capacity to manage and contain serious crises." Murphy Decl. ¶ 31. Not only is this statement not certain or immediate harm, but it is not irreparable either. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." (citation omitted)).

Plaintiffs' alleged irreparable harm is not sufficiently likely, nor will it moot the case in the absence of an injunction. Accordingly, the Court should deny Plaintiffs' Motion for this extraordinary relief.

## IV.    The balance of equities favor the public interest in denying Plaintiffs' Motion.

When one party is a United States agency, the public interest and the agency's interest merge, and the public interest weighs in favor of the agency's decision. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 22-23; *Hope v. Warden York*

25 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

*Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (vacating orders granting emergency relief because district court failed to properly analyze the public interest factor); *see also Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 785 F. App'x 467, 469 (9th Cir. 2019) (finding that district court abused its discretion when it issued a preliminary injunction without paying "particular regard for the public consequences").

The Court may not "abandon a balance of harms analysis just because a potential environmental injury is at issue." *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overturned on other grounds*. Instead, the Court must be "sufficiently specific" and cannot "merely acknowled[e] that the public's interest is not served by the Government violating" the ICA or NEPA. *Hope*, 972 F.3d at 332; *Cont'l Grp.*, 614 F.2d at 357.

Here, the significant national interest in combatting unlawful immigration favors allowing ICE to continue taking the steps necessary to ultimately operate the Roxbury Property as a processing and detention center. *See* Byers Decl. ¶¶ 10-12 (explaining that the temporary detention center's use in detaining aliens operationally benefits ICE and furthers its immigration enforcement mission). Currently, DHS must carry out deportation orders for more than 350,000 people in New Jersey alone, and more than 10,000 of those orders are for individuals with criminal records. *Id*. ¶ 12; *see also* Murphy Decl. Ex. D (listing illegal aliens convicted of crimes such as murder, sex offenses, and terroristic activity); *Hope*, 972

26 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

F.3d at 332 ("individual criminal histories directly relate to the harm to the public"). An injunction delaying ICE's ability to provide detention space for these individuals is not in the public interest. *See* Pls.' Proposed Order, Dkt. No. 10-12 (proposing order that enjoins DHS from "taking any steps" to retrofit the Roxbury Property). This delay is more than a "slight inconvenience" to DHS's immigration enforcement. Pls. Br. 40 (quoting *Maryland*, 2026 WL 691507, at *6). It would mean that ICE may have to forgo arrest of dangerous criminals for lack of detention space. Byers Decl. ¶ 12; *see generally Nken*, 556 U.S. at 436 (recognizing the "public interest in prompt execution of removal orders").

ICE has an urgent need for detention space in New Jersey, as the only two other centers lack sufficient capacity to handle the New York City field office's docket of more than 1,000,000 cases. Byers Decl. ¶ 12. This lack of detention space requires ICE to move detainees to facilities in other states, likely farther away from where the individual was apprehended and therefore likely farther away from family and legal counsel. *See e.g.*, *Khalil v. President, United States*, 164 F.4th 259, 266 (3d Cir. 2026) (transferring detainee from New Jersey to Louisiana). In comparison to the speculative and distant future harms claimed by Plaintiffs, *see supra* 21, the public interest and balance of the equities favor denial of Plaintiffs' Motion.

V.    **If the Court enjoins activities, Plaintiffs are required to post a bond.**

Although Plaintiffs have not established that they are entitled to emergency relief, if DHS is enjoined from continuing activities at the Roxbury Property, the Court should require Plaintiffs to post a meaningful bond.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A court "commits reversible error when it fails to require the posting of a bond by the successful applicant for a preliminary injunction." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 (3d Cir. 1989).

Enjoining DHS from "taking any steps" to develop the Roxbury Property as Plaintiffs request, *see* Pls.' Proposed Order, would not only cause harm to the public interest described above, but also result in economic harm. Without the security measures to prevent vandalism like arson, DHS will bear the brunt of paying for what could end up being costly repairs. Byers Decl. ¶ 13. Preventing DHS from "taking any steps" as Plaintiffs request could also mean that minor repairs to fix leaks, for example, go unaddressed and cascade into larger, more expensive and problematic damage to repair later. The Court should order Plaintiffs to post a bond at least in an amount suitable to compensate for future damage to the property in

28 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

addition to the amount the Court deems appropriate to compensate for any harm to the public interest. *See e.g., Ethicon, Inc. v. Randall*, No. 2:20-cv-13524-BRM-JBC, 2021 WL 3144702, at *7 (D.N.J. July 26, 2021) (ordering plaintiffs to "post a bond in the amount of $565,500 for the preliminary injunction").

## CONCLUSION

Plaintiffs fail to demonstrate a need for the extraordinary relief that they request: preliminarily enjoin DHS from taking any steps to retrofit the Roxbury Property into an immigration detention and processing center. Plaintiffs lack standing to assert their NEPA and ICA claims. Plaintiffs have not shown a likelihood of success on the merits of any of their claims. Nor have Plaintiffs established that they will be irreparably harmed in the absence of a preliminary injunction. Finally, the balance of equities favors the public interest in allowing DHS to continue development of the Roxbury Property so that immigration removal orders can be promptly fulfilled. The Court should deny Plaintiffs' Motion.

Respectfully submitted this 23rd day of April 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*29 – Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*

/s/ Krystal-Rose Perez
KRYSTAL-ROSE PEREZ, Texas Bar No. 24105931
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 532-3266
krystal-rose.perez@usdoj.gov

*Attorney for Defendants*

30 – *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*