**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>　　　　　Defendants. | Hon. Jamel K. Semper, U.S.D.J.<br><br>Hon. James B. Clark, U.S.M.J.<br><br><br>Civil Action No.: 26-02884 |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY
Jeremy M. Feigenbaum
　*Solicitor General*
Shankar Duraiswamy
　*Deputy Solicitor General*
Naima Drecker-Waxman
Yael N. Fisher
Viviana M. Hanley
Kristen D. Heinzerling
Kristina L. Miles
Lauren E. Van Driesen
　*Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
Shankar.Duraiswamy@njoag.gov
(862) 350-5800

*Attorneys for the State of New Jersey*

**MURPHY MCKEON, PC**
901 Route 23 2nd Floor
Pompton Plains, New Jersey 07444
(973) 835-0100
jbryce@murphymckeonlaw.com

*Attorneys for the Township of Roxbury*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................1

ARGUMENT.............................................................................................3

   I.   PLAINTIFFS HAVE STANDING.................................................3

   II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................5

      A.  DHS Violated NEPA. ....................................................5

      B.  DHS Violated The ICA...................................................10

   III.   THE EQUITIES COMPEL PRELIMINARY RELIEF. ..........................11

   IV.   NO BOND OR ONLY A NOMINAL BOND IS APPROPRIATE...........15

CONCLUSION.........................................................................................15

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Bordentown v. FERC,*
  903 F.3d 234 (3d. Cir. 2018) ................................................................6, 7

*Defs. of Wildlife v. USFWS,*
  539 F. Supp. 3d 543 (D.S.C. 2021) ...................................................15

*Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs,*
  685 F.3d 259 (3d Cir. 2012). .................................................................15

*Doe #1 v. Noem,*
  781 F.Supp.3d 246 (D.N.J. 2025)............................................ 12, 13, 15

*DSSA v. Del. Dep't of Safety & Homeland Sec.,*
  108 F.4th 194 (3d Cir. 2024) ......................................................... 12, 13

*Friends of the Inyo v. U.S. Forest Serv.,*
  103 F.4th 54 (9th Cir. 2024) ...................................................................8

*Maine v. USDA,*
  778 F. Supp. 3d 200 (D. Me. 2025)........................................................15

*Maryland v. Corp. for Nat'l & Cmty. Serv.,*
  785 F. Supp. 3d 68 (D. Md. 2025).........................................................15

*Maryland v. Mullin,*
  --- F. Supp. 3d ----, 2026 WL 1045503 (D. Md. Apr. 17, 2026) ................. *passim*

*Odebrecht Const., Inc. v Sec'y, Florida Dep't of Transp.,*
  715 F.3d 1268 (11th Cir. 2013) ............................................................12

*Pub. Emps. for Envtl. Responsibility v. NPS,*
  605 F. Supp. 3d 28 (D.D.C. 2022)...........................................................6

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
  826 F.3d 1030 (8th Cir. 2016).................................................................15

ii

*Rochester v. USPS*,
    541 F.2d 967 (2d Cir. 1976) ............................................................................ 10, 11

*Rodriguez v. Bostock*,
    802 F. Supp. 3d 1297 (W.D. Wash. 2025) .........................................................14

*Sampson v. Murray*,
    415 U.S. 61 (1974) .............................................................................................12

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991) ..............................................................................15

*Trenton Threatened Skies, Inc. v. FAA*,
    90 F.4th 122 (3d Cir. 2024) ...................................................................... 6, 7, 10

*Waltham v. USPS*,
    11 F.3d 235 (1st Cir. 1993) ...............................................................................11

**Statutes**

31 U.S.C. § 6506 ......................................................................................................10

## **<u>INTRODUCTION</u>**

This Court's intervention is needed to prevent DHS from continuing to march forward with its unlawful final decision to establish a detention facility at the Warehouse. While DHS's opposition brief promises for the first time to conduct an Environmental Assessment before finalizing facility operations, this Court must still act because DHS nevertheless intends to proceed with reconfiguring the Warehouse to make it "useful for ICE purposes" before that assessment concludes. That requires this Court to act now, rather than wait for the EA, to protect its power to grant full and effective final judgment. After all, if DHS proceeds as it imminently intends— demolishing walls and internally reconfiguring space to suit ICE's detention-center needs, meaning the site will no longer be situated to operate as a Warehouse—DHS's decision will become increasingly difficult to unwind. So too, if DHS invests even more time and money into constructing the detention facility, its *post hoc* assessment of environmental consequences and state and local consultations will prove an empty exercise. Those concerns, and the shifting nature of DHS's representations regarding its imminent steps, thus justify a narrow preliminary order from the Court—to permit DHS's security activities, but otherwise restrain implementation of its final decision to maintain a detention facility pending compliance with NEPA and the ICA.

