**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY and TOWNSHIP OF ROXBURY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | Hon. Jamel K. Semper, U.S.D.J.<br><br>Hon. James B. Clark, U.S.M.J.<br><br>Civil Action No.: 26-02884 |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE COURT'S MAY 12 ORDER


**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY
Sundeep Iyer
*Solicitor General*
Shankar Duraiswamy
*Deputy Solicitor General*
Naima Drecker-Waxman
Yael N. Fisher
Nathaniel Rubin
Angela Xiao
*Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
Shankar.Duraiswamy@njoag.gov
(862) 350-5800

*Attorneys for the State of New Jersey*

**MURPHY MCKEON, PC**
901 Route 23 2nd Floor
Pompton Plains, New Jersey 07444
(973) 835-0100
jbryce@murphymckeonlaw.com

*Attorneys for the Township of Roxbury*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........ 1
BACKGROUND ........ 3
A. This Litigation And The May 12 Order. ........ 3
B. Defendants' November 2026 Contract To Convert The Warehouse. ........ 6
ARGUMENT ........ 9
I. Defendants Violated the Court's May 12 Order. ........ 10
II. The Court Should Grant Plaintiffs Relief To Ensure That Defendants Comply With The May 12 Order. ........ 17
CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*Acosta v. Paragon Contractors Corp.*,
884 F.3d 1225 (10th Cir. 2018) .......... 17

*Delaware Dep't of Nat. Res. & Env't. Control v. U.S. Army Corps of Eng'rs*,
685 F.3d 259 (3d Cir. 2012) .......... 1, 12, 15

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) .......... 12

*Harris v. City of Philadelphia*,
47 F.3d 1311 (3d Cir. 1995) .......... 10

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025) .......... 18

*In re Nexstar-Tegna Merger Litig.*,
No. 2:26-CV-00976, 2026 WL 2273005 (E.D. Cal. Aug. 6, 2026) .......... 19

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) .......... 17

*Marshak v. Treadwell*,
595 F.3d 478 (3d Cir. 2009) .......... 9, 17

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .......... 19

*New York v. Noem*,
812 F. Supp. 3d 321 (S.D.N.Y 2025) .......... 18

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*,
605 F. Supp. 3d 28 (D.D.C. 2022) .......... 15

*Quinter v. Volkswagen of Am.*,
676 F.2d 969 (3d Cir. 1982) ........ 9

*Roe v. Operation Rescue*,
54 F.3d 133 (3d Cir. 1995) ........ 9

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ........ 10

*Shillitani v. United States*,
384 U.S. 364 (1966) ........ 9

**Other Authorities**

2 U.S. Gov't Accountability Off.,
Principles of Federal Appropriations Law at 7-59-60 (3d ed.) ........ 18

Jasmine Garsd, *ICE Has Quietly Used This Warehouse As a Detention Facility All Summer, Neighbors Say*, NPR (Oct. 8, 2026, 6:13 AM) https://www.npr.org/2026/10/08/nx-s1-5983441/ice-warehouses-new-jersey-roxbury (updated Oct. 13, 2026, 7:29 PM) ........ 6

## INTRODUCTION

Six months ago, this Court entered an Order barring Defendants from undertaking any activities at the Roxbury warehouse site to convert it into an immigration detention center until the completion of an initial environmental assessment, a final agency decision based on that assessment, and an opportunity for Plaintiffs to challenge any such decision. ECF 36 (the "May 12 Order"). That Order served a vital purpose. It sought to ensure that Defendants' environmental assessment would take a genuine "hard look" at the local impacts of a detention facility—and grapple with its damaging effects on local sewer and water systems, the environmental injuries it would cause, and the harms to public health it would inflict—"before committing resources" to the project. *Delaware Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 269 (3d Cir. 2012). Not only did Defendants agree to abide by this Court's Order, but they then told the Court that they were reassessing whether to pursue a detention center in Roxbury at all. And they twice assured the Court—in July, and again in September—that they had not yet decided whether to pursue the warehouse conversion and had no timetable for making that decision.