DHS's arguments in response fail. DHS claims the State and Roxbury do not face imminent injury from DHS's rushed decision to establish a detention facility in

1

Roxbury because DHS has not finalized construction and operation plans. But Plaintiffs' declarations showed that regardless of operational details, a detention facility housing even a few hundred detainees would overburden local water and sewer systems. DHS does not dispute this. Nor does it disclaim intent to continue establishing a detention facility, despite these concerns, as quickly as possible. Indeed, that DHS would proceed with demolition and construction activities imminently and without waiting for a forthcoming EA proves the point. Absent this Court's intervention, DHS will keep marching toward establishing a detention center without proper legal compliance. And in the end, the Township, the State, and their residents suffer: any plausible detention facility will compromise Roxbury's ability to supply water to residents, put State-owned water at risk of pollution, and harm public health.

It is equally clear that the NEPA and ICA claims remain likely to succeed. As to NEPA, DHS attempts to splice the decision to establish a detention facility at this Warehouse into discrete sub-parts, some of which it says are subject to a categorical exclusion and some of which will supposedly unfold only after it conducts a now-promised EA. But NEPA requires the environmental consequences of related actions be considered in one unified analysis prior to undertaking those actions. And a *post hoc* EA that does not assess *whether* to establish a detention center at the Warehouse site—and just assesses *how* to do so, as DHS proposes—does not cure the problem. As to the ICA, DHS acknowledges that it must engage in state and local consultation,

2

but similarly says it may do so *post hoc*. But that procedural circumvention violates the ICA, just as it violates NEPA. DHS's decision to engage in further analysis is a welcome development. But the way DHS intends to handle the EA, without considering the actual decision to establish a detention center, does not cure its violations.

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING.

Plaintiffs have standing because establishing an immigration detention facility at the Warehouse site would work myriad harms to state and township resources, including damage to Roxbury's public infrastructure and pollution of State-owned water bodies. *See* ECF 10-1 (Pls. Br.) 18–21. DHS claims that these record-based harms are speculative or insufficiently "imminent," but focuses on uncertainties that do not actually affect whether these evidence-based harms would come to pass.

DHS emphasizes that its construction plans are not finalized, *see* ECF 26 (Dfs. Br.) 8, but that is irrelevant. However designed, operating a facility for detaining even a few hundred detainees—much less the 542 that DHS plans—would impose the harms to public infrastructure and natural resources detailed in Plaintiffs' declarations. The water system's capacity would be exceeded "even if the facility had no staff and only 323 detainees," ECF 10-3 (Ingelido Decl.) ¶26—resulting in unreliable water supply and risking contamination, *id*. ¶¶9, 31. And for the sewer system, "no additional flow through any of [4 pipes downstream of the Warehouse] could be

3

approved consistent with NJDEP design standards," meaning the facility necessarily will increase risk of sewage overflows. ECF 10-2 (Ferriero Decl.) ¶17. Nor could on-site sewer improvements address the issue, *see* ECF 26-3, Record of Environmental Consideration (REC) at 1, because these limitations stem from pipes downstream from the Warehouse. *See* Ferriero Decl. ¶¶16–17. DHS does not actually grapple with any of this contrary record evidence. Its promise that it might only have 542 detainees instead of 1,000+ is thus of no moment.

Similarly, although DHS emphasizes its intent to undertake further planning about *how* to operate the facility, Dfs. Br. 8–9, it never denies that the agency already made the final decision to have the facility. Indeed, DHS insists that it must "tak[e] the steps necessary to ultimately operate the Roxbury Property as a processing and detention center." Dfs. Br. 26. And to that end, DHS is planning imminently to demolish and reconfigure internal office space to "make [the Warehouse] useful for ICE's purposes"—confirming the agency's commitment to establishing a detention facility, notwithstanding its promises of an EA before undertaking other construction. ECF 26-1 (DeGregorio Decl.) ¶¶9–10.[1] Yet the preliminary record evidence

---

[1] Notably, DHS has made inconsistent representations about its intended actions. When negotiating a briefing schedule, DHS represented it would not begin *any* construction activity until a contract was awarded. Decl. of Naima Drecker-Waxman, Ex. 1. Now, DHS will commence demolition—separate from the steps needed to secure the facility, to "serve [ICE's] needs," *i.e.*, detention—before a contract. ECF 26-2 (Byers Decl.) ¶¶12–14. Given these inconsistencies, this Court should not

shows the only outcome that would avoid demonstrated harms to Plaintiffs would be abandoning the facility altogether.