In what has become a recurring pattern in this case, those representations were inaccurate. Despite telling the Court in a sworn declaration that they would not begin the contracting process for converting the facility without first conducting an environmental assessment, Defendants quietly solicited bids on constructing a detention center in August, received at least one such bid in early September, and then—two days after the midterm elections—awarded a $1 billion contract to renovate the warehouse into a detention center. It was only when Plaintiffs asked Defendants about a public report

regarding this contract that Defendants acknowledged for the first time that they intend to retain the Roxbury facility and renovate it for detention purposes. And when Defendants finally produced that contract to Plaintiffs, it revealed that Defendants have already obligated tens of millions of dollars in federal funding for the purpose of converting the warehouse into a detention center.

Defendants' issuance of the contract violates the May 12 Order in at least two ways. *First*, as Defendants have conceded, the contract expressly authorizes them to approve interior construction and reconfiguration of office space for a detention center *before* environmental reviews are completed. And the contract itself makes clear that those activities are for the purpose of converting the warehouse into a detention center—in violation of the plain terms of the May 12 Order, which requires an environmental assessment to be completed first. *Second*, the contract preemptively commits $31 million to "Transition In" activities that include renovations to the facility and the delivery of detention beds. Defendants' own contract documents treat the outcome of the environmental assessment as a foregone conclusion—they expressly say this work will begin "once" (not if) a finding of no significant environmental impact is issued—and financially commit tens of millions of dollars to the work on that basis, all before Defendants have actually completed the requisite environmental assessment. That commitment of funding undermines the entire purpose of the environmental review process. And it runs afoul of the May 12 Order.

To remedy Defendants' breach, the Court should enforce its May 12 Order and enjoin Defendants from performing, or agreeing to perform, any work at the site for purposes of detention center conversion—including interior construction or any other

alterations. The Court should also direct Defendants to de-obligate any funds committed for work other than the preparation of facility designs, environmental review of those designs, and the narrow set of maintenance and site security tasks allowed by the May 12 Order. Finally, in light of Defendants' shifting representations and obfuscation of their activities in Roxbury, the Court should permit Plaintiffs to inspect the warehouse site to ensure compliance with the May 12 Order.

## BACKGROUND

### A. This Litigation And The May 12 Order

In December 2025, as part of its plan to run the Federal Government's deportation operations "like (Amazon) Prime, but with human beings," ECF 10-11, Ex. A, ICE purchased a vacant warehouse in Roxbury, New Jersey for use as an immigration detention center. ECF 10-11, Ex. H. In February 2026, ICE falsely denied to the public that it had purchased a facility in Roxbury. ECF 10-11, Ex. C. But two days later, DHS disclosed the truth and acknowledged the purchase. ECF 10-11, Ex. C, Ex. G. A few weeks later, Defendants notified the Township of Roxbury that they intended to renovate the warehouse and start operating it as a detention facility within 90 days. ECF 10-7 ¶¶15-16.

Given the severe impact this plan would have on local infrastructure, public health, and the environment, Plaintiffs promptly filed suit to challenge Defendants' decision. *See* ECF 1. Among other claims, Plaintiffs asserted that Defendants had failed to conduct the necessary environmental reviews under the National Environmental Policy Act (NEPA). *Id.* ¶¶152-62. NEPA generally requires federal agencies to conduct an Environmental Assessment (EA) before they decide to move forward with a major

federal action such as the construction of a detention center. *See id.* ¶¶17-31. If the EA finds that there are potentially significant environmental impacts, the agency must then issue a more detailed Environmental Impact Statement (EIS). *See id.* Only if an EA concludes with a finding of no significant impact (a so-called "FONSI") may the agency proceed without preparing an EIS. *See id.* ¶25. The purpose of these environmental reviews is to provide federal agencies with the information they need to decide whether to proceed with a major action. *See id.* ¶¶29-31. Because converting the Roxbury warehouse into a mass detention center would overwhelm local sewer and water infrastructure and inflict a range of related environmental and public health harms, Plaintiffs alleged that a properly completed EA and EIS should show that the warehouse is unsuitable as a site for a detention center. *See* ECF 10-1 at 14-18.