In short, Plaintiffs suffered injury-in-fact at the moment DHS finally decided to establish a detention facility at the Warehouse site. Pls. Br. 18–21. And Plaintiffs continue to suffer such injury with each additional step DHS takes to implement this decision—steps DHS will take despite its promise of an eventual EA. Only a court order that enjoins further steps until DHS completes the required review and consultations to see whether to establish the detention facility in Roxbury—and not merely how best to manage it—can redress the State's and Roxbury's injuries.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    DHS Violated NEPA.

Plaintiffs are likely to succeed because DHS failed to take a "hard look" at the environmental consequences before deciding to establish a detention facility at the Warehouse—a decision consummated when it expended millions to acquire the site. *See* Pls. Br. 22–33. Although DHS's sole purpose for acquiring the property was to operate a detention center, it argues that it could acquire the property for that purpose and then, months later, conduct an EA analyzing the impact of detention operations. NEPA forbids such segmentation. Because acquisition of the property had no utility

---

deny Plaintiffs' motion based on DHS's representations unless and until Plaintiffs have an opportunity to take testimony from DHS witnesses at a deposition or hearing—to determine which steps DHS will take if this Court awards no narrow relief.

independent of the plan to establish a detention facility, DHS violated NEPA when it purchased the property without first analyzing the environmental impacts.

"An agency violates NEPA when it considers ... related actions separately." *Trenton Threatened Skies, Inc. v. FAA*, 90 F.4th 122, 135 (3d Cir. 2024) (cleaned up). Actions are related if they lack "independent utility" from each other. *Id*. Requiring agencies to scrutinize environmental consequences of related actions together ensures that the agency "address[es] the true scope and impact" of the proposal. *Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018). This "mandated unified review" is designed to prevent an agency from proceeding with any significant step toward its goal without having analyzed the consequences of the whole action. *Id*. After all, "NEPA is not just a box that must be checked at some point in an agency process." *Pub. Emps. for Envtl. Responsibility v. NPS*, 605 F. Supp. 3d 28, 59–60 (D.D.C. 2022). Rather, its required "hard look" must occur when a project is proposed and before "committing resources." *Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 269 (3d Cir. 2012). Analyzing environmental impacts piecemeal as the project proceeds and after resources have been committed is inconsistent with the statute. *See Bordentown*, 903 F.3d at 248.

That impermissible approach to NEPA is precisely what DHS has taken here. Without question, it purchased the Warehouse solely to establish a detention facility at that site. Indeed, in its own REC, DHS defined the project it approved as a

6

"propos[al] to acquire and retrofit an existing industrial facility … *to serve as a Detention Processing Center.*" REC 1 (emphasis added). DHS's evidentiary submissions confirm it acquired the property for no other purpose. *See, e.g.*, ECF 26-2 (Byers Decl.) ¶12 (DHS intends to "use [the Warehouse]" as "detention space"); Dfs. Br. 26; DeGregorio Decl. ¶9 (explaining that, prior to any EA, DHS will take steps to "make [the Warehouse] useful for ICE purposes"). Nor does DHS even attempt to argue that acquisition was unrelated to its plan for a detention facility there or has any "utility" for it "independent" of that plan. *Trenton*, 90 F.4th at 135.

Accordingly, DHS's plan to acquire the Warehouse property and to ultimately operate a detention facility at that site forms one project made up of "related actions." *Id.* And the environmental consequences of "related actions" must be analyzed in a "unified review." *Bordentown*, 903 F.3d at 248; *see Maryland v. Mullin*, --- F. Supp. 3d ----, 2026 WL 1045503, at \*25 (D. Md. Apr. 17, 2026) (in parallel warehouse litigation, rejecting DHS efforts to "piecemeal their proposed action" and analyze environmental impacts of each piece in isolation). Yet, by its own concession, DHS did not analyze the environmental consequences of establishing this detention facility. Dfs. Br. 4. DHS thus failed to conduct NEPA's "mandated unified review." *Bordentown*, 903 F.3d at 248. Although DHS argues "the REC does not authorize operations," Dfs. Br. 14, that is the issue: NEPA does not permit a piecemeal analysis of a proposed action. *Trenton*, 90 F.4th at 135; *Bordentown*, 903 F.3d at 248.