Plaintiffs moved for a preliminary injunction on this basis, seeking to block Defendants from converting the warehouse into a detention center until they completed the full range of required environmental reviews. *See id.* In response, Defendants stated for the first time that they would not be moving forward with the warehouse conversion until they undertook an EA. *See* Decl. of Andrew DeGregorio, ECF 26-1 ¶8. Specifically, Defendants represented in a sworn declaration that "ICE will complete the preparation of an EA before ICE issues a final decision" on constructing a detention facility and that "[o]nly after ICE issues a final decision will the process for contracting a vendor to perform construction begin." *Id.* ¶10.

Based on Defendants' representations that ICE would perform an EA before beginning the process for contracting a vendor or deciding whether to proceed with a detention center, Plaintiffs agreed to defer their pending preliminary injunction motion.

Instead, the parties agreed to, and the Court entered on May 12, 2026, an order to freeze the status quo. *See* ECF 36. The Order bars Defendants from "undertak[ing] any activities at the Roxbury Warehouse site for purposes of converting it into a detention center"—subject to certain limited exceptions—unless and until (i) Defendants conduct an EA and issue an agency decision document based on that EA; and (ii) Plaintiffs have an opportunity to review and challenge the EA's findings and agency decision document in a renewed motion for a preliminary injunction. *Id.* at 3-4. The limited exceptions are confined to certain maintenance services—such as "maintenance of HVAC operations and electrical services," "limited custodial services," and "lawncare and grounds maintenance"—and security activities. *Id.* at 4-5. The Order nowhere permits Defendants to undertake other kinds of maintenance, repair, renovation, or construction activities that are not enumerated within the carefully-crafted exceptions in the order.

In late June 2026, following a public report that ICE was abandoning its plan for a detention center in Roxbury, Defendants stated that they were in fact dropping their plan for the site. In a Joint Status Report, Defendants told the Court they "no longer intend to convert the Roxbury Warehouse into an immigration detention facility and intend to sell the warehouse." ECF 42.

Eleven days later, however, Defendants backtracked yet again. They notified the Court that, "upon reconsideration, the agency intends to move forward with plans to consider the retrofitting of the Roxbury Township warehouse facility for use as a detention facility." ECF 44. A week later, Defendants advised the Court that they were "continuing to assess whether to proceed with plans to convert the Roxbury Warehouse into a detention facility" and that "there [wa]s no timeline for reaching that decision."

ECF 45. Defendants then repeated this language in a status report they filed with the Court on September 15. ECF 50.[1]

### B. Defendants' November 2026 Contract To Convert The Warehouse

On November 6, Plaintiffs learned of a public report that Defendants had entered into a $31.8 million contract to convert the Roxbury warehouse into a detention center. *See* ECF 51 at 2. Defendants had not advised Plaintiffs or the Court about the development at the time they entered into the contract—much less at the time they solicited bids for that contract. When Plaintiffs asked Defendants about that report, Defendants finally acknowledged that they had in fact decided to pursue a detention facility in Roxbury. *See id.* In response to Plaintiffs' inquiry, Defendants stated through counsel that "money ha[d] been obligated for maintenance, design of ICE's preferred alternative, and the NEPA analysis of that design." *Id.* (quotation marks removed). Plaintiffs made a written request to Defendants for a copy of the contract to assess Defendants' compliance with the May 12 Order. *See id.* Eleven days later, Defendants

---

[1] In September, Plaintiffs learned of reports that ICE had been using the Roxbury warehouse in connection with immigration enforcement. *See* ECF 50. Plaintiffs raised these concerns with Defendants, who ultimately provided a written statement through counsel acknowledging that ICE had used the warehouse parking lot for processing of apprehended individuals two times in early September. *See* Exhibit A (Oct. 9, 2026 Email from K.R. Perez). Defendants represented that ICE officers had since been instructed not to use the parking lot during immigration enforcement operations. *Id.* In light of additional public reports and complaints to the Attorney General's Office that individuals had actually been held inside the warehouse, *see, e.g.,* Jasmine Garsd, *ICE Has Quietly Used This Warehouse As a Detention Facility All Summer, Neighbors Say*, NPR (Oct. 8, 2026, 6:13 AM) https://www.npr.org/2026/10/08/nx-s1-5983441/ice-warehouses-new-jersey-roxbury (updated Oct. 13, 2026, 7:29 PM), Plaintiffs asked Defendants to provide more information about how long and where the individuals were held. *See* Exhibit A (Oct. 23, 2026 Email from S. Duraiswamy). One month later, Defendants still have not responded to these questions.