Defendants' invocation of categorical exclusions (CEs) from the DHS Manual does not remedy this defect. As the manual acknowledges, the "entire action" must "clearly fit[] within one or more [CEs]"; "[i]t is not appropriate to segment a proposed action or connected actions … into smaller parts to avoid a more extensive evaluation of … environmental impacts under NEPA." ECF 26-4 (DHS Manual) V-5; *see Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 556–57 (9th Cir. 2024) (rejecting agency's "patchwork application of CEs" to segmented portions of project as this would "swallow the protections of NEPA" since "[a]ny project can be broken down into seemingly innocuous independent acts").

None of the CEs DHS invokes encompasses its entire "propos[al] to acquire and retrofit an existing industrial facility … to serve as a Detention Processing Center." REC 1; *see* Pls. Br. 27–30. For example, exclusions C1 and D1 apply solely if there is no change in "functional use of the property"; there is no plausible argument that converting this industrial warehouse into a 542-bed detention center is anything other than such a change. *See Maryland*, 2026 WL 1045503, at *25 (noting such an argument "strains credulity"). C1 also does not apply as the Warehouse is "within or adjacent to environmentally sensitive areas." REC 2–3. Indeed, the REC acknowledges the presence of wetlands and protected species at the site. S*ee id.* at 8, 87–94. Likewise, E2 is inapplicable because the resulting structure will violate local zoning, "exceed existing support infrastructure capacities," and substantially increase local

8

traffic. *See* REC 3; Pls. Br. 29–30. And even if these CEs encompassed DHS's entire plan, application would be barred by extraordinary circumstances, *see* Pls. Br. 30–32: a detention center would, at a minimum, have "potentially significant effect[s] on public health and safety," DHS Manual V-6, since it would, among other harms, exceed local water and sewer capacity—risking contamination in the potable water supply and sewage overflows in the streets—and worsen traffic on an already hazardous stretch of roadway, *see infra* at 11–14; Pls. Br. 14–18.[2]

DHS does not even attempt to argue that these CEs properly encompass its entire plan for the Warehouse, from property acquisition through facility operation. The agency's only response is that facility operations need not be considered at this time. But as explained above, that is wrong because acquisition and retrofitting have no utility independent of eventual operations. *See supra* at 6–8. This Court should thus reject DHS's argument that it need not have prepared an EA or EIS prior to purchasing the Warehouse property, just as the District of Maryland did. *See Maryland*, 2026 WL 1045503, at *24–27. And while DHS faults that court for assessing whether the CEs encompass "the ultimate *operation* of the facility," rather than its acquisition, repair and maintenance, and construction activities in isolation, Dfs. Br.

---

[2] Although the REC asserts, without any factual support, that there will not be potentially significant impacts on public health or safety because "operations will comply with all applicable" regulations on water and wastewater, REC 5, Plaintiffs' submissions establish such compliance does not appear possible, consistent with DHS's intended use of the Warehouse. *See* Ferriero Decl. ¶17; Ingelido Decl. ¶26.

9

16, the refusal to "consider[] ... related actions separately" is not merely correct but compelled by Third Circuit precedent. *Trenton*, 90 F.4th at 135; *see Maryland*, 2026 WL 1045503, at *25.[3]

### B.    DHS Violated The ICA.

DHS is wrong that the ICA allows state and local consultation to occur after a property is purchased for development, with millions already invested. The ICA's purpose is to avoid the "delays, cost overruns," and tensions that accompany selecting a site for federal development absent consultation. Pls. Br. 9. Consultation only after an agency decides where to locate a development *and buys the relevant property* violates the directive that agencies consult with states and localities to make "reasoned choices" about "appropriate land uses." 31 U.S.C. § 6506(b)(1). Proceeding with demolition activities aimed solely at enabling ICE's intended use of the Warehouse, all while consultation remains lacking, exacerbates the problem.