produced two contract documents to the Plaintiffs and filed those documents with the Court: (i) a 20-page "Solicitation/Contract/Order" form for Task Order No. 70CDCR27FR0000002, ECF 56-2 (the "Task Order"), ECF 56-2, and (ii) a 158-page Performance Work Statement detailing the work referenced in the Task Order, ECF 56-3. Defendants also produced and filed a declaration from Sarah A. West, an ICE contracting officer, that purports to explain the Task Order and Performance Work Statement, ECF 56-1.

The Task Order states that the contract was awarded to SK2 LLC in response to an offer for "Roxbury, NJ" submitted on September 4, 2026, ECF 56-2 at 1—12 days before Defendants assured the Court that there was no timeline for deciding whether to consider constructing a detention center in Roxbury. Defendants have not produced the solicitation or the offer from SK2. But SAM.gov, a Federal Government website that summarizes federal contract awards, states that Defendants issued the underlying solicitation three weeks before that—on August 12, 2026. *See* Exhibit B. That solicitation was apparently issued without any notice to the Court or to Plaintiffs, and in contravention of Defendants' representation in a sworn declaration just months earlier that they would not begin the contracting process before completing an EA.

The Task Order contemplates a nearly $1 billion contract that covers an expansive range of activities for construction and operation of a detention center. The Task Order says on its face that it was "issued ... to obtain design and renovation of existing, ICE-owned permanent structures to serve as processing and detention facilities for US ICE, delivery of comprehensive detention operations and wraparound services, and

delivery of facility and grounds maintenance." ECF 56-2 at 2. The "total value" of this work is identified in the Task Order as approximately $998 million. *Id.* at 3.

Of this amount, the Task Order immediately obligates more than $31 million for two contract line items: (1) $650,000 to line item 0009, titled "[]NEPA[] Compliance"; and (2) $31,127,231 to line item 0010, for a 120-day "Transition In." ECF 56-2 at 6-7. The Performance Work Statement appended to the Task Order provides additional details regarding the contractor's obligations for each line item. Under a section titled "Transition-In," the Performance Work Statement directs the contractor to "[s]ubmit all design documents" to the Federal Government "no later than 30 calendar days post award"—that is, by December 5. ECF 56-3 at 14 (emphasis removed). The same section expressly authorizes Defendants to approve certain interior construction activities "while environmental review is ongoing." *Id.* at 15. And, "[o]nce the [Finding of No Significant Impact] is issued," the contractor must complete all other "required renovations necessary to begin intake no later than 120 days from [that] issuance." *Id.*; *see also id.* at 23. This section of the Performance Work Statement also requires delivery of beds and prescribes how that delivery should occur. *See id.* at 15. As for NEPA Compliance, the Performance Work Statement indicates that NEPA documents "must be prepared under an expedited timeline," whereby the draft EA is due within 15 days of the Federal Government's approval of the 50% design and the final EA is due within 15 days of approval of the 90% design. *Id.* at 23.

The West declaration submitted by Defendants confirms that the "Transition In" work for which ICE has committed more than $31 million is "not optional." ECF 56-1 ¶5. The declaration characterizes this work as being "for maintenance and repair

of the facility for four months and design of ICE's proposed action for some level of detention capacity at the facility as well as other uses, such as training and office space." *Id.* But nothing in the "Transition In" section of the Performance Work Statement refers to "maintenance and repair." ECF 56-3 at 14-16. And the declaration does not specify the types of "maintenance and repair" activities that are contemplated or whether they fall within the limited set of permissible activities set forth in paragraph 4 of the May 12 Order.