DHS's responses to the caselaw fall short. DHS fails to distinguish *Rochester v. USPS*, 541 F.2d 967 (2d Cir. 1976). True, those plaintiffs did not sue until construction was underway, but that was not why they prevailed. Instead, the Second Circuit considered that delay improper, *id.* at 977, and held that an ICA violation occurred as soon as the agency "finally determined … without informing … the

---

[3] DHS also criticizes the court's interpretation of "functional use" without suggesting any alternative interpretation or engaging with the court's extensive reasoning on this point. *Compare* Dfs. Br. 16 *with Maryland*, 2026 WL 1045503, at *24–25.

10

City" as to the "site for the new facility." *Id.* at 972, 976. That is exactly what has happened here. And DHS's reliance on *Waltham v. USPS*, 11 F.3d 235 (1st Cir. 1993), is misplaced. Far from supporting DHS's view that the ICA does not require consultation before an agency purchases a property, Dfs. Br. 25, *Waltham* simply rejected the argument that consultation had to occur prior to "[p]ublication of [an] environmental assessment," 11 F.3d at 244–45. Further, that *Waltham* considered consultation adequate when the agency met with local officials six times *before* buying the property is irrelevant, *id.*; here, there was no consultation before DHS spent $129 million to purchase the Warehouse solely to establish a detention center.

## III. THE EQUITIES COMPEL PRELIMINARY RELIEF.

Without disputing that Plaintiffs' environmental and infrastructure harms are irreparable, DHS argues that they are not "certain []or immediate," Dfs. Br. 21—but this argument ignores Plaintiffs' detailed factual submissions and DHS's own commitment to establishing a detention facility at this site as soon as possible.

DHS has done nothing to undermine Plaintiffs' evidence that operating a detention facility at the site likely will harm Plaintiffs. The record evidence shows that *any* additional wastewater flow via the conveyance system downstream of the Warehouse would worsen existing capacity deficits, Ferriero Decl. ¶17, and that providing water to the Warehouse would exceed the system's capacity "even if the facility had no staff and only 323 detainees," Ingelido Decl. ¶26. So, housing 542 detainees

11

rather than 1,000+ will not avoid the harms. Nor will DHS's claimed intention to seek permits or update the Warehouse's water and sewer infrastructure, *see* Dfs. Br. 29–30, resolve the deficits, because these are physical limitations of Roxbury's water system and sewer pipes. *See* Ferriero Decl. ¶¶16–17; Ingelido Decl. ¶¶25–26.[4]

Plaintiffs "likely" will suffer these irreparable harms "while [these] proceedings are pending" notwithstanding that DHS intends to conduct further environmental analysis before proceeding with certain construction activities. *DSSA v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024); *see, e.g.*, *Doe #1 v. Noem*, 781 F.Supp.3d 246, 265–68 (D.N.J. 2025); *Maryland*, 2026 WL 1045503, at *27–32. Critically, DHS does not suggest that it will forgo establishing a detention facility at this site based on the outcome of that analysis. Instead, it has already invested $129 million in locating a detention facility here, ECF 10-11 (Van

---

[4] DHS also fails to rebut the showings that the facility will cause other harms. Plaintiffs' traffic impact study depends not on a particular number of detainees, but on industry standards for comparing vehicle trips generated by a warehouse to those by an adult detention facility. *See* Ferriero Decl., Ex. A, Table 3. DHS provides no basis for asserting the operations would not impact traffic. *See* REC 6. These harms will be compounded by air pollution emitted by a large capacity generator DHS will install, *see* REC 1; ECF 10-10 (Steitz Decl.) ¶¶9–11, 18, and the significant strain on Roxbury's health and law-enforcement services, Murphy Decl. ¶¶31–34. In denying these harms as irreparable, Defendants quote incompletely from *Sampson v. Murray*, 415 U.S. 61 (1974), but that case merely acknowledged that expending "money, time and energy" is not irreparable when later compensation is available. *Id.* at 90. DHS does not explain how Roxbury would be compensated for these harms, given the Federal Government's sovereign immunity. *See Odebrecht Const., Inc. v. Sec'y, Florida Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Driesen Decl.) 42, and plans imminently to "demolish[]" the Warehouse's interior walls and "reconfigure" the building "to make it useful for ICE purposes," all before the EA concludes. DeGregorio Decl. ¶9; *see* Byers Decl. ¶¶12–14; Dfs. Br. 19, 26 (insisting "speed is important to ICE's plans" and that even temporarily enjoining such steps would impede its ability to increase bed space); ECF 10-7 (Murphy Decl.) ¶16 (DHS's representations that it will commence operations within months). Given DHS's commitment to pressing forward with its plan to establish a detention facility at this site, regardless of the EA, that promised further analysis is cold comfort.