## ARGUMENT

This Court should grant Plaintiffs' motion to enforce the May 12 Order. "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see Quinter v. Volkswagen of Am.*, 676 F.2d 969, 971-72, 974 (3d Cir. 1982) (affirming district court's grant of a motion to "Show Cause for Adjudication of Civil Contempt" for party's "alleged failure ... to comply with the district court's Protective Order"). A "party is liable for civil contempt" when: (1) "a valid order of the court existed"; (2) the party "had knowledge of the order; and (3) the party "disobeyed the order." *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir. 1995) (quotation marks removed); *see also Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009) (same standard). "[C]lear and convincing evidence" establishes each of those elements here. *Roe*, 54 F.3d at 137.

As a threshold matter, there can be no serious dispute as to the first two elements: the May 12 Order is a valid order of the Court, and Defendants had knowledge of it. Once entered by a court, a stipulated order is "subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378

(1992) (explaining that "an agreement" between parties that is "reflected in ... a judicial decree"—such as a consent decree or stipulated order—is judicially enforceable); *see also Harris v. City of Philadelphia*, 47 F.3d 1311, 1327 (3d Cir. 1995) (one party to a stipulated court order cannot "unilaterally default on its obligations to the court and other litigants"). And Defendants have repeatedly referenced the Order and vowed to comply with it. *See*, *e.g.*, ECF 45 at 1 (Defendants stating in a joint status report dated July 17, 2026 that "[i]f Defendants decide to proceed with the use of the facility for detention, they will do so in accordance with the process set forth in the [May 12] Order staying adjudication of Plaintiffs' motion for preliminary injunction, ECF No. 36").

That leaves only the question of whether the Defendants have violated the May 12 Order. Taking their contract documents at face value, they have.

## I. Defendants Violated the Court's May 12 Order

Defendants' issuance of the Task Order violates the Court's May 12 Order. That Order bars Defendants from undertaking "any activities at the Roxbury Warehouse site for purposes of converting it into a detention center," except for certain enumerated site maintenance and security activities, prior to the completion of an EA and issuance of an agency decision document. *See* ECF 36 at 3-4. As Defendants acknowledge, the Task Order financially commits Defendants to two specific contractor tasks. It authorizes activities for NEPA Compliance, which pays the contractor $650,000—about two percent of the total amount obligated to date, and less than 0.1% of the total value of the contract—to undertake environmental reviews. But it also authorizes activities under the telling label of "Transition In," ECF 56-2 at 7, which pays the contractor approximately $31 million for activities to transition the warehouse facility into a detention

center capable of "intak[ing]" the "first tranche of aliens" to be detained at the Roxbury Warehouse. ECF 56-3 at 15. Plaintiffs do not challenge Defendants' right to contract for environmental reviews or the preparation of facility designs that are necessary for such reviews. But Plaintiffs do challenge the obligation of $31 million for "Transition In" activities extending far beyond that—to physical construction and renovation tasks that violate the May 12 Order.

Defendants' issuance of the Task Order violates the May 12 Order in at least two respects. *First*, the "Transition In" line item expressly provides that Defendants can direct the contractor to begin "interior construction or reconfiguration of administrative and office space *while environmental review is ongoing*." ECF 56-3 at 15 (emphasis added). Those construction activities are plainly "for purposes of converting [the Roxbury warehouse] into a detention center" within the meaning of the May 12 Order. ECF 36 at 4. To begin, the Task Order is clear that all the work it authorizes is for "design and renovation of" the Roxbury warehouse "to serve as [a] processing and detention facilit[y]." ECF 56-2 at 2; *see also* ECF 56-3 at 9. Moreover, the Performance Work Statement confirms that "office space" at the facility is intended for detention support activities "as outlined in the ICE Contract Detention Facility Design Standards, this [Performance Work Statement] and the [ICE National Detention Standards]." ECF 56-3 at 40. Indeed, the very phrase "Transition In" contemplates that the warehouse site will be transitioned into a detention facility—so the inclusion of "administrative and office space" under that label bespeaks Defendants' reason for administrative and office space construction. The May 12 Order plainly bars such work before an EA is completed. And for good reason. Interior construction prior to an EA makes it costly and

impractical to restore the status quo ante, undermining the Court's "ability to render a meaningful judgment" should the Plaintiffs renew their Preliminary Injunction Motion. *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 201 (3d Cir. 2024) (quotation marks removed). Interior construction prior to an EA also undermines the very purpose of the EA itself—to ensure Defendants carefully evaluate the local impact of a detention center "*before* committing resources." *Delaware Dep't of Nat. Res.*, 685 F.3d at 269 (emphasis added).

Defendants mistakenly assert that the Task Order complies with this Court's May 12 Order because "Plaintiffs cannot cite to any approval to begin interior construction." ECF 61. But the West declaration Defendants submitted expressly acknowledges that the Performance Work Statement authorizes Defendants to "grant approval" for interior construction work "while environmental review is ongoing." ECF 56-1 ¶8. Defendants have thus asserted authority to undertake such construction at the Roxbury warehouse—even though the May 12 Order denies them that authority. Tellingly, Defendants have failed to disclaim any intent to approve interior construction. Nor have they stated that they will inform the Court or Plaintiffs in the event they decide to approve interior construction—and there are good reasons, in light of Defendants' troubling lack of complete candor throughout this litigation, to doubt that they would.[2]

*Second*, before Defendants have completed an EA, the "Transition In" line item has obligated $31 million in funds for initial renovations and preparations for housing

---

[2] Of course, the Performance Work Statement does not permit "interior and infrastructure renovations *for housing aliens*" until an EA is done. ECF 56-3 at 15 (emphasis added). But undertaking interior construction and reconfiguration of *office and administrative space* to convert the warehouse into a detention facility no less violates this Court's Order.

detainees. The "Transition In" section of the Performance Work Statement expressly directs the contractor to "complete all required renovations necessary to begin alien intake," and it describes with specificity the requirements for delivering beds. ECF 56-3 at 15; *see also id.* at 23 ("The vendor is required to complete all necessary reviews/assessments and all required renovations within the 120-day delivery timeline referenced in Section: Transition-In."). So Defendants' contract documents financially commit them—*prior* to completion of the EA—to undertaking activities to convert the warehouse into a detention center. That contractual commitment violates the May 12 Order's bar on initiating such activities prior to completing an EA. Indeed, it is directly contrary to Defendants' prior sworn representations to this Court—which were the predicate for this Court's May 12 Order in the first place—that they would not "begin" the "process for contracting a vendor to perform construction" until after conducting environmental reviews and issuing a final agency decision. ECF 26-1 ¶10. In truth, Defendants began the contracting process for construction of a detention center by issuing a solicitation in August, even as they were telling the Court they had not yet decided whether to pursue a detention center. But Defendants have now gone even further by contractually committing $31 million to that work—without the required EA.

The specific work contemplated under the "Transition In" label underscores why the commitment of $31 million to that work now violates this Court's Order. The West declaration asserts that "Transition In" work does not actually cover renovations, but only design of a detention center and "maintenance and repair of the facility for four months." ECF 56-1 ¶5. That representation is inconsistent with the plain language of the Performance Work Statement, which expressly describes the "Transition In"

activities as involving "renovations" and says nothing about "maintenance and repair." *See* ECF 56-3 at 14-15. But even if the "Transition In" phase involved only "maintenance and repair," as Defendants contend, the amount obligated for this work indicates that it goes far beyond the enumerated activities permitted by the May 12 Order. Indeed, it is difficult to fathom why a few months of basic maintenance and repair work—assuming that such work is limited to the enumerated items allowed by the May 12 Order—would cost more than $31 million. The Task Order's separate line items for "Facility Operations and Maintenance" underscore this point. These tasks, which cover full operation of a detention center, are priced at $1.39 million per month. *See* ECF 56-2 at 4, 7, 9, 11, 13; *see also* 56-3 at 11 (describing the work contemplated by the "Facility Operations and Maintenance" line items). If "operations and maintenance" of a fully-operational detention center would cost less than $7 million over four months, it could not possibly cost more than $31 million to maintain an empty warehouse over the next four months—unless, of course, Defendants are taking steps beyond those contemplated by the May 12 Order in order to convert the facility it into a detention center. Nor can the magnitude of the financial commitment be explained by the cost of preparing a design for a detention center, especially since that design must be based off a sample floor plan provided by Defendants and must be concluded within a month of the contract award. *See* ECF 56-3 at 13-14.[3]

[3] In addition, any maintenance and repair performed prior to the publication of an EA must be limited to the enumerated actions in the May 12 Order. So the declaration is inconsistent with the Court's Order to the extent it describes any other activities.

This violation of the Order is highly consequential because it undermines Plaintiffs' rights to a fair environmental review process. The Performance Work Statement presupposes the outcome of an EA, stating that the contractor shall complete the renovations "[o]nce the FONSI is issued." ECF 56-3 at 15.[4] And based on that assumption, it commits without qualification to $31 million of work. But "NEPA is not just a box that must be checked at some point in an agency process." *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 59-60 (D.D.C. 2022). Rather, its required "hard look" must occur when a project is proposed and "*before* committing resources." *Delaware Dep't of Nat. Res.*, 685 F.3d at 269 (emphasis added). That is why the May 12 Order is so important: by freezing the status quo and limiting Defendants' ability to plow ahead with building a detention center, it sought to avoid an EA process that was mere window dressing for a final decision that had already been made. Defendants' evasion of that Order directly undermines the very rights NEPA was designed to protect.

Defendants insist without explanation that Plaintiffs "misunderstand[]" the nature of contract costs, ECF 61 at 1, but Plaintiffs are simply taking the contractual language at face value. Those documents say that (i) Defendants have committed more than $31 million to "Transition In" activities; (ii) "Transition In" activities contemplate renovations and delivery of beds; and (iii) "Transition In" activities for an empty warehouse far exceed the monthly costs contemplated for maintenance of a fully operational detention center.

---

[4] This assumption is not surprising given that the same contractor that has been tasked with performing the EA has been promised a billion-dollar contract if the EA concludes with a finding of no significant impact. Defendants have barely concealed their treatment of the EA has a meaningless formality.

Moreover, given Defendants' history of inconsistent and shifting representations, they are hardly due the benefit of the Court's doubt. In February, Defendants falsely announced that they had not purchased a facility in Roxbury. In April, after Plaintiffs filed their preliminary injunction motion, Defendants told the Court that they would not begin the contracting process for construction of a detention center at least until issuance of an EA and then a final agency decision—but then solicited offers in August and received a bid in early September, all without a word to the Court or to Plaintiffs. After telling the Court in late June that they were selling the warehouse, they admitted two weeks later that this was incorrect. And while they then insisted that they had no timetable for deciding whether to pursue the idea of a detention center in Roxbury, they were actively soliciting and receiving bids for such work. On top of that, Defendants have continually hid the ball regarding their activities at the warehouse: speeding ahead with purchase of the property and plans for a detention center without consulting State and local officials, as required by law, *see* ECF 10-1 at 11-14; failing to disclose that Defendants were using the warehouse site for immigrant processing, and then ultimately ceasing such operations only after they were disclosed in public reporting and Plaintiffs sought additional information, *see supra* at 6 n.1; and advising that they had in fact decided to pursue a detention center only after Plaintiffs discovered a public report about the November 5 contract, *see supra* at 6-7.

In light of Defendants' repeated obfuscation and misdirection, there is little reason to take their assertions at face value, particularly when they appear to conflict with the plain language of their contract documents. This Court should enforce its May 12 Order and hold that Plaintiffs have violated that Order. And at a minimum, the Court

should require Defendants to present appropriate witnesses for examination under oath to further probe Defendants' compliance with the May 12 Order, and it should permit Plaintiffs to periodically inspect the warehouse site to assess what work is being done and ensure that Defendants comply with the May 12 Order.

## II. The Court Should Grant Plaintiffs Relief To Ensure That Defendants Comply With The May 12 Order

Plaintiffs respectfully request that the Court enforce the May 12 Order by awarding Plaintiffs appropriate injunctive relief. This Court may employ its broad equitable powers to fashion a remedy for civil contempt "to coerce the defendant into compliance with the court's order." *Marshak*, 595 F.3d at 494 (quotation marks removed); *see also In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017) (explaining that a district court "can take any reasonable action to secure compliance" with its prior orders based on its broad "equitable powers" (alterations and quotation marks removed)); *see also Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1238 (10th Cir. 2018) (similar).

Here, the Court should find that Defendants violated the May 12 Order when it awarded Task Order No. 70CDCR27FR0000002. And on that basis, the Court should issue an order that explicitly enjoins Defendants and their contractors from engaging in, approving, agreeing to undertake, or awarding or obligating any funds to support any of the following activities at the warehouse site until Defendants complete an initial EA and Plaintiffs have an opportunity to challenge the EA and any subsequent agency decisions, pursuant to the May 12 Order: (i) any interior construction or reconfiguration of administrative and office space; (ii) any physical renovation, reconfiguration, or other physical alteration of the buildings at the warehouse site; and (iii) any maintenance and

repair activities at the warehouse site beyond those specifically set forth in paragraph 4 of the May 12 Order. Consistent with Plaintiffs' proposed order accompanying this motion, the Court's injunctive relief can be carefully crafted to permit Defendants to engage in activities for the purpose of conducting the required environmental reviews or preparing the facility designs that are necessary for such reviews.

In addition, the Court should direct Defendants to de-obligate funds awarded in Task Order No. 70CDCR27FR0000002 for activities other than NEPA compliance, preparation of facility designs necessary for NEPA compliance, and the site security and maintenance activities enumerated in the May 12 Order. That relief is well within this Court's power to grant, as other recent cases involving DHS confirm. *See*, *e.g.*, *New York v. Noem*, 812 F. Supp. 3d 321, 338 (S.D.N.Y 2025) (ordering DHS to "de-obligate" certain funds that it was not authorized to obligate); *Illinois v. Noem*, 813 F. Supp. 3d 282, 295, 300 (D.R.I. 2025) (noting that the United States "confirmed compliance" with order to "de-obligate" certain funds)*; see also* 2 U.S. Gov't Accountability Off., Principles of Federal Appropriations Law at 7-59-60 (3d ed.) (recognizing that the Federal Government may de-obligate still-undisbursed funds "for a variety of reasons," including where the "[i]nitial obligation [is] determined to be invalid").

Finally, to ensure that Defendants continue to comply with the May 12 Order, the Court should order Defendants to grant Plaintiffs, on reasonable notice, access to the warehouse site to inspect the premises. Given Defendants' questionable candor in this litigation over the past year, there are good reasons to doubt that Defendants will be forthcoming about their plans and ongoing work at the warehouse site. Ordering such compliance-monitoring protocols is well within the Court's authority, particularly

where a party has a history of inaccurate representations. *See Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (finding injunctive provisions that allowed the court to monitor compliance with its order justified, in part by defendants' "history of noncompliance with prior orders" (quotation marks removed)); *In re Nexstar-Tegna Merger Litig.*, No. 2:26-CV-00976, 2026 WL 2273005, at *7 (E.D. Cal. Aug. 6, 2026) (finding "ongoing compliance monitoring" was "warranted … to ensure adherence to the [court's prior order], particularly in light of Defendants' lack of candor"). Plaintiffs' request for inspection access is eminently reasonable in light of the circumstances and is necessary to enable the parties to promptly identify and address any compliance disputes.

## CONCLUSION

This Court should grant the motion to enforce and order the relief requested by Plaintiffs.

Respectfully Submitted,

Date: November 23, 2026

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: *<u>/s/ Naima Drecker-Waxman</u>*
Naima Drecker-Waxman

## CERTIFICATE OF SERVICE

I certify that on November 23, 2026, I electronically filed this Memorandum of Law in Support of Plaintiffs' Motion to Enforce and accompanying papers, with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

Dated: November 23, 2026

*<u>/s/ Naima Drecker-Waxman</u>*
Naima Drecker-Waxman