Moreover, allowing DHS to plow forward toward the creation of a detention center—including by demolishing the Warehouse's interior—requires urgent action even before the EA concludes. For one, permitting DHS to imminently reconfigure the Warehouse's interior just because it promises to later analyze environmental consequences of its operations would undermine this Court's "ability to render a meaningful [final] judgment." *DSSA*, 108 F.4th at 201; *see Doe #1*, 781 F.Supp.3d at 260 (explaining *DSSA* allows courts to issue relief to preserve the status quo until a final judgment can issue). Once the interior is reconfigured, it will be costly and impractical to restore the status quo ante. For another, any further environmental assessment and state/local consultations concerning whether to establish the partially-constructed detention facility would be meaningless. And finally, at minimum, given the inconsistency in DHS's representations about the steps it will imminently take,

13

*see supra* at 4 n.1 (noting DOJ had denied pre-contract construction, but DHS represents internal reconfiguration would occur), this Court should not deny relief based on those representations without allowing Plaintiffs to depose or cross-examine DHS's declarants on these issues.[5]

Finally, the balance of harms and public interest favor Plaintiffs. An injunction will serve the public interest by protecting Roxbury's water and sewer systems, infrastructure, and environmental health; ensuring public participation in the environmental review process; and avoiding wasteful spending. Pls. Br. 38–39. Although DHS invokes its interest in immigration enforcement, pointing to outstanding removal orders, it does not claim an injunction would prevent it from carrying out these orders, only that housing detainees elsewhere is less convenient. Dfs. Br. 26–27. But DHS's decision to stand down on a similar facility in New Hampshire, *see* Pls. Br. 40, confirms it can flexibly meet operational needs. And though DHS suggests "ICE *may* have to forgo arrest of dangerous criminals for lack of detention space," Dfs. Br. 27, it does not substantiate this speculation, nor claim to have ever had to release a dangerous individual for lack of bed space, even though DHS has never before had access to this Warehouse. That makes sense: most recent ICE detainees—many of whom have been held in violation of court orders, *see Rodriguez*

---

[5] To be sure, if DHS were willing to defer any construction activity until after completion of an EA, Plaintiffs would be willing to defer consideration of their preliminary injunction motion until then as well.

14

*v. Bostock*, 802 F. Supp. 3d 1297, 1303–04 & n.3 (W.D. Wash. 2025)—have no criminal record. *Cf.* Byers Decl. ¶12 (under 4% of individuals ordered removed have criminal records). In any event, even DHS recognizes it can engage in an EA before most of the construction without harming its immigration enforcement interest; there is no basis for DHS to uniquely claim internal demolition must happen first.

## IV.    NO BOND OR ONLY A NOMINAL BOND IS APPROPRIATE.

Finally, the Court should require at most a nominal bond. Courts deny bond requests if a plaintiff seeks to "enforce important federal rights or 'public interests,' arising 'out of comprehensive federal health and welfare statutes.'" *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991); *see also Doe #1*, 781 F. Supp. 3d at 270. NEPA cases commonly involve waived or nominal bonds. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016); *Defs. of Wildlife v. USFWS*, 539 F. Supp. 3d 543, 560–61 (D.S.C. 2021) ($1,000 bond). Disputes between States and the Federal Government are particularly apt for requiring no bonds or nominal ones, ensuring low costs when "enjoin[ing] unlawful agency actions in public interest litigation." *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 125–26 (D. Md. 2025); *see also Maine v. USDA*, 778 F. Supp. 3d 200, 238 (D. Me. 2025) ($1,000 bond).

## CONCLUSION

This Court should grant the motion for a preliminary injunction.

Date: May 5, 2026

Respectfully Submitted,

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ *Naima Drecker-Waxman*
Naima Drecker-Waxman

16

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 5, 2026, I electronically filed this Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction and accompanying papers, with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.


Dated:        May 5, 2026                 */s/ Naima Drecker-Waxman*
                                          Naima Drecker-Waxman

